IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| KIMBERLY D. BRANTLEY, ADMINISTRATRIX OF THE ESTATE OF BENJAMIN BRANTLEY, DECEASED | § § § § | Civil Action No. 3:16-CV-352DPM |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| UPS GROUND FREIGHT, INC.; OPTIMUM STAFFING, INC. d/b/a OPTIMUM LOGISTIC SOLUTIONS; ROBERT L. WOODALL and JOHN DOES 1-6 | § § § § § | |
| | § | |
| Defendants | § | |

## OSI AND WOODALL'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION IN LIMINE/DAUBERT REGARDING TESTIMONY OF BARRY GRANT

Come now Separate Defendants Optimum Staffing, Inc. ("OSI") and its employee, Separate Defendant Robert L. Woodall ("Woodall"), and for their Motion in Limine/Daubert Regarding Testimony of Barry Grant, state that the Plaintiff should be prohibited from introducing evidence, and her counsel should be prohibited from arguing or implying in questions to witnesses, regarding the matters contained herein.

## I.   INTRODUCTION.

Plaintiff's proposed expert Barry Grant, a Michigan CPA, seeks to offer opinions on damages in this wrongful death action. For the sake of brevity, Defendants incorporate the Daubert Memorandum of Co-Defendant UPS. In

42976.0001/6911332.1

addition, however, Defendants argue as contained herein. Grant offers essentially two main opinions concerning (1) a loss of financial earnings of the Decedent Ben Brantley and the company he worked for IES; and (2) loss of services to Brantley's surviving spouse and daughters.

Grant calculates what he calls the loss of financial contribution to the surviving spouse and daughters, but fails to adequately lay a foundation or basis for the amount contributed by Brantley.  Grant describes the loss of "financial contribution" as follows:

### 1.7 LOSS OF FINANCIAL CONTRIBUTION, AT FUTURE VALUE, PAGE 4 AND PAGE 5

**Loss of financial contribution, at future value, is the element of the measure of damages of Mr. Brantley's gross earnings**, rental income, employee benefits, Social Security income, and ownership income that **would have been available** for him to support his spouse and minor child.

The **gross** financial contribution is reduced for the Medicare tax and Mr. Brantley's personal consumption.

The damage table calculated and presented on page 4 **is the loss of financial contribution**, computed at future value, based on Mr. Brantley's and the Company's historical income.

The damage table calculated and presented on page 5 **is the loss of financial contribution**, computed at future value, based on the Company's earnings growing/Mr. Brantley's earnings growing.

(Grant Second Report, p. 18 (emphasis added), attached to the Motion as Exhibit 1)[hereinafter "Second Report"].  In 1.8, Grant describes that the "Loss of Financial Contribution Gross Earnings" as being "the element of damages of

42976.0001/6911332.1

the gross wages and bonuses Mr. Brantley **would have earned to support** his spouse and minor child." (Second Report, p. 19 (emphasis added)).    Grant makes the following assumptions:

- that April 10, 2016 through June 30, 2017, Brantley made a base amount representing approximately $13.00 per hour.    (Second Report, p. 7).

- That on June 30, 2017, Ronnie Brantley, the father of the decedent and majority owner of IES, would have retired and gave the entirety of IES to Ben Brantley.    (Grant Second Dep., 66:17—67:01); (Second Report, p. 7).

- That from June 30, 2017 through April 29, 2027, Ben Brantley would receive salary of $100,000 plus 50% of all profits up to $50,000 and 100% of all profits after $50,000.    (Second Report, p. 7; p.32).

- That from April 30, 2027 (which is the date of Ronnie Brantley's statistical life expectancy as assumed by Grant) Ben Brantley will own 100% of IES. (Second Report, p. 7).

- That Ben Brantley would work until he was 75 years old because his wife stated that Ben Brantley would "work forever." (Second Report, p. 7).

- That Ben Brantley would have spent 12.1 percent to keep himself alive. (Second Report, pp.33—39).

42976.0001/6911332.1

In addition to these assumptions, Grant assumes two alternative scenarios regarding the future value of IES.  Scenario A is that IES grows at inflation until Ben Brantley's retirement at age 75 and is worth a future value of $492, 699.  (Grant Second Dep., 73:19-23, attached to the Motion as Exhibit 2).  Scenario B is that IES grows at five percent until Ben Brantley's retirement at age 75 and is worth a future value of $850,054.  (Grant Second Dep., 74:4—6).  Grant thus seeks to opine that the damage values are:

| ELEMENTS OF MEASURE OF DAMAGES AMI2261 WRONGFUL DEATH-DAMAGES | PAST PV | PECUNIARY INJURIES FUTURE PV | TOTAL PV |
|---|---|---|---|
| Loss of Financial Contribution: | | | |
| (A) Historical Adjusted Income-Page 4 | $323,504 | $3,933,065 | $4,256,569 |
| (B) Company Earnings Growth-Page 5 | $323,504 | $4,447,921 | $4,771,425 |
| (C) Loss of Services: | | | |
| To Spouse and Minor Child | $ 85,747 | $1,293,325 | $1,379,072 |
| To Adult Child/Children | 29,143 | 321,430 | 350,573 |
| Total Loss of Services | $114,890 | $1,614,755 | $1,729,645 |
| Damages (A) + (C) Page 2-Historical Adjusted Income: Past, Future, and Total Damages | $438,394 | $5,547,820 | $5,986,214 |
| Damages (B) + (C) Page 3-Company Earning Growth: Past, Future, and Total Damages | $438,394 | $6,062,676 | $6,501,070 |

(Second Report, p.1). Fatal to the calculation is that Grant does not calculate the contribution that would have made to the statutory beneficiaries.  Instead, he assumes that everything that Ben Brantley had (minus only what would keep Ben Brantley alive) would go 100% to the surviving spouse. Further, the assumptions underlying the calculation are entirely speculative and based upon the credibility of one witness, Ronnie Brantley, while ignoring evidence to the contrary.[1]

---

[1] Grant does also rely upon the spouse's testimony that Brantley would "work forever," and from that Grant assumes Brantley would work until age 75.

42976.0001/6911332.1

In addition, Grant calculates a loss of services number that he contends represents the statutory beneficiaries' loss. In his report, Grant spends roughly nine (9) pages discussing and opining as to these "lost" services and their alleged value. (Second Report, pp. 10-18.) Grant relies on a list of "services" received from Plaintiff with minimal explanation of the "services" actually at issue, and no estimate whatsoever of how often or to what extent such "services" were allegedly "lost." (*Id.*; *see also* First Dep. of Barry Grant, pp. 93:22-94:1, 95:9-100:10, attached hereto as Exhibit 3.) Fatal to Grant's analysis is the lack of foundation, and lack of reliable evidence that any statutory beneficiary actually incurred a loss of service.

## II.   RULE 702 AND THE *DAUBERT* STANDARD

Federal Rule of Evidence 702 controls and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. With its holding in *Daubert,* the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526

42976.0001/6911332.1

U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Under the framework developed in *Daubert,* trial courts must "'insure that proffered expert testimony is both relevant and reliable.'" *Anderson v. Raymond Corp.,* 340 F.3d 520, 523 (8th Cir.2003) (quoting *Dancy v. Hyster Co.,* 127 F.3d 649, 652 (8th Cir.1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 316 (1998)).

The burden is on the party offering the expert testimony to prove by a preponderance of the evidence that: (a) the expert is actually qualified to render each of the opinions proffered; (b) that the expert's methodology underlying his conclusions is scientifically valid and that each opinion derived therefrom is reliable; and (c) that the reasoning or methodology was applied properly to the facts of the case. *See, e.g., United States v. Kehoe,* 310 F.3d 579, 593 (8th Cir.2002), *cert. denied,* 538 U.S. 1048, 123 S.Ct. 2112, 155 L.Ed.2d 1089 (2003); *Rice ex rel. Clark v. Union Pac. R. Co.,* No. 4:12-CV-00108-SWW, 2012 WL 1710906, at *4 (E.D. Ark. May 15, 2012.) The Daubert and Rule 702 Standard is discussed extensively in the UPS Memorandum of Law on the Grant Daubert Motion and incorporated herein for the sake of brevity.

As described below, Grant's opinions do not meet these standards and thus should be excluded.

### III.   ARGUMENT.

The damages available are defined by the Arkansas Wrongful Death Statute, A.C.A. Section 16-62-102.   *See also* AMI 2216 (defining the damages which can be recovered). Grant's opinions as to the damage evaluation are

inconsistent with the damages allowable in wrongful death actions. Accordingly, as set out below, his opinions should be excluded.

### A. GRANT'S OPINIONS ON THE DECEDENT'S FUTURE WAGE LOSS SHOULD BE EXCLUDED.

#### i. The Estate cannot recover for future wage loss.

The Estate cannot recover for future wage loss; instead, it can recover for "the value of any earnings, profits, salary, working time lost by the deceased person prior to his death." AMI 2216 (defining the damages which can be recovered). In this case, the decedent's death occurred at the time of the subject accident and there was no working time lost prior to death. All the loss would be considered future wage loss, not recoverable by the Estate.

#### ii. The Statutory Beneficiaries cannot recover for future wage loss. Rather, they can recover for the present value of that which Ben Brantley would have contributed to them. Grant fails to apply that standard.

Future wage loss is also not recoverable by the statutory beneficiaries. Rather, the statutory beneficiaries may recover the pecuniary injuries sustained. "The term 'pecuniary injuries' in a wrongful death action refers to the present value of benefits, including money, goods and services which the deceased would have contributed to the claimed beneficiaries had [the decedent] lived." *Lowe v. United States*, 662 F.Supp. 1089, 1094 (W.D.Ark. 1987). *See also Stahan v. Webb*, 231 Ark. 426, 439, 330 S.W.2d 291, 299 (Ark. 1959) ("damages should be based . . . on the present value of the amount that you find from a preponderance of the evidence deceased would have

42976.0001/6911332.1

contributed to the support and well-being of this wife during his lifetime."); AMI 2216 (defining pecuniary injuries and the relevant factors).

However, Grant does not apply a "would have contributed" standard. As he states in 1.7 of his Second Report, he believes that the "[l]oss of financial contribution, at future value, **is** the element of the measure of damages. . . ." (emphasis added). As noted above, that is not how Arkansas defines the element of the measure of damages. Further, Grant instead uses a standard of "would have been available for him to support his spouse and minor child." (Second Report, p. 19). These are two different standards—just because it would have been available does not mean that it would have been contributed. This failure in applying the correct standard renders the opinion fatal, as seen by Arkansas Supreme Court decisions remitting the damages awarded by juries not in compliance with the standard. *See Southern Nat'l Ins. Co. v. Williams,* 224 Ark. 938, 948, 277 S.W.2d 487, 494 (Ark. 1955) (remitting the amount of pecuniary damages awarded to statutory beneficiaries); *Missouri P.R. Co. v. Gilbert,* 106 Ark. 683, 686, 178 S.W.2d 73, 75 (Ark. 1944) (remitting the amount of pecuniary damages awarded to statutory beneficiaries).

### iii. Grant's methodology is unreliable and offers nothing more than speculation.

Grant fails to provide any information which would allow the Court to determine that his methodology is based in real-science, or real accounting principles. However, as explained in *Daubert,* every judicial body must act as a gatekeeper to insure that any and all expert testimony admitted satisfies the requirements of Rule 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509

U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993); *see also Wheeling Pittsburg Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-15 (8th Cir. 2001) ("when it comes to the admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility" and must ensure an expert's testimony rests on a reliable foundation and is relevant, *citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). Courts have recognized that a trial court must be convinced that jurors will be exposed to real science-based testimony. *See, e.g., Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996), *cert. den.*, 117 S. Ct. 73 (1996). Among other things, the court must determine if the expert's theory can be and has been tested; whether the theory has been subjected to peer review or publication; whether the theory has a known or potential rate of error; and, whether the theory is accepted generally in the area or profession. *Daubert*, 509 U.S. at 593-94.

As was explained above, Grant's calculation is to award all of his future lost earnings calculation to Plaintiff (surviving spouse) minus 12.1% personal consumption attributed to keeping Ben Brantley alive. He, however, fails to support his methodology as reliable. On its face, the methodology appears unreliable because it would mean that Brantley was contributing 87.9% of every dollar made to Plaintiff. Further, once the last minor daughter reached the age of majority, Grant awards the whole benefit of her now diminished contribution to Plaintiff. However, of course, Ben Brantley would have likely received some of that benefit back to himself, if not 50% of that amount.

Grant's methodology on the business valuation of IES (even if such a damage was allowable) is equally flawed.  Grant uses a base earning number of $66,590 and multiplies it times four.  (Grant Second, 106: 16—23).  Grant cannot point to a single peer-reviewed article that supports this methodology. (Grant Second, 107:1—25—108:1—7).  Grant did not do an audit of IES. (Grant Second, 108: 8—9).  He did not look at any of IES's monthly profit and loss statements. (Grant Second, 108: 10—12).  He did not research to determine IES's competitors or to see if IES would remain viable. (Grant Second, 108:13—19). Grant did not determine if there were any projects after 2016.  (Grant Second, 108: 20—25 109:1—3). He ignored actual negotiations Ronnie Brantley in attempting to sell IES.  (Grant Second, 115: 5-22).  He "computed . . . EBITDA, that's cash flow available to an investor." (Grant Second, 109: 4—7).  He also admittedly computed it incorrectly, overstating the interest used by $245,000.  (Grant Second, 109—114).

Because he cannot point to a single *Daubert*-surviving source that supports his methodology and because his own calculations are wrong, his method is unreliable. Nothing "requires a [trial court] to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). In other words, his opinions are mere speculation. Rule 702 requires that expert testimony be based upon "knowledge." Although exact certainty is not required, the term "knowledge" "does connote more than subjective belief or unsupported speculation." *Pillow v. GMC,* 184 F.R.D. 304, 306 (E.D. Mo. 1998). "Proposed

42976.0001/6911332.1

testimony must be supported by appropriate validation--*i.e.,* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. "Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 105 (8th Cir. 2000). *See also Weisgram v. Marley Co.*, 169 F.3d 514, 519 (8th Cir. 1999) (holding that the trial court abused its discretion by allowing expert speculation); *Jacuzzi Bros. v. Todd*, 316 Ark. 785, 791, 875 S.W. 2d 67 (1994) (holding that the trial court erred in allowing expert speculation). Because *ipse dixit* is all that Grant relies upon for this methodology, it should be rejected and his opinions excluded.

> **iv. Grant's opinions would not be helpful to the trier of fact because (a) he fails to apply the correct legal standard; (b) the evidence he relies upon for the future lost wages is unreliable.**

"[W]here, as here, the expert's analysis is unsupported by the record, exclusion of that analysis is proper, as it can offer no assistance to the jury." *Cole v. Homier Distrib. Co., Inc.,* 599 F.3d 856, 865 (8th Cir.2010) (finding the expert's report to be factually flawed where the expert was unaware of or disregarded certain facts); *see also Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

> **a. Grant fails to apply the correct legal standard.**

Grant's failure to apply the correct legal standard is not helpful to the trier of fact. They would serve only to confuse the jury into believing that the statutory beneficiaries were entitled to the entire amount of the future lost wages rather than only that amount which represents what Ben Brantley

would have contributed to each of the statutory beneficiaries. Further, Grant includes an opinion about the value of IES, a business. There is no allowance under the wrongful death statute for future loss to a business.

Without making these corrections, the jury is left with a false impression that the statutory beneficiaries are entitled to future wage loss, and damages to a business. Moreover, Grant uses gross numbers despite the fact gross numbers are not recoverable in a wrongful death action as the amounts going for taxes would never be available to contribute to the statutory beneficiaries. Yet, Grant does nothing to calculate the admissible net numbers.

The risk of misleading the jury into awarding damages unavailable to the statutory beneficiaries and deciding against the defendants on that "improper basis" is high. *Block v. R.H. Macy & Co.*, 712 F.2d 1241, 1245 (8th Cir. 1982). This testimony thus poses a severe risk of "unfair prejudice, confusion of the issues, or misleading the jury." *Firemen's Fund Ins. Co. v. Thien*, 63 F.3d 754 (8th Cir. 1995) (citing Fed. R. Evid. 403). Any probative value is thus substantially outweighed by the danger of unfair prejudice pursuant to Fed. R. Evid. 403, and such testimony should be excluded.

Further, these opinions lack the "fit" required to be helpful to the jury. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. The Supreme Court has indicated it will strictly enforce the "fit" requirement. *See General Electric Co. v. Joiner*, 522 U.S. 136, 141-45, 118 S.Ct. 512, 139 L.Ed. 2d 508 (1997). That "fit" is missing here.

42976.0001/6911332.1

**b.**   **Grant's evidence for future lost wages is unreliable.**

The foundation for Grant's opinions as to future lost wages and the value of IES both rest on the shoulders of Ronnie Brantley. (Grant Second, pp. 60:12-61:17; 118:25-120:23; 225:1-16) (also discussed in the UPS Memorandum of Law). Thus, Grant makes an improper credibility opinion about the testimony of Ronnie Brantley.

"Credibility, however, is for the jury," and courts have routinely excluded "expert" testimony on other witness' credibility for lack of relevance under Rule 401 and because it will not assist the trier of fact as required by Rule 702. *See, e.g., United States v. Azure*, 801 F.2d 336, 340 (8th Cir. 1986) (reversing and remanding verdict where expert's testimony concerning the credibility of a witness was improperly admitted and finding that the admission of such testimony was not harmless); *Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006) ("An expert may not opine on another witness's credibility."). It is for the jury to determine whether Ronnie Brantley's self-serving and subjective beliefs are credible and "reasonable," and Grant's opinions as to the future earning capacity of Ben Brantley, resting upon his improper credibility opinions, should be excluded.

Further, in making this credibility determination, Grant ignores other relevant facts to the analysis, discounting them as not important. As illustrations,

- He never read Carole Brantley's deposition, so he had no idea of her testimony that IES was "not thriving" at the time of the Decedent's death, or that "once the Arkansas job was gone, then we didn't have all- everything going on." (Dep. Carole

Brantley, pp. 36:3-14, portions of which are attached to the Motion as Exhibit 4.) Grant instead openly speculates that even if that were true, and despite the fact that he never did "a complete workup" on this issue, "that [didn't] mean that there isn't going to be another major project in two more years, three more years." (First Dep. Grant, pp. 214:25-216:5.)

- He never read Plaintiff Kimberly Brantley's deposition other than a single page (page 163), so he had no idea the real nature of the Decedent's job or his multiple pre-existing health conditions and the toll they took on him as part of his "very physical job." (Grant Expert Report, p. 1; *but see* Ex. 5, Deposition of Kimberly Brantley, pp. 59:19-68:13 (discussing Benjamin Brantley's multiple health problems, including medication dependent diabetes, shoulder and knee issues, diverticulitis, and prostate cancer).

- He never read or considered the testimony of Roger Ingley, IES's long-time CPA and tax preparer, and therefore had no idea about the prior valuations given for IES or the conflicts between Ronnie Brantley's statements concerning Benjamin Brantley's stock ownership. (*See, e.g.* Ex. 6 Deposition of Roger Ingley, pp. 11:16-14:3, 15:23-16:25, 17:19-22:23, 27:19-31:14, 33:12-15, 34:12-35:3, 39:17-41:25, 53:6-17.)

- He had never seen Dr. Kush's life expectancy report. (Grant Second, 52:1—2). Dr. Kush, an expert for Defendants, opines that Mr. Brantley had a life expectancy of 21.5 years rather than 25 years as opined by Grant. (Grant Second, 52:7—12). When asked if he could rebut Dr. Kush's opinion, Grant responded, "I have no opinion." (Grant Second, 12). Kush admits that the specific limitations upon Brantley with regards to life expectancy are outside his expertise. (Grant Second, 51:21—24). Accordingly, he should not be opining in the first place given he admits that he is not an expert in life expectancy issues.

- While opining that IES would have an "actual growth rate of 2.5 percent each year, every year, between 2019 and 2041," Grant nevertheless admits he has no idea what IES's business model was, how the business worked, how IES got its customers, who its competitors were, what specific services the company provided, or even whether IES was still competitive in its chosen market at the time Benjamin Brantley died. (Grant First Dep., pp. 201:15-203:23.)

42976.0001/6911332.1

- That neither Ben Brantley nor Ronnie Brantley had ever reported to the IRS that they had made $100,000 base salary plus a bonus.  (See Report, p. 19).

The issue goes beyond a simple cross-examination issue; it goes to the foundation and reliability of the opinion, factors required by *Daubert* and Rule 702.

"An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported: If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate. Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case." *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 415-417 (8th Cir. 2005) (*citing Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (citations and footnote omitted)).

Grant's failure to consider all facts and the speculative nature of the damages he opines is further problematic because "it is essential to prove the earning power of the decedent at the time of the accident at death." *See Missouri P.R. Co. v. Gilbert*, 106 Ark. 683, 686, 178 S.W.2d 73, 75 (Ark. 1944). It cannot be speculative.  In *Missouri P.R. Co. v. Gilbert*, the Arkansas Supreme Court remitted the pecuniary damages awarded to the statutory beneficiaries in part because of the speculative nature of the employment evidence relied upon. The Court explained,

> In view of the fact that the deceased had been employed on the air port [sic] job for only five weeks, and such employment was of a temporary nature, it would appear that this employment, and the compensation paid therefor, considered alone would not be a proper test to furnish a fair and general measure of his earning capacity.

*Id.* at 688, 178 S.W.2d 76. "[S]peculative expert testimony with no basis in the evidence is inadmissible." *Powell v. Camping World RV Sales LLC*, No. 4:13-CV-00195 KGB, 2015 WL 13651139, at *7 (E.D. Ark. Mar. 25, 2015) (*citing Weisgram v. Marley Co.,* 169 F.3d 514, 518-19 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000)); *see also United States v. Bailey*, 571 F.3d 791, 803 (8th Cir. 2009); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

## B.   GRANT'S OPINIONS ON LOSS OF SERVICES SHOULD BE EXCLUDED.

Grant's loss of services opinions (described in full in UPS's Memorandum of Law and incorporated herein for the sake of brevity) are pure speculation with no basis.  Grant testified:

> Q:   Has Mrs. Brantley incurred any of the costs that you are awarding as part of this [loss of services] calculation?
>
> A:   Well, again, my report is through June 11, 2018. That's my cutoff, so from today to June 12, 2018, I've not talked to her, so I have no information.  Prior to June 12, 2018, I—I—I—I don't recall my –my—you know, I don't use the word feeling but my gut feeling is that she told me she had spent some money on some issues, but I can't—I don't recall exactly what she said, so.
>
> Q:   Okay.  And did she record—did you ask for a receipt for her for that?
>
> A:   No, I did not get receipts.

> Q:    Okay.  No receipt?
>
> A:    I do not have receipts.

(Grant 2, 155:22—156:10). Left with nothing to document an actual loss that was paid for, Grant instead takes a list from Mrs. Brantley and applies professional rates and times to the "loss."  There is no market value for Ben Brantley providing financial services, or on call time, or any of the enumerated services Grant provides numbers.  In fact, Grant admits the market value for Ben Brantley providing these services would be zero.  (Grant 2, 154:06—154:15). For the same reasons Grant's methodology of calculating contribution to the statutory beneficiaries is invalid, his methodology for calculating loss of services is invalid.

In addition, Grant's opinions on loss of services are entirely based on speculation and unreliable. "While weighing [Daubert] factors, the Court must continue to function as a gatekeeper who separates expert opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge. Thus, speculative expert testimony with no basis in the evidence is inadmissible." *Powell v. Camping World RV Sales LLC*, No. 4:13-CV-00195 KGB, 2015 WL 13651139, at *7 (E.D. Ark. Mar. 25, 2015) (*citing Weisgram v. Marley Co.,* 169 F.3d 514, 518-19 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000)); *see also United States v. Bailey*, 571 F.3d 791, 803 (8th Cir. 2009); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Accordingly, the opinion should be excluded.

42976.0001/6911332.1

### C.   GRANT CANNOT REMEDY THE FAILINGS AS THE EXPERT REPORT DEADLINE HAS EXPIRED AND HE HAS ALREADY AMENDED HIS OPINIONS ONCE.

Grant cannot amend his opinion to correct the failings contained therein. The expert disclosure and the discovery deadlines have passed. "A . . . scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Jochims v. Isuzu Motors, Ltd.*, 144 F.R.D. 350, 356 (S.D. Iowa 1992). It is "designed to streamline the flow of litigation through . . . crowded dockets . . . ." *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001). It is not to be taken "lightly" and should be enforced. *Id.*; *see also Dabney v. Montgomery Ward & Co., Inc.*, 692 F.2d 49, 51 (8th Cir. 1982) ("A district court may exclude from evidence at trial any matter which was not properly disclosed in compliance with [its] pretrial order . . . ." (quoting *Iowa-Mo. Enterprises, Inc. v. Avren*, 639 F.2d 443, 447 (8th Cir. 1981)). *See, e.g, Williams v. Little Rock Mun. Water Works,* 155 F.R.D. 188, 189 (E.D. Ark. 1993) (entering an order prohibiting additional discovery after the discovery cutoff and stating that the "[t]he express reason for a discovery cutoff is to avoid last minute discovery disputes)

Moreover, Defendants would be prejudiced by any further late amendments. Grant has already once rendered a completely new opinion where he realized, during Defense Counsel's cross-examination of him, that his calculations were wrong and that he had applied incorrect assumptions to his opinions. As a result, he issued a new opinion on August 6, 2018 complete with four pages explaining the changes to the new opinion on produced the day

42976.0001/6911332.1

before his second deposition on this second report. This second opinion continued to be flawed in many respects, but fatally flawed as explained herein. Grant cannot now, after all this time, two reports, two depositions, and the close of disclosures, discovery, and motions practice, now amend his opinions to correct the flaws. It is fatal, and he should be prohibited from rendering the opinions discussed herein.

## IV.    CONCLUSION

Grant's opinions are fatally-flawed. It is now too late to correct the deficiencies. Allowing Grant to offer opinions on damages that are not recoverable, based on a foundation that is unreliable and speculative, would violate the standards of Daubert and Rule 702 and unduly prejudice Defendants. Respectfully, Grant's opinions should be excluded in full.

Respectfully submitted,

James C. Baker, Jr. #86009
Jamie Huffman Jones, #2003125
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3522
(501) 370-1576 - Telephone
(501) 376-2147 - Facsimile
baker@fridayfirm.com – Email
jjones@fridayfirm.com – Email

*Attorneys for Defendant*
*Optimum Staffing, Inc. and Robert Woodall*


By:    *Jamie Huffman Jones*
        JAMIE HUFFMAN JONES

42976.0001/6911332.1

## CERTIFICATE OF SERVICE

I, Jamie Huffman Jones, hereby certify that a copy of the foregoing has been served upon the following counsel of record via the electronic notification system of the U.S. District Court, Eastern Division of Arkansas, on this 27th day of February, 2019:

Bobby McDaniel
MCDANIEL LAW FIRM
400 S. Main Street
Jonesboro, AR  72401-2976
bobby@mcdaniellawyers.com

Robert Cox
GLASSMAN, WYATT, TUTTLE & COX
26 North Second Street
Memphis, TN  38103
RCox@gwtclaw.com

Adam E. Miller
MILLER LAW GROUP
1937 E. Atlantic Blvd, Suite 204
Pompano Beach, FL  33060
litigation@adammillerlaw.com

Roman Galas
ANSA ASSUNCACO
Four Penn Center, Suite 900
1600 JFK Boulevard
Philadelphia, PA  19103
Roman.Galas@Ansalaw.com

James H. Gordon
ANSA ASSUNCAO
Two Miranova Place, Suite 300
Columbus, OH  43215
James.gordon@ansalaw.com

/s/ Jamie Huffman Jones
JAMIE HUFFMAN JONES

42976.0001/6911332.1