**IN THE UNITED STATES DISCTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**KIMBERLY D. BRANTLEY,**
**ADMINISTRATRIX OF THE ESTATE**
**OF BENJAMIN BRANTLEY, DECEASED** **PLAINTIFF**

**vs.** **NO. 3:16-CV-352 (DPM)**

**UPS GROUND FREIGHT, INC.;**
**OPTIMUM STAFFING, INC. d/b/a**
**OPTIMUM LOGISTIC SOLUTIONS;**
**ROBERT L. WOODALL and JOHN DOES 1-6** **DEFENDANTS**

---

**AFFIDAVIT OF DR. RICHARD FREDERICK, PHD**

---

1. My name is RICHARD FREDERICK, PH.D., I am over eighteen years of age and have personal knowledge of the matters set forth within this Affidavit.

2. I am engaged in the private practice of psychology in the state of Missouri.

3. I earned a doctoral degree in Clinical Psychology from Oklahoma State University in 1986. I earned a master's degree in mathematics with an emphasis in statistics from Texas A&M University in 2004. I completed a post-doctoral residency in forensic psychology at the Whiting Forensic Institute in Middletown, Connecticut, in 1990.

4. I am a psychologist licensed in the State of Missouri, continuously so licensed without interruption since 1992, and engaged full-time in the practice of forensic psychological assessment since 1988. I also am licensed as a psychologist in the States of Arkansas, Oklahoma, Iowa, Florida, Kansas, Louisiana, Texas, and Wisconsin.

5. I am board certified by the American Board of Professional Psychology, with a specialty in Forensic Psychology since 1996. I was on the Board of Directors for the American Board of



EXHIBIT D

Forensic Psychology (ABFP) from 2006 for six years. I was the National Chair of Examinations for ABFP for three years beginning in 2008 and president of ABFP in 2011.

6. Since 2008, I continually develop and coordinate 50 to 60 full-day continuing education workshops concerning the specialty of forensic psychology as the co-chair of continuing education for the American Academy of Forensic Psychology. These workshops are presented by a variety of top clinicians and researchers in the discipline of forensic assessment.

7. From 2011 through 2016, I was a professor of psychology for the Chicago School of Professional Psychology, where I taught graduate-level courses in law and mental health and research design. I have taught graduate and undergraduate courses in psychology, statistics, research design, algebra, and pre-calculus for a variety of schools from 1995 through 2016.

8. I have personally presented since 1998 over 70 full-day continuing education workshops to practicing psychologists in the United States, Canada, Germany, Australia, and New Zealand, on the topics of forensic psychological assessment and the practice of assessment of malingered cognitive impairment, malingered psychopathology, and other feigned disorders.

9. I am board certified by the American Board of Assessment Psychology since 2007.

10. I authored a widely-used and accepted psychological assessment instrument published by the nation's largest publisher of psychological tests. The *Validity Indicator Profile* has been in continual release world-wide since 1997. The *Validity Indicator Profile* is a psychological test used in forensic assessments of cognitive abilities to discern the likely approach to testing exhibited by the person being tested. Since 1997, I have continually received a royalty from the sale of this test and its various reports.

11. As a recognized expert in forensic psychological assessment, I was selected for membership on the American Psychological Association's Committee on Psychological Testing and Assessment from 2011 to 2013. That committee, among other responsibilities, was responsible for reviewing, critiquing, and approving the in-process revision of the current (2014) *Standards for Educational and Psychological Testing*. The *Standards* promotes the sound and ethical use of tests and provides a basis for evaluating the quality of testing practicing.

12. In 2014, I was selected by the American Academy of Forensic Psychology for its annual award for Distinguished Contributions to Forensic Psychology.

13. My scientific activity includes original research, writing, and direct involvement in the scientific peer-review process. I have many original research papers in peer-reviewed, widely-read journals, including The *Clinical Neuropsychologist, Psychological Assessment, Behavioral Sciences and the Law, Journal of Head Trauma Rehabilitation, Assessment, Journal of Forensic Neuropsychology, NeuroRehabilitation, Journal of Clinical and Experimental Neuropsychology, Archives of Clinical Neuropsychology, Law and Human Behavior*, and *Journal of the American Academy of Psychiatry and the Law*. Additionally, I have published a number of books and books chapters in the area of mental health law and forensic psychological assessment.

14. My professional activity includes involvement in the scientific editorial process. I have served on the editorial boards for *Assessment* and for *Behavioral Sciences and the Law*. I have also served as an ad hoc reviewer for *Psychological Assessment, Journal of Personality Assessment, Law and Human Behavior, Archives of Clinical Neuropsychology, Journal of Clinical and Experimental Neuropsychology, Journal of Forensic Neuropsychology,*

*NeuroRehabilitation, Psychological Injury and Law, The Clinical Neuropsychologist*, and *Psychology, Public Policy, and the Law*.

15. My professional activity includes 23 years of service to the US Navy as an evaluating and treating psychologist, including assignment in 2003 to the Combat Stress Unit, 4th Medical Battalion, I Marine Expeditionary Force, mobilized to a combat zone for Operation Iraqi Freedom. My role in the US Navy included assessment and testimony for many courts-martial as a mental health expert. I retired as a US Navy Captain in 2008.

16. My professional activity includes 20 years as expert witness for the US Department of Justice, involved in hundreds of evaluations of criminal defendants for criminal responsibility, competency to proceed, and dangerousness to others. I have produced neutral forensic psychological assessments and provided expert testimony for all federal circuits and numerous federal districts. I retired from the US Department of Justice in 2012.

17. My *curriculum vitae* is attached as Exhibit A.

18. I have reviewed the 8/10/18 deposition of Dr. Gary Souheaver.

19. I have also reviewed the reports issued by Dr. Souheaver on Danielle and Kimberly Brantley.

20. I have reviewed the raw test data generated by Dr. Souheaver secondary to his evaluations.

**STANDARDS OF PRACTICE**

21. The Ethical Principles of Psychologists and Code of Conduct (EPPCC, 2010),[1] Section 9.01(b) of the EPPCC states: "...psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the

[1] American Psychological Association. (2010). Ethical principles of psychologists and code of conduct. Washington, DC: American Psychological Association.

individuals adequate to support their statements or conclusions." Section 9.02(a) of the EPPCC states: "Psychologists administer, adapt, score, interpret, or use assessment techniques, interviews, tests, or instruments in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques." Section 9.09(c) of the EPPCC states: "Psychologists retain responsibility for the appropriate application, interpretation, and use of assessment instruments, whether they score and interpret such tests themselves or use automated or other services." Finally, Section 5.01(b) states: "(b) Psychologists do not make false, deceptive, or fraudulent statements concerning…(5) their services…."

22. The AACN practice guidelines for neuropsychologists state[2]: "Accuracy of scoring is essential for appropriate interpretation of test results. The neuropsychologist is familiar with scoring methods and criteria for specific items, procedures for aggregating scores, and the meaning of the scores (i.e., the normative base used for converting raw to standard, or derived scores). Scoring is performed with care, with double-checking of scores, sums, and conversion tables to ensure accuracy. If novel scoring procedures are used, they should be justified by previous research. Computer scoring programs, because of the 'hidden' nature of their operations, are used only if validated against other reliable and previously validated procedures. Neuropsychologists are responsible for the accuracy of scores when a psychometrist or computerized scoring program are utilized…." (pp. 222-223). These practice guidelines also include this admonition: "The neuropsychologist also explicitly acknowledges in the report the modifications of test administration and scoring and their

[2] American Academy of Clinical Neuropsychology (2007). Practice guidelines for neuropsychological assessment and consultation. The Clinical Neuropsychologist, 21, 209-231.

potential effect on the validity of the assessment results" (p. 221).

23. There are additional standards of practice with respect to psychological testing[3]. These are contained in a book published jointly by the American Psychological Association and two other professional organizations: "The intent of the *Standards for Educational and Psychological Testing* is to promote sound testing practices and to provide a basis for evaluating the quality of those practices. The *Standards* is intended for professionals who specify, develop, or select tests and for those who interpret, or evaluate the technical quality of test results. The purpose of the *Standards* is to provide criteria for the development and evaluation of tests and testing practices and to provide guidelines for assessing the validity of interpretations of test scores for the intended test uses. Although such evaluations should depend heavily on professional judgment, the *Standards* provide a frame of reference to ensure that relevant issues are addressed. All professional test developers, sponsors, publishers, and users should make reasonable efforts to satisfy and follow the *Standards* and should encourage others to do so" (p. 1). "...although the *Standards* are not enforceable by the sponsoring organizations, it has been repeatedly recognized by regulatory authorities and courts as setting forth the generally accepted professional standards that developers and users of tests and other selection procedures follow. Compliance or noncompliance with the *Standards* may be used as relevant evidence of legal liability in judicial and regulatory proceedings. The *Standards* therefore merit careful consideration by all participants in the resting process" (p. 2). The AACN practice standards requires that neuropsychologists follow standard procedures in test administration and scoring, consistent with the *Standards*

[3] American Educational Research Association, American Psychological Association, & National Council on measurement in Education (2014). Standards for educational and psychological testing. Washington, DC: American Educational Research Association.

*for Educational and Psychological Testing* (p. 222).

24. The *Standards* states: "Standardized tests present the same or very similar test materials to all test takers, maintain close adherence to stipulated procedures for test administration, and employ prescribed scoring rules that can be applied with a high degree of consistency. Administering the same questions or commonly scaled questions to all test takers under the same conditions promotes fairness and facilitates comparisons of scores across individuals. Conditions of observation that are fixed or standardized for the testing procedure remain the same across replications" (p. 35). The *Standards* states: "Traditionally, careful standardization of tests, administration conditions, and scoring procedures have helped to ensure that test takers have comparable contexts in which to demonstrate the abilities or attributes to be measured. For example, uniform directions, specified time limits, specified room arrangements, use of proctors, and use of consistent security procedures are implemented so that differences in administration conditions will not inadvertently influence the performance of some test takers relative to others. Similarly, concerns for equity in treatment may require, for some tests, that all test takers have qualified test administrators with whom they can communicate and feel comfortable to the extent practicable" (p. 51).

**VIOLATIONS OF STANDARDIZED TESTING**

**PRODUCES UNSCIENTIFIC RESULTS**

25. It is a fact of testing that "modified assessments are measuring a different construct from that measured by the standardized assessment, [and] it is important to interpret the assessment scores as resulting from a new test and to gather whatever evidence is necessary to evaluate the validity of the interpretations for intended uses of the scores.

a. For norm-based score interpretations, *any modification that changes the construct will invalidate the norms for score interpretations*" (*Standards*, p. 61, emphasis added). Fairness in testing means that "instructions for taking the test should be clear and that test administration conditions should be standardized for all examinees" (p. 83).

b. "When standardized tests or testing procedures are changed for relevant subgroups of test taken, the individual or group making the change should provide evidence of the comparability of scores on the changed versions with scores obtained on the original versions of the tests. If evidence is lacking, documentation should be provided that cautions users that scores from the changed test or testing procedure may not be comparable with those from the original version" (p. 103-104).

c. "The usefulness and interpretability of test scores require that a test be administered and scored according to the test developer's instructions. When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to ensure that all test takers have the same opportunity to demonstrate their competencies. Maintaining test security also helps ensure that no one has an unfair advantage. The importance of adherence to appropriate standardization of administration procedures *increases with the stakes of the test* (emphasis added)....Standardized directions help ensure that all test takers have a common understanding of the mechanics of test taking. Directions generally inform test takers on how to make their responses, what kind of help they may legitimately be given if they do not understand the question or task, how

they can correct inadvertent responses, and the nature of any time constraints....Standardized scoring procedures help to ensure consistent scoring and reporting, which are essential in all circumstances" (pp. 111-112).

d. "Changes or disruptions to standardized test administration procedures or scoring should be documented and reported to the test user" (p. 115). "Those responsible for test scoring should establish and document quality control processes and criteria. Adequate training should be provided. The quality of scoring should be monitored and documented. Any systematic source of scoring errors should be documented and corrected" (p. 118).

e. "Test users should follow the standardized test administration procedures outlined by the test developers. Computer administration of tests should also follow standardized procedures, and sufficient oversight should be provided to ensure the integrity of test results. When nonstandard procedures are needed, they should be described and justified. Test users are also responsible for providing appropriate testing conditions. For example, the test user may need to determine whether a test taker is capable of reading at the level required and whether a test taker with vision, hearing, or neurological disabilities is adequately accommodated....Despite the best efforts of test developers, however, appropriate test use and sound interpretation of test scores are likely to remain primarily the responsibility of the test user" (p. 140).

f. "Test administrators should administer tests in the manner that the test manuals indicate and should adhere to ethical and professional standards" (p. 153).

**DR. SOUHEAVER DID NOT**

**CONSTENTLY FOLLOW PROFESSIONAL STANDARDS OR**

**ADMINISTER TESTING IN A STANDARDIZED MANNER**

26. Dr. Souheaver authored a report and concluded that Danielle Brantley was exaggerating psychological problems, based upon the MMPI-2-RF, the only psychological test he administered.

27. Dr. Souheaver's deposition revealed that he actually did not administer the test, and he had the test administered by a person unqualified to administer it.

    a. A receptionist administered the psychological testing (MMPI2RF) when Dr. Souheaver was not in the room.[4]

    b. Dr. Souheaver acknowledged that the receptionist no formal psychological training.[5]

    c. When asked what instructions were given the plaintiffs regarding what to do regarding any questions they may have with the test (since the only trained professional on the test was not even in the room with them) his response was "I don't understand the question."[6]

    d. The test administration manual created by the publishers clearly states on page 17 of the manual that the individual administering the test should be either a qualified test user [usually a psychologist] or a technician trained by and working under the direct supervision of a qualified user." [7] The receptionist did not meet either of those categories. She was unqualified to administer the test.

---

[4] Deposition, Dr. Gary Souheaver 8/10/18 page 18 line 8-20
[5] Deposition, Dr. Gary Souheaver page 18 line 8-20
[6] Page 18 line 21-24
[7] Page 17, Ben-Porath, Tellegen, MMPI2-RF Manual for Administration, Scoring and Interpretation, University of Minnesota Press

e. Standardized procedure further requires that the individual administering the test conduct an assessment to determine whether the test taker has any limitations which might impair his or her ability to answer the test items.[8] Dr. Souheaver did not do this. Reading level was not considered, which is required by the test manual (a 6th grade reading level is required).[9]

f. When the test was being given, the patient was alone, and the receptionist was not in the room with the patient.[10] But a qualified test giver would have maintained control over the testing.

g. There was no one available for the patient to speak to regarding any confusion or questions on the test. In fact, when Dr. Souheaver was asked, "And if she had questions or concerns, would the receptionist be the person that she should have asked?", he responded with "I don't understand the question"[11] In deposition, Dr. Souheaver revealed he was unfamiliar with basic test administration requirements.

h. Dr. Souheaver did not follow standardized procedure to administer the MMPI-2-RF. Dr. Souheaver was not even sure *who* gave the MMPI2-RF to the patient and did not know the name of the receptionist who may or may not have been the individual who gave the test.[12] For example, he related that another person is not allowed in the room during the testing, which is not part of manual instructions.[13] The MMPI-2-RF

---

[8] Page 17, Ben-Porath, Tellegen, MMPI2-RF Manual for Administration, Scoring and Interpretation, University of Minnesota Press
[9] Page 178, Ben-Porath, Interpreting the MMPI2-RF
[10] Deposition page 18 When the test was given, was she in the room with the client?
A. No.
Q. Was anyone else?
A. No.
[11] Deposition page 55 line 24, page 56 line 2
[12] Page 56 line 7-13
[13] Page 55 line 14

test administration and interpretation manual does *not* prohibit the supervisor from being in the room with the test taker but, in fact, suggests the it is *desirable* that the supervisor be within line of sight of the person taking the test.[14] See attached reference authored by the creator of the test in a book sold to the public.

28. A psychologist is required to be able to verify that a test was given properly, and Dr. Souheaver cannot verify this. Based on Dr. Souheaver's testimony, he cannot even name who gave the test and how. Dr. Souheaver cannot confirm that the test was administered properly and without undue influence or that the patient even understood how to take the test or that the test instructions were followed per the manual. Dr. Souheaver cannot rule out anyone altering the answers, nor can he confirm the answers given on this test actually represent the answers of the plaintiffs.

29. Dr. Souheaver claimed he told the Plaintiffs to answer the test items according to their experiences in the last 30 days.[15] This "instruction" is not in the manual and is another instance of non-standard administration. This is the sort of non-standard instruction that can easily change the meaning of test results.

30. Once Dr. Souheaver departed from standardized administration and gave the test substantially differently than everyone else gives it, he was required to announce that he had changed the test in his report, and he was required to explain why *his* form of the test should be accepted for diagnostic considerations instead of the standard MMPI-2-RF test. He did not do this, and his change to the test was discovered only by deposition.

31. When pressed to advise the rest of the instructions given to the Plaintiffs, he said "Oh, I

[14] Page 181 Ben-Porath, Interpreting the MMPI2-RF
[15] Deposition page 52 line ll.

don't recall."[16] If he does not "recall" what instructions he gave, then he cannot testify he actually *followed* the instructions from the manual which is required for standardized administration of tests.

32. The test author's authoritative guidance on how to administer the test states the actual instructions is as follows:

> **Use Standard Administration Instructions**
>
> Each of the administration modalities provides standard instructions for completing the inventory, which are the same as those that were used in collecting the test norms. The instructions are as follows:
>
> This inventory consists of numbered statements. Read each statement and decide whether it is *true as applied to you or false as applied to you.* You are to mark your answers on the answer sheet you have. Look at the example of the answer sheet shown at the right. If a statement is **true** or **mostly true** as applied to you, blacken the circle marked **T.** If a statement is **false** or **not usually true** as applied to you, blacken the circle marked **F.** If a statement does not apply to you or if it is something that you don't know about, make no mark on the answer sheet. But try to give a response to every statement. Remember to give **your own** opinion of yourself[17]

33. Dr. Souheaver altered the instructions in this test by limiting the patient to the last 30 days. This is relevant in this case because the very basis of this law suit is an event that took the life of a family member well over 30 days ago. Thus, by limiting the test taker to only the last 30 days, he is, by definition, minimizing the effects of such a loss since the loss occurred and the symptoms manifested well before the time of testing.

34. The author of the test clearly states, "Deviations from these instructions may compromise the interpretability of the resulting test scores."[18] See attached from Interpreting the MMPI-2-RF by Yossef S. Ben-Porath, a book sold to the public. In his deposition, Dr. Souheaver

[16] Deposition page 52 lines 13-16
[17] Page 180 Ben-Porath, Interpreting the MMPI-2-RF
[18] Page 180 Ben-Porath, Interpreting the MMPI-2-RF

acknowledged that the book was authoritative on the issue of how to administer the test.[19]

35. Dr. Souheaver did not and cannot produce any data or articles that support his non-standard administration, nor are there any norms to which the plaintiffs were compared who were tested in such a similar non-standard fashion. As such, the results are reasonably considered unreliable and cannot be reproduced with standard administration practices.

**Dr. Souheaver's MMPI-2-RF Interpretation for Kimberly Brantley**

36. Dr. Souheaver began his interpretation of Kimberly's MMPI-2-RF with this statement: "…there was a slight elevation on the FBS scale (T = 73), which was not sufficient to prevent interpretation." This is entirely misleading. First, it is misleading because it is false. A scale such as FBS is a "validity scale." Its purpose is to help psychologists understand how the test-taker approached the test. FBS is particularly concerned with over-reporting of somatic and cognitive problems. A validity scale is "elevated" if its value (number of items endorsed) can possibly be an indicator of over reporting or exaggeration. For FBS, any T-score less than 80 has this interpretation: "There is no evidence of over-reporting" (p. 29, MMPI-2-R manual). Thus, every T-score less than 80 is "***not** elevated*." Such scores are common and are not considered "abnormal." There were absolutely no indications of any sort of exaggeration on the part of Kimberly. It is entirely misleading for Dr. Souheaver to suggest that there was a possible problem with exaggeration, "which was not sufficient to prevent interpretation." There was no problem *at all.*

37. Kimberly's responses on the MMPI-2-RF clearly support a conclusion that she has moderate to severe symptoms of depression. Statements from the publisher's interpretive report, provided by Dr. Souheaver, include:

[19] Deposition page 102 lines 9-10.

a. Her responses indicate significant emotional distress.

b. She is likely to be preoccupied with suicide and death.

c. She is likely to be preoccupied with poor health and to complain of sleep disturbance, fatigue, and sexual dysfunction.

d. She is likely to feel hopeless, overwhelmed, to feel that life is a strain, to believe that she cannot be helped….

e. She is also likely to be stress-reactive and worry prone and to engage in obsessive rumination.

38. Diagnostic hypotheses offered by the MMPI-2-RF included depression-related disorder and disorders involving excessive stress and worry, such as obsessive-compulsive disorder. According to Dr. Souheaver, "I didn't diagnose her with anything."[20] While he acknowledged Kimberly could be depressed due to the loss of her husband and life partner, he claimed there could be other reasons, even though he never asked her why she was stressed or depressed. [21]

**Dr. Souheaver's MMPI-2-RF Interpretation for Danielle Brantley**

39. Dr. Souheaver rejected outright that he could interpret the MMPI-2-RF of Danielle Brantley: "In summary, we cannot provide an accurate diagnosis in this case, since we were unable to rule out purposeful over-endorsement of symptoms for secondary gains" (report, page 3).

40. This conclusion is based on other assertions from Dr. Souheaver's report:

---

[20] Deposition page 230 line 12
[21] Deposition page 210 line 21-23

a. "As shown on the profile, three of the seven validity scales (lower left) were very abnormal. In fact, the results reflected an extraordinary over-endorsement of symptoms and problems in daily living" (report, page 3).

**Comment:** This assertion is completely false. Here is what is true: Three of the seven validity scales were elevated and produce two possible interpretations: she has significant psychological problems (severe "psychopathology" or severe emotional distress), or she is just pretending to have such problems. There is nothing "very abnormal" about these scores. These scores do not at all reflect "extraordinary endorsement" of symptoms in daily living. Psychologists who are appropriately trained in the use of this test and who regularly administer and interpret this test know that these scores are commonly seen.

b. "The F-scale (T = 111) was more abnormal (i.e., higher) than 99.9% of the female normative U.S. population" (report, page 3).

**Comment:** This is hardly surprising. The "normative sample" for the MMPI-2-RF are all the "normal" individuals who were tested to calibrate the test, so we could know what "normal" looked like. If an individual had no active mental health problems, was not in mental health treatment, had no serious medical problems, was not drug dependent or in drug treatment, and did not have mental retardation, they were eligible to be in the normative sample. If we compare an individual actively reported serious mental health problems to this sample, we

fully expect to see her obtain a score on an indicator of serious problems (such as the "F-scale") that is higher than almost all these individuals.

When we compare Danielle's F-score to women in outpatient mental health treatment, her F-score is at the 92%ile, meaning that 8% of individuals in outpatient mental health treatment (none of whom were faking or exaggerating) got higher scores than she did.

When we compare Danielle's F-score to women in inpatient mental health treatment, her F-score is at the 88%ile, meaning that 12% of individuals in inpatient mental health treatment (none of whom were faking or exaggerating) got higher scores than she did. (See attachments for the publisher's reporting of each of these percentiles.)

c. "According to the test publisher, a T-score of 100-119 may be invalid due to psychosis or over-reporting of severe emotional distress. Given [that] there is no evidence of psychosis from the interview or history, extreme caution should be used to assign reliability to the level of self-reported symptoms in this case."

**Comment:** This is patently false. It is not true at all. Dr. Souheaver is conflating psychosis with psychopathology. The F-scale is a collection of items related to psychopathology. The F-scale is not a collection of items related to psychosis. On page 27 of the interpretive manual, the interpretation for a score of 100-119 on the F-scale includes "severe psychopathology" and "severe emotional distress." Psychosis is not mentioned. The interpretation continues:

"…this level of infrequent responding may occur in individuals with genuine, severe psychological difficulties who report credible symptoms."

The publisher offers psychologist who use this test the opportunity to print out the test items for a scale to determine what items are elevating the scale. Dr. Souheaver could have easily pushed a button and obtained a listing of the items endorsed by Danielle when she completed the test—the publisher recommends doing so. None of those items related to psychosis. She did not report any psychotic symptoms at all. Dr. Souheaver wrote in his report (page 3): "Since we did not observe nor elicit any such clinical history of disorganization and psychosis…." But Danielle never claimed to have psychotic symptoms. The 15 items she endorsed on the F-scale include items related to depression, anxiety, fear, self-condemnation, low confidence, dissociation, and physical illness.

d. "The items of the F-scale are rarely endorsed by normative samples and [reflect] over-endorsement of a broad range of psychological, cognitive, and health-related symptoms."

**Comment:** This statement is also patently false and misleading. It is common for normal individuals to endorse items on the F-scale. In fact, it is not unusual to see normal individuals endorse many items on the F-scale. Only when normal individuals endorse 6 or more F-scale items does it become unusual. When the MMPI-2-RF was created and the F-scale was developed, the basic rule to <u>exclude</u> a potential item from inclusion in the F-scale was when ***more than 20%*** of

normal individuals endorsed the item. Most normal individuals endorse items on the F-scale—what is true is that it is unusual (***not "rare"***) for normal individuals to endorse ***a lot*** of the F-scale items. It is not unusual for individuals with severe psychopathology to endorse a lot of the F-scale items.

e. The standard interpretation of F-scale score of 100-119 is: (1) individuals might have genuine psychopathology, or (2) they might be over-reporting or exaggerating their problems. There are many ways to contend and investigate the potential meaning of elevations of F-scales. The most direct method is to interview the individual and determine what they meant when they endorsed certain items on the F-scale. The MMPI-2-RF publisher's report, used by Dr. Souheaver, has the option to list out the items endorsed for any of the 50 scales used for interpretation. The MMPI-2-RF is easy and fast to score with a laptop or any internet connection—the results can be obtained in a couple of minutes on a laptop or by internet. There was no practical reason for Dr. Souheaver to have to guess which items the claimants endorsed or what they meant by their responses. He could have easily scored the tests while the claimants were present and clarified why certain scales were elevated. Dr. Souheaver did not do so.

f. Some psychologists follow-up the MMPI-2-RF with a test specifically designed to evaluate exaggeration. Dr. Souheaver chose not to do so.

g. Finally, the MMPI-2-RF itself can be used to evaluate the meaning of a high F-scale score (the correct name is "F-r"). From the manual (page 27): "Scores on

Fp-r can be particularly helpful when a test taker produces a substantially elevated score on F-r, and the interpreter needs to determine whether this reflects over-reporting or genuine dysfunction. The lower the score on Fp-r, the less likely it is that an elevation on F-r reflects over-reporting, and the more likely it is that it reflects ***accurate reporting of experiences that are uncommon in the general population, but not in individuals with significant psychological difficulties***." [Emphasis added]

**Comment:** For an unbiased psychologist who knows the test and its potential interpretations, this is the standard course of interpretation. As noted in the bolded language above, this is a common issue—it is ***common*** for individuals with significant psychological difficulties to produce substantially elevated scores on the F-scale—it is not rare or evidence of an individual who is "so impaired that participation in legal or decision-making situations would not be recommended." That statement is patently false.

In Danielle's case, her Fp-r score was 68. The standard interpretation of Fp-r = 68 is "There is no evidence of over-reporting." Consequently, the meaning of F-r = 111 is made evident: "It reflects accurate reporting of experiences that are uncommon in the general population, but not in individuals with significant psychological difficulties."

**SUMMARY**

41. Professional psychologists administer and interpret psychological tests in a standardized manner.

42. Dr. Souheaver did not administer the MMPI-2-RF in a standardized manner, and he turned the administration of the test over to an untrained and unqualified receptionist.

43. Dr. Souheaver did not provide standard interpretations of the MMPI-2-RF. For Kimberly, he inserted a suggestion that maybe she had not cooperated with the test, but not enough to frustrate interpretation—but that was highly misleading. He seems to have failed to acknowledge that her responses are consistent with moderate-to-severe depression. For Danielle, he made numerous patently false statements and made other misleading statements. Based on the information in the MMPI-2-RF alone, the best hypothesis about Danielle is that she has genuine severe psychopathology that she cooperatively reported.

I hereby acknowledge that the above information is true and accurate to the best of my knowledge and ability.

RICHARD FREDERICK, PH.D.

RICHARD FREDERICK

PRINT

STATE OF Missouri

COUNTY OF Greene

BEFORE ME personally appeared RICHARD FREDERICK to me well known to be the person who executed the foregoing instrument, and acknowledged that he/she executed the same as his/her free act and deed.

SWORN TO AND SUBSCRIBED before me an officer authorized to take acknowledgements and oaths, this 13th day of September, 2018

NOTARY PUBLIC

Printed Name: SHERRY PARIS

My commission expires:

SHERRY PARIS
Notary Public, Notary Seal
State of Missouri
Greene County
Commission # 08486670
My Commission Expires 06-05-2021