```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                     JONESBORO DIVISION

 3

    KIMBERLEY D. BRANTLEY,
 4  Administratrix of the Estate
    of Benjamin Brantley,              No. 3:16CV352 DPM
 5  Deceased,

 6              Plaintiff,
       v.                             Friday, June 28, 2019
 7                                    Jonesboro, Arkansas
    UPS GROUND FREIGHT, INC.;         9:05 a.m.
 8  OPTIMUM STAFFING, INC., d/b/a
    Optimum Logistic Solutions;
 9  and ROBERT L. WOODALL,

10              Defendants.

11
                  TRANSCRIPT OF MOTIONS HEARING
12          BEFORE THE HONORABLE D. P. MARSHALL JR.,
                  UNITED STATES DISTRICT JUDGE
13
    APPEARANCES:
14
    On Behalf of the Plaintiff:
15
       MR. BOBBY R. MCDANIEL, Attorney at Law
16     MR. BRETT A. MCDANIEL, Attorney at Law
          McDaniel Law Firm, PLC
17        400 South Main Street
          Jonesboro, Arkansas  72401-2976
18
       MR. ADAM GREGORY WEEKS, Attorney at Law
19        Post Office Box 86
          Powhatan, Arkansas  72458
20
       MR. BRIAN G. BROOKS, Attorney at Law
21        Post Office Box 605
          Greenbrier, Arkansas  72058
22
       MS. BREEAN WALAS, Attorney at Law
23        Walas Law Firm, PLLC
          Post Office Box 4591
24        Bozeman, Montana  59772

25                              [ CONTINUED ]
```

Christa R. Jacimore, RDR, CRR, CRC
United States Court Reporter

1

2    APPEARANCES CONTINUED:

3    On Behalf of Defendant UPS:

4        MR. ROBERT A. COX, Attorney at Law
            Glassman, Wyatt, Tuttle & Cox, P.C.
5        26 North Second Street Building
            Memphis, Tennessee  38103

6
         MR. ROMAN T. GALAS, Attorney at Law
7            Ansa Assuncao LLP
             1600 John F. Kennedy Blvd., Suite 900
8            Philadelphia, Pennsylvania  19103

9
     On Behalf of Defendant Optimum:
10
         MR. JAMES C. BAKER JR., Attorney at Law
11       MS. JAMIE MARIE HUFFMAN JONES, Attorney at Law
             Friday, Eldredge & Clark, LLP
12           400 West Capitol Avenue, Suite 2000
             Little Rock, Arkansas  72201-3522

13

14

15

16

17
             Proceedings reported by machine stenography and displayed
18   in realtime; transcript prepared utilizing computer-aided
     transcription.

19

20

21

22

23

24

25

1          (Proceeding at 9:06 a.m., as follows:)

2               THE COURT:  Good morning, everybody.  Please be

3     seated.

4          This is the Estate of Ben Brantley, administered by Kim

5     Brantley, against UPS Ground Freight and Optimum Logistics

6     Solutions and the driver, Robert L. Woodall, and John Does 1

7     through 6, which is something we'll talk about here in a minute,

8     a loose end.  It's Case No. 3:16CV352 DPM.

9          I'm blessed with a courtroom full of lawyers today.  It's

10    good to see everyone.  For the plaintiff, Mr. Bobby McDaniel.

11              MR. BOBBY MCDANIEL:  Yes, your Honor.

12              THE COURT:  Mr. Brett McDaniel.

13              MR. BRETT MCDANIEL:  Good morning.

14              THE COURT:  Mr. Brian Brooks.  Ms. Walas, new to the

15    case.  Glad to have you.

16              MS. WALAS:  Good morning.

17              THE COURT:  And Mr. Weeks.

18         And help me.  I think I know, but if I get this swapped,

19    y'all correct me.  For UPS, we have Mr. Cox.

20              MR. COX:  Yes, your Honor.

21              THE COURT:  And Mr. Galas.

22              MR. GALAS:  Yes, Judge.

23              THE COURT:  Welcome.

24              MR. GALAS:  Thank you.

25              THE COURT:  And for Optimum, we have Mr. Baker and

1   Ms. Jones.

2        MR. BAKER:  Yes, your Honor.

3        THE COURT:  Good to see you all.

4        MR. BAKER:  Thank you.

5        THE COURT:  Counsel, I know you're busy.  I'm not so

6 far from the law office that I have forgotten what it's like to

7 deal with the phone and the email and now the texts, and the fax

8 machine is still creaking over in the corner and all the files

9 that need your attention and things that have to be done.  I

10 know it is no small thing for, what, five -- nine lawyers and a

11 legal assistant to assemble in one place and spend a day talking

12 about a case.  I appreciate you making time to do it.

13     For better or for worse, I'm a plodder, and I believe I

14 make better decisions, at least I feel like I do, after I can

15 have a conversation with the lawyers and talk through things,

16 and that's what I look forward to doing today.  I've been

17 looking forward to this for some time.  I know that y'all have

18 been working on this case hard for many years.  But it's time to

19 get it in shape for trial.

20     As I said in my prehearing order, my terse prehearing order

21 of a few days ago, we've got many motions to handle.  I want us

22 to make haste slowly.  We'll spend more time on some things than

23 others because there are some areas of agreement, and I think

24 after I make some rulings and counsel get the sense of where I'm

25 going in the case, that things will become clearer.

1    I want us to start, as I said in the order, with these

2  motions for summary judgment.  I think that's a good place to

3  dive in.  And then after that, I want to turn to the defense

4  motions about the experts.  And then after that, the Brantley

5  motions about the experts.  And then after that, these motions

6  in limine, some particular and some more general, but that big,

7  big stack of things at the end.

8    We'll take a mid-morning break in about an hour and a half

9  when I start to wear out, and folks may need to step down the

10  hall.  And we'll break for lunch when we get hungry and come

11  back and keep going, take another mid-afternoon break, and I

12  fully expect us to spend the day on all of this.  And, as I

13  said, I'm looking forward to it.

14    Before we get into the summary judgment motions, is there

15  anything that anybody would like to say by way of preface or

16  opening or some issue that's arisen since all of the motions

17  ripened?

18    Mr. McDaniel, we'll start on the plaintiff's side.

19  Anything from your point of view?

20        MR. BOBBY MCDANIEL:  No, thank you, your Honor.  We've

21  not got anything else that's not been produced or discussed.

22        THE COURT:  Very good.  And from the defendants' side,

23  Mr. Cox?

24        MR. COX:  Nothing from this side, your Honor.  I think

25  we've briefed everything and everybody has done a good job of

1  cooperating to get us here, so --

2              THE COURT:  Good.  Mr. Baker?

3              MR. BAKER:  We're ready to proceed, your Honor.

4              THE COURT:  All right.  I'm in favor of amens, so

5  that's good.

6         All right.  Let's take up these summary judgment motions on

7  what claims there are, given the defendants' acceptance of

8  responsibility for Mr. Woodall's acts and omissions on the day

9  of the accident.  Let's take up these issues of what else, what,

10  if anything, else by way of theories of negligence go to the

11  jury.  I think it would be helpful, Mr. McDaniel, or someone

12  from the plaintiff's side, to have not an argument from you, but

13  a bullet point list of what -- what you believe the theories of

14  independent negligence are on the part of the two companies.

15             MR. BOBBY MCDANIEL:  Your Honor, so that I don't step

16  on the toes of the person who is actually making the argument,

17  I'll let Mr. Brooks address that, if that will be acceptable to

18  the Court.

19             THE COURT:  That's fine.  So, Mr. Brooks, I think I

20  know the answer, but I'm sure you'll clarify and it will help us

21  all to have that list, I think.

22             MR. BROOKS:  Yes.  And can you hear me?

23             THE COURT:  Not as well, probably, as I need to.  So

24  let's get that mike down there.

25             MR. BROOKS:  I was being extremely rude.  I was

1    actually talking to the court reporter, who had warned us that

2    she can't hear sometimes.

3              THE COURT:  Oh, okay.

4              MR. BROOKS:  As we put forth in our responses to the

5    statement of material facts, the theory of negligence on the

6    part of the two employers goes to the training for Mr. Woodall

7    in handling how to drive his rig in hazardous weather

8    conditions.

9              THE COURT:  That's one.

10             MR. BROOKS:  That is particularly what this case is

11   going to surround.

12             THE COURT:  And then two is weather, monitoring and

13   warning about the weather?

14             MR. BROOKS:  Yes.

15             THE COURT:  And three?

16             MR. BROOKS:  That is, as I appreciate -- and

17   Mr. McDaniel can correct me if he needs to.  As I appreciate it,

18   those are the two bases that we are going forward on.

19             THE COURT:  I confess to some surprise because I

20   thought there was a third, and that is a theory that UPS had

21   failed in terms of its internal policies and procedures to

22   monitor its subcontractor, to monitor Optimum and make sure that

23   Optimum was doing everything that it was supposed to under this

24   contract.

25             MR. BROOKS:  I'm glad you asked it that way.  To me,

1  that is wrapped up in the first overall issue.  Where the rubber

2  meets the road in this case, in my view and I think in all of

3  our views on this side of the fence, is what training and

4  implementation of policy there was with respect to Mr. Woodall

5  handling his rig in hazardous weather conditions, and those -- I

6  melded those two together, so I apologize.

7          THE COURT:  Well, there's no need to apologize, but I

8  think -- I think you've put your finger on it because I'm not

9  sure that that larger universe that you've just identified as

10 issue number one survives *Elrod*.  You may have a stronger

11 argument that the smaller issue of -- or the embedded issue of

12 what UPS was doing to look over Optimum's shoulder, that might

13 survive.  But we'll see how the argument develops.

14         MR. BROOKS:  Okay.

15         THE COURT:  Thank you for the bullet points.

16         MR. BROOKS:  Sure.

17         THE COURT:  Okay.  From the defendants' side, I'd like

18 to -- I guess a similar pointed question for each company at the

19 beginning.  Is there any theory, in your view, of direct

20 negligence that survives in this case, or is everything gone,

21 given the acceptance of responsibility?

22         MR. BAKER:  It's all gone, a hundred percent of it.

23         THE COURT:  Okay.  Y'all are going to have to share

24 the mike.  And, if you would, you know, counsel, we're going to

25 be at this a long time today, and I appreciate very much the

1  standing out of respect for the Court, but Mr. Baker might be

2  leading us all in the right direction, that it will be okay to

3  speak from seated as we go through, to save everybody's knees.

4       Mr. Baker, there's nothing from -- as far as Optimum is

5  concerned, there's no possibility of independent negligence on

6  the part of the company?

7            MR. BAKER:  No possibility.  I mean, that is what

8  *Elrod* states, that there can only be one theory of liability,

9  and once one is accepted, that's it, for several reasons.

10           THE COURT:  Hold on.  Let me push back.  Isn't that an

11  overreading of the *Elrod* case, given that that statement comes

12  in a discussion about *Kyser*, the *Kyser* opinion, and the only

13  issues presented in *Elrod* were the respondeat superior and

14  negligent entrustment?

15           MR. BAKER:  That's correct, but there's nothing about

16  the rule -- I mean, the rule from *Elrod* is, plaintiff can only

17  proceed on one theory of recovery where liability has been

18  admitted on one theory of recovery.  That's the rule.  I mean,

19  even the federal court decisions have expanded it from negligent

20  entrustment to hiring and retention.  There's just no logic that

21  would say it would exclude hiring, retention, and entrustment,

22  but not training.  So that's one of the issues.  And the *Kyser*

23  case really explains the logic.  It's the "it makes no

24  difference" reasoning of the *Kyser* Court.  Because UPS and OSI

25  have accepted liability under the theory of respondeat superior,

1  they're going to be a hundred percent liable for the damages in

2  this case, because if Woodall is not negligent, if Woodall

3  didn't negligently cause this accident, there is no recovery

4  independently, independent of Woodall's non-negligence for

5  failure to monitor the weather, for failure to train, for

6  failure to supervise your subcontract.

7      It's a fundamental principle of tort law that a plaintiff

8  is limited to one recovery.  It's the one recovery rule.

9          THE COURT:  Hold on, please, sir.  Let me interrupt

10  you.  I've got to let that point sink in about Woodall's

11  negligence being a premise.

12      Assume with me, Mr. Baker, that as a matter of ordinary

13  care, a trucking company that is in regular communication --

14  over-the-road trucking company that's in regular communication

15  with its drivers, that a jury could conclude that the company

16  had an obligation to monitor for extreme weather and communicate

17  that to its drivers.  I know you don't agree with that, but

18  assume that that is the Court's conclusion.  Wouldn't it be

19  possible for plaintiff to recover here finding Woodall did

20  everything right because the facts on the ground were moving so

21  quickly during the dust storm, the problem is that UPS didn't

22  alert him to the dust storms in the area, and that was the

23  proximate cause of the accident?

24          MR. BAKER:  I don't see how it would survive the

25  proximate cause analysis.  So, in other words, because doing

1    something wrong because of the weather has to be a proximate

2    cause -- I mean, the weather then or the duty to do something in

3    response to the weather would have to be the proximate cause of

4    the damages.  So it's certainly possible that a jury can enter a

5    verdict that is logically inconsistent, I suppose, and say that

6    the driver of the 18-wheeler that rear-ends another vehicle in a

7    dust storm isn't negligent and I guess what your hypothetical

8    suggests is, but determine that the reason that the driver drove

9    into the storm was because he wasn't aware there was bad

10   weather.

11           THE COURT:  And that the company could have alerted

12   him and didn't.  That's the hypothetical.  I'm trying to -- I'm

13   trying to press you on these potential independent theories.

14       One problem in the case is the perhaps overreach on the

15   plaintiff's part where it wants to talk about training and all

16   of the things that in my tentative view are part of negligent

17   entrustment, but at the -- if you peel back the layers of the

18   onion, I'm wondering if beyond entrustment-like issues, beyond

19   things that go to the competence of the driver, if there are

20   independent claims on the weather, for one, or, two, on the how

21   closely did UPS have to look over Optimum's shoulder.

22           MR. BAKER:  I think if I can back out of your

23   hypothetical a little bit, number one, the problem with

24   monitoring the weather, as you're aware, is going to be subject

25   to a separate motion.  We don't think there is such a duty.  But

1    I understand you're asking me to assume that the Court for the

2    purposes of the hypothetical is assuming there is a duty.  I

3    still don't think there's proximate causation if the driver is

4    not at fault.  I would appeal it.

5        But let's use something more obvious.  It's a three-vehicle

6    accident, and, you know, both of the vehicles, both of the

7    commercial vehicles were at fault or you've got some sort of

8    scenario where the employer does somehow, separate and apart

9    from the employee driver, independently contribute to the

10   damages of the plaintiff.

11            THE COURT:  Yes.

12            MR. BAKER:  Let's just leave it in the abstract.

13            THE COURT:  Okay.

14            MR. BAKER:  We still have a one recovery rule.  You

15   can still only recover your damages once.

16            THE COURT:  But can't there be several roads to that

17   one recovery?  If we can -- if we can hypothesize circumstances

18   where the driver's negligence is not an essential ingredient and

19   yet plaintiff could recover, then I think that that implicitly

20   answers our question.

21            MR. BAKER:  Well, then the next step is, how are you

22   going to instruct the jury?  Because the employer that has

23   accepted liability under respondeat superior cannot be a joint

24   tortfeasor to the employee, because then you're going to have

25   independently the employee and the employer on the fault

1    interrogatory.  And say they put 20 percent on the plaintiff and

2    50 percent on the driver and 30 percent on the employer.

3            THE COURT:  Let me --

4            MR. BAKER:  You've got a potential for a double

5    recovery then because the employer is now going to have to

6    pay -- the employer is going to be liable for 80 percent, not

7    just their 30 percent, because they're now being held liable for

8    damages under two separate theories of liability as if they are

9    a joint tortfeasor in a case where they've admitted respondeat

10   superior, and that violates the one recovery rule.

11           THE COURT:  I want to think more about that, but let

12   me broaden the conversation.

13       Mr. Cox or Mr. Galas, I'd like y'all to weigh in on this.

14           MR. GALAS:  Yes, Judge.  Basically, we're in

15   agreement -- it's Roman Galas.  We're in agreement with

16   Mr. Baker.  *Elrod* -- the holding in *Elrod* is clear, as Mr. Baker

17   pointed out.  It's the quote from the case:  Only one theory of

18   recovery in cases where liability has been admitted as to one

19   theory of recovery.

20           THE COURT:  Mister --

21           MR. GALAS:  We've admitted as to one theory of

22   recovery.  *Elrod* is clear, and the end result is that under

23   either theory, liability, if that's going to be established

24   against the defendant, it's already been established.

25       We don't think that there is support under Arkansas law for

1    a separate claim for negligent monitoring of the weather.  We

2    set forth on page 11 of the reply brief the Arkansas jury

3    instructions that do set forth the theories of recovery that are

4    available against an employer.  It's negligent entrustment when

5    the person entrusted with the vehicle was incompetent and he

6    created or she created an unreasonable risk of harm to others.

7         Then there's also negligent hiring, retention, and

8    supervision, where the employer should have known that its

9    employee subjected others to an unreasonable risk of harm.

10   Those are 608 and 709A.  Those are the only instructions under

11   Arkansas law for theories of recovery against an employer.

12   There is no separate theory of recovery under Arkansas law as

13   currently written that would allow for a negligent monitoring

14   claim, you know, in the hypothetical situation where a driver

15   wasn't negligent, but the company can be negligent if the driver

16   is not negligent.  There is no such claim under Arkansas law.

17        So we appreciate your Honor's hypothetical, but the answer

18   to the hypothetical is that Arkansas law doesn't support a claim

19   for liability for that hypothetical.

20             THE COURT:  May I interrupt, Mr. Galas?

21             MR. GALAS:  Of course, Judge.

22             THE COURT:  We need to think things, not words, would

23   be helpful here, and I understand the defense's argument, but

24   what about ordinary negligence?  In other words, is it wrong to

25   abstract from the situation a bit and say this is truly a sudden

1    emergency, driver is not at fault.  Assume that.  But under

2    general principles of ordinary care, the company should have

3    done more in the circumstances.  Why -- so that's why I'm

4    pushing back.  The ordinary negligence instruction is in the AMI

5    book, too.

6            MR. GALAS:  Sure, Judge, but there's an ordinary

7    negligence instruction, but then there are specific instructions

8    that are specifically applicable in the situation where

9    liability is sought against an employer.  So you have to go to

10   the specific instructions for the theories that are sought here.

11   And those specific instructions do not allow for a claim, a

12   hypothetical claim where a driver is not even negligent, in the

13   hypothetical, but the company would be.  As Mr. Baker said,

14   there just wouldn't be proximate causation in such a

15   hypothetical because under the established law, the established

16   claims recognized under established law, the tie to get employer

17   liability assumes that the driver is negligent.

18        And the reason, the whole reason in the genesis of law that

19   there are separate claims against an employer is because in the

20   past, employers would deny course and scope with the employee,

21   and so the plaintiff would have to prove up separate theories of

22   liability because they may not prove the course and scope

23   allegation.  So they had to have an alternate route to get at

24   the employer.

25        Here, what we've got is an admission, and that's the whole

1    reason for this rule.  Because otherwise you have multiple

2    claims going about, wasting trial time, and the courts recognize

3    this.  We've cited -- the Colorado Supreme Court has a great

4    kind of exposition of the basis for this rule because it's a

5    majority rule, it's recognized across the country, that you

6    don't waste time, you don't waste court time, party time, jury

7    time, proving up claims that ultimately get to the same result,

8    employer liability.

9        But, again, to the hypothetical, there's no employer

10   liability unless there's employee liability first.  It's just

11   not recognized under Arkansas law.  That's our response to the

12   hypothetical.

13            THE COURT:  Thank you.

14       No, sir, let me get back to the plaintiff because I've been

15   talking to the defense side, and I want Mr. Brooks to open his

16   mind to me now that he has the benefit of this discussion.

17       And assume, Mr. Brooks, please, that the Court is not

18   inclined to agree with you on this whole hog theory of bullet

19   point number one, the overlap of training, everything that in my

20   view really is negligent entrustment by different names.  But

21   what about these potential independent theories?

22            MR. BROOKS:  Accepting your position because you have

23   the robe and I don't, I will work from that premise.

24       First of all, I think a problem with *Elrod* and a problem

25   with this entire argument that you hear is also contained within

1    another jury instruction, and that is that there can be more

2    than one proximate cause of the same injury.  And we simply tell

3    the jury that, to solve Mr. Baker's problem, that we handle that

4    problem by telling them there can only be one recovery.  That's

5    the way that problem is handled.

6         Now, I agree with your underlying premise that there can be

7    actions on the part of the employer, particularly in a situation

8    like this one, where the driver may not have acted unreasonably

9    in their 12 -- it will be 12, I assume -- their 12 minds, but

10   the company didn't act reasonably because of the particular

11   circumstances of the case.  I think that's exactly why this case

12   needs to go forward on both theories of recovery.

13        I don't necessarily agree -- well, I don't agree that the

14   only way a claim can survive directly against an employer after

15   *Elrod* is when you have that odd situation where maybe we could

16   say the employee didn't do anything particularly negligent, but

17   the employer did, because what this jury is going to be asked to

18   find is what were the causes of this accident.  And a proximate

19   cause contributing to the accident, along with Mr. Woodall's

20   actions, could be what the employer did wrong, and that's why we

21   tell the jury there can be more than one proximate cause.

22             THE COURT:  I thought you were headed to a slightly

23   different point, and maybe you are, and that is that building on

24   the more than one proximate cause, the jury could easily say

25   some fault on the part of the driver, some fault on the part of

1   company for failure to warn about the weather or look harder at

2   what Optimum was doing or -- yes.  And so there's that possible

3   result as well.

4        MR. BROOKS:  Yes.

5        THE COURT:  What about your brother Baker's response

6   of the core concern about avoiding a double recovery?  You

7   mentioned instructing the jury that there's no double recovery

8   and being plain about that.  If that instruction is given and

9   the jury puts 20 percent on the driver and 40 percent on the

10  company, or vice versa, is there a double recovery if plaintiff

11  gets 60 percent?

12       MR. BROOKS:  No.  There's no -- we dealt with this in

13  Arkansas law way back when with the *Sauer* case when the Court

14  approved a non-pattern jury instruction telling jurors there can

15  only be one recovery.

16       What negligence caused that indivisible injury is something

17  the jury has to assess.  For reasons that I don't -- I have to

18  confess to you I don't completely understand and wholly disagree

19  with, we have *Elrod* taking some of those claims back.  But we

20  still have the premise that more than one act of negligence can

21  cause that indivisible injury, and the jury ought to be able to

22  hear those acts of negligence.

23       THE COURT:  So you disagree with your brothers Baker

24  and Galas that the holding of *Elrod* is, there is only one

25  indivisible -- one possible theory of recovery in this

1    circumstance?

2           MR. BROOKS:  Yes, I do.  I think that *Elrod* is limited

3    to the negligent entrustment notion that it spoke to in that

4    particular case, that negligent entrustment being completely

5    derivative of the employee's negligence in and of itself, and we

6    don't assess that.  I don't agree with it, but I don't get to

7    make that decision, for all of the reasons I said I don't agree

8    with it.

9           THE COURT:  Now, quarrel with my premise.  Why -- the

10   Court is sitting in diversity and has to follow Arkansas law, in

11   particular *Elrod*.  Why isn't that the end of what Brantley wants

12   to talk about here that are training, supervision, and

13   retention-ish kinds of things?  Your first bullet point, as you

14   described it.

15          MR. BROOKS:  Sure.  As I appreciate a negligent

16   entrustment claim, we look at this particular person and their

17   underlying qualifications to do a job, and for whatever reason

18   in their background, there are 15 different wrecks under certain

19   circumstances for a truck driver, perhaps.  That person never

20   should have been entrusted with this vehicle.  It's something

21   from that person's background that eliminates them overall as

22   qualified to even be on the road.

23          THE COURT:  They're incompetent.

24          MR. BROOKS:  They're incompetent.  Someone can be

25   generally competent to handle the ordinary situation but yet not

1    adequately trained to handle the extreme situation, which is

2    what the case is about.  The training does not depend on that

3    person's being so incompetent that they never should have been

4    entrusted with the vehicle to begin with.

5         THE COURT:  It's almost a continuing entrustment,

6    though, isn't it?  Aren't these variations on the theme of you

7    need training, special training about hazardous situations

8    because they're starting to arise?  Or a variation would be,

9    you've gotten a bunch of tickets driving for us or had a bunch

10   of wrecks, so we're not going to retain you?  Isn't that a

11   continuing entrustment?

12        MR. BROOKS:  I'm going to have to think about that for

13   a minute, but I'll try to talk and think at the same time.  I

14   don't believe it is, because we're not looking at the overall

15   minimal competence of the driver to do the job; we're looking at

16   the ongoing training that the driver has to handle peculiar and

17   discrete situations.

18        THE COURT:  So your brother Galas invoked the AMI, and

19   I'm going to as well because I have precedent to do it, and in

20   the bracketed alternatives about negligent entrustment, it's got

21   impaired -- right?  I give the keys to the drunk driver,

22   negligent entrustment.  Incompetent.  That's your point.  The

23   third bracket, though, is inexperience.  Why -- these things

24   that you have just instanced about particular circumstances,

25   that -- doesn't that go to experience?

```
1           MR. BROOKS:  Is the nurse who is experienced in labor
2   and delivery incompetent or inappropriately entrusted to be
3   transferred to ICU, to the heart or cardiac floor?  I don't
4   think so.  But if she has not been adequately trained, I think
5   that's not an experience issue; it's different, it's a training
6   issue.  It's a squirrelly line, I will give you, but
7   inexperience to me means placing a person in -- it still deals
8   with competence.
9           THE COURT:  Okay.
10          MR. BROOKS:  Competence and experience meld with one
11  another.
12          THE COURT:  I understand your point.
13      Mr. Baker and Mr. Galas, a last word on these issues?  I
14  stopped you, Mr. Baker, before.  You were about to come out of
15  the chair.
16          MR. BAKER:  That's fine.  I would just, you know,
17  rhetorically or however you want to handle it, ask the Court to
18  give consideration practically to just envisioning what such a
19  trial would look like when we reached the point of instructing
20  the jury and sending the comparative fault interrogatory out to
21  them.  What if they do put 20 percent on OSI and 40 percent on
22  Woodall?  What is -- OSI is my client.  What is my client?  Is
23  it a joint tortfeasor?  If so, under Arkansas substantive law,
24  it can only be liable for its own negligence.  It can only be
25  liable for its 20 percent.  Or is it liable for its 20 percent
```

1    and also its joint tortfeasor's 40 percent?  Well, that violates

2    Arkansas substantive law.  So that's the law we're going to run

3    into.

4            THE COURT:  I wonder if -- I wonder if the defendants

5    have climbed that wall by assuming the employee's share,

6    whatever it may be?  In other words, I understand the argument,

7    but I don't know that -- I don't know that the acceptance of

8    liability for the employee is the end of the matter.  We may

9    just have to agree to disagree.

10           MR. BAKER:  I think the one recovery rule answers

11   that, and, you know, Civil Justice Reform Act, the elimination

12   of joint liability, and liability is several only, and if a

13   direct negligence claim can be brought against the employer,

14   then I think that's an election by the plaintiff that they are

15   going to treat the employer as a joint tortfeasor and they're

16   not treating them as an employer who has accepted vicarious

17   liability under respondeat superior.

18           THE COURT:  I guess my question would be, why can't it

19   be both?

20           MR. BAKER:  Because a joint tortfeasor by law is only

21   liable for their own percentage of fault.  You've made Woodall a

22   joint tortfeasor to OSI when you proceed on a direct negligence

23   claim against the employer.

24           THE COURT:  Mr. Galas, before I turn to you,

25   Mr. Brooks, do you have one or two sentences on that joint

1  tortfeasor issue?

2          MR. BROOKS:  I think you're right that when they

3  accepted responsibility, they climbed that -- your phrase --

4  they climbed that wall.  There's a section of Act 649 that

5  speaks to joint and several liability still applying where it's

6  the acts of an agent or an employee.

7          THE COURT:  Okay.  That's a good two sentences.

8      Mr. Galas?

9          MR. GALAS:  I was about to stand.  Sorry.

10          THE COURT:  And you can stand anytime.  Anytime anyone

11  needs a seventh-inning stretch, just take it.  I'm for it.  I

12  will probably do it myself.

13          MR. GALAS:  Duly noted.  I may myself as well, Judge.

14      The only other thing we're batting, I feel we're batting at

15  this point, you know, we've talked about a given hypothetical,

16  but in this case there's no evidentiary support for that

17  hypothetical.  The plaintiff's expert has admitted that there is

18  no duty for a motor carrier like UPS or a nonmotor carrier like

19  OSI to monitor the weather.  It's, frankly, impossible for any

20  motor carrier to employ desk clerks to sit behind a computer and

21  monitor from some remote location, from some remote central

22  location, what the weather is on a little individual stretch of

23  highway in Walnut Ridge, Arkansas.  You can monitor the weather

24  for Walnut Ridge, Arkansas, but it's still not going to tell you

25  about that dust storm that's sitting there in the middle of 412.

1    It's just not feasible.  That's the evidence in the case.

2    There's no evidence to suggest that they didn't.

3         Anecdotally, we have evidence that -- because there's

4    another company involved here, IES, which is the plaintiff,

5    decedent's company, and we took a 30(b)(6) deposition from them

6    and we cited it in our motion.  They don't do it either.

7         So the evidence in this case, the only evidence of record,

8    is from plaintiff's expert there's no such duty.  Our expert

9    agrees.  OSI's expert agrees.  So the three experts in this case

10   agree that there's no such duty, and the other company involved

11   in this case doesn't do it either.  So there's no evidence to

12   support the existence of such a duty, applying this

13   hypothetical.

14        So in this specific case, there's not even evidentiary

15   support for that hypothetical, even if your Honor was to

16   conclude that Arkansas law supports such an exception for

17   employer liability.

18             THE COURT:  Thank you, Mr. Galas.

19             MR. GALAS:  Thank you, Judge.

20             THE COURT:  All right.  Counsel, I appreciate your

21   work on those first issues.  I will -- I'm going to do my best

22   to rule from the bench as we go throughout the day, and then

23   I'll enter a "for the reasons stated on the record" order, so

24   you'll need to get the transcript.  Mr. Cox is nodding his head.

25   He's seen me do this before and lived under the burden of it.

1    So I'm going to deal now with 202 and 252.  Those are the

2  summary judgment motions insofar as they touch this direct

3  liability issue.  The motions are denied, but -- well, I take

4  that back.  They're granted in part and denied in part.  The

5  plaintiff, I believe, Brantley, is seeking too much to -- when

6  it tries to litigate these issues of training, the schooling

7  about ultrahazardous conditions or hazardous conditions, all of

8  that.  Mr. Brooks, as my pointed questions to you indicated, I

9  think that is negligent entrustment or it's -- or the Venn

10  diagram, there's a sufficient overlap in there that you just

11  can't pull the two apart.  And under the *Elrod* case, that

12  negligent entrustment claim is torpedoed by the defendants'

13  acceptance of liability.

14    At the same time I believe the defendants are overreading

15  *Elrod* to say that there is no possibility of a direct liability

16  claim once the employer has admitted responsibility for the acts

17  and omissions of its employee.  I believe the line in Arkansas

18  law to be whether the -- whether a submissible case is made on

19  the employer's independent acts of negligence.  That is, did it

20  exercise ordinary care independent of the particulars of what

21  the employee may or may not have done that day?

22    From the papers in the case, what I have discerned is two

23  possible independent theories that Brantley can pursue, subject,

24  Mr. Galas, of course, to adequacy of the proof on them to go to

25  the jury.  But one of those theories is monitoring the weather

1   and alerting over-the-road truck drivers to the weather.  And

2   the other is, in my view, when we have this kind of

3   subcontracting of staffing situations, monitoring the

4   subcontractor's work to see if it is complying with the terms of

5   the parties' agreement.

6        Those are things separate and apart from Mr. Woodall's

7   actions on that day, and I think there is a jury instruction

8   that we can use about it, and it's the ordinary care

9   instruction.  And assuming that the proof is sufficient to

10  create a jury question on those issues, then we'll go to the

11  jury.  If it's not, then we won't.

12       I don't know what the proof is, Mr. Galas, about

13  feasibility of monitoring weather.  I would assume that in this

14  over-the-road vehicle, like in most, there are means of

15  communication with some central authority and some dispatching

16  authority and that there is regular communication.  And even a

17  Luddite like me knows about The Weather Channel and these

18  national looks at radar.  And to spin another hypothetical, it

19  would seem to the Court to create a jury question on ordinary

20  care if a trucking company knew that a hurricane was about to

21  make landfall or that there were tornadoes in a particular area

22  or there was flooding -- pick your example of extreme and

23  hazardous weather -- and it could have but did not communicate

24  that to its drivers.  So, as I said, partly granted and partly

25  denied.

1    The defendants' motions are granted on direct theories

2  except for the two that I have just indicated, and, of course,

3  subject to what the Court might do once the proof is in.

4    Let me take the opportunity to make two other points.

5  Mr. Galas.  As it will become clear when we go through the day,

6  the Court's the one that gets to decide the duty question and

7  that gets to decide the law issues in the case, and I expect,

8  though I haven't made up my mind completely, that there's going

9  to be some substantial trims to the proposed expert testimony in

10 that regard.

11    And then the second point, Mr. Baker, about a motion, I

12 assume you said there would be a motion about this issue, on the

13 monitoring the weather?

14         MR. BAKER:  Yes.

15         THE COURT:  Did you mean a motion for judgment as a

16 matter of law at the trial?

17         MR. BAKER:  No, your Honor, in today's list, I believe

18 there's a motion in limine on expert testimony imposing upon the

19 defendants a duty to monitor the weather.

20         THE COURT:  Got it.

21         MR. BAKER:  I'm sorry for not clarifying that.

22         THE COURT:  No, no, I just wanted to -- thank you.

23 That helps me to understand what you were referring to, and

24 we'll take care of that when we get to that one.

25    Requests for clarification about the Court's ruling on that

1    direct independent negligence issue?

2        Okay.  Let's move on to punitive damages.

3        I believe it would be helpful for me to hear a sentence or

4    two from the defendants, maybe clasping the *D'Arbonne* case to

5    your heart and explaining to the Court why our facts here are

6    just not sufficient, but maybe not.  Mr. Cox?

7                MR. COX:  Yes, your Honor.  The facts in this case are

8    clearly different from that case.  In that case there was an

9    intentional act that they talked about, the brakes issue, and

10   that's where that case is different from, frankly, all the other

11   cases in Arkansas that talk about the negligence aspect of it.

12   And in this case, the plaintiff's argument, and I'm sure when

13   you'll turn over to them, they really just have two arguments:

14   That Mr. Woodall was going five miles over the speed limit or

15   that Mr. Woodall drove into this -- and we're going to get to

16   that, but their term, the "wall of dust."

17                THE COURT:  Yes.

18                MR. COX:  There is no argument that there was any

19   intentional or hidden act by Mr. Woodall.

20       Now, what I assume the plaintiff's argument will be, well,

21   driving into the dust storm was the intentional act.  Frankly,

22   your Honor, the -- and I'll spell it because I always pronounce

23   it wrong, the *Riffey* case, R-i-f-f-e-y --

24                THE COURT:  That's Judge Wilson's ice and snow case.

25                MR. COX:  Correct, your Honor.  That case, frankly, is

1    the spotted cow for how weather is different from the *D'Arbonne*

2    case and the intentional acts, and I think that is the case that

3    separates this from rising to the level, again, as your Honor

4    knows, conduct no matter how gross that is not intentional.  If

5    it's negligent, it's negligent.  And I think one of the quotes

6    from that case that, frankly, I thought was appropriate for our

7    case was when the Court in that case talked about, well, every

8    driver was out there driving.  And that's what's important here,

9    because clearly if your Honor holds that seeing the dust storm

10   and continuing to drive was punitive, then every driver that was

11   out there that day, their conduct was punitive.  And I think

12   that is an expansive view of Arkansas law as to punitive

13   damages.

14        THE COURT:  Thank you, Mr. Cox.

15        Mr. Brooks, you knew this was coming.  Why is this -- we

16   don't have drinking.  We don't have drugs.  We don't have

17   racing.  We've got weather.  Now it's bad weather, but why is

18   that sufficient to show -- to create a jury question on malice?

19        MR. BROOKS:  I start with the standard which I think I

20   can say in two sentences, if that.  If something is facing me as

21   an actor, whether I'm a nurse or a doctor or a truck driver or

22   driving a Pinto, and I know that, if I proceed with that thing,

23   that there's a strong likelihood that somebody is going to get

24   hurt and I do it anyway, that's punitive conduct.  That's what

25   our statute says, that's what the standard in *D'Arbonne* says,

1    and that's what all of these cases that we've read in Arkansas

2    for the years have said.

3         Where it matters here is not, well, let's compare the

4    actions of the other drivers and Mr. Woodall.  Let's take as an

5    assumption that driving a Pinto you exercise the same degree of

6    care as you do when you're driving a big truck.  All of the

7    other drivers did something that he didn't do:  They slowed down

8    when they experienced the dust cloud, the dust wall, whatever

9    you want to call it, when they knew they couldn't see anymore.

10   That's what he didn't do.

11        What he saw facing -- he was in a storm that debilitated

12   vision all along, but we have evidence from the picture that

13   we're all going to talk about later to witness testimony that

14   hovering in front of people clearly visible was a cloud that

15   people disappeared into and you couldn't see.  And I know or I

16   ought to know that if I hurtle through that cloud at my normal

17   rate of speed and somebody is in it and I hit them, somebody is

18   going to be hurt.  That's the punitive standard.

19        If I know that there's a strong likelihood that a nursing

20   home resident is going to be injured if I don't have adequate

21   numbers of staff, I don't have to intend to hurt any of them,

22   but I know the consequences of my actions are that somebody is

23   going to get hurt.  That's what we see in this case.  Had he

24   slowed down, had he taken note that here is this cloud that I

25   can't see into, I need to take some precautionary step, then

1  maybe not.  Maybe we're just talking about pure negligence.  But

2  when I see this thing in front of me that I'm -- if I experience

3  it without making some adjustment, someone is likely to be hurt,

4  that presents a question of punitive damages for a jury.

5          THE COURT:  And does the record as it currently sits

6  provide clear and convincing evidence that he saw the cloud,

7  recognized it as the dust cloud, and carried on at his 50 miles

8  an hour?

9          MR. BROOKS:  I'm sorry.

10          THE COURT:  No, I'm done.  Your brother McDaniel is

11  nodding his head up and down.  So are you going to defer to him

12  on the facts?

13          MR. BROOKS:  No.  Does he say that he saw it?  No.  Do

14  we have evidence that he ought to have said that and that he

15  ought to have appreciated?  Yes, we do.  We have everybody who

16  went into it before him, and, most convincingly, we have the man

17  who was following him, who saw the very same thing he saw.  And

18  what he saw when Mr. Woodall entered into that cloud was an 18-

19  wheeler disappear, completely disappear.  And what did he do?

20  He slowed down.

21          THE COURT:  Isn't it one or two steps short of

22  *D'Arbonne*, though, where the brakes are disabled, which would

23  have -- on one side, which would be the equivalent of the bad

24  circumstances, and then the old truck driver says to the

25  company, "You've got to fix them brakes.  They pull to the left.

1    It's going to pull me into the other lane."  And nothing is

2    done.  Why isn't that -- don't you need somebody riding shotgun

3    saying to the driver to stop, recognize this, something bad is

4    going to happen, and then proceeding on to allow malice to be

5    inferred in these circumstances?

6            MR. BROOKS:  Do we have to have it called to the

7    attention of the negligent person before his conduct rises to

8    the level of punitive conduct?  I don't think so when this is

9    perceptible to him.  I don't believe so.

10            THE COURT:  So there's some circumstances so

11    obvious -- while it might be useful, part of the proof, to have

12    it -- to have the driver saying, don't do this, company, get it

13    fixed, your argument, there are some circumstances that are so

14    obvious, the likelihood of injury so substantial that it's

15    reckless disregard to proceed such that malice can be inferred.

16            MR. BROOKS:  Sure, and to be -- to make a nearly

17    ridiculous hypothetical, if you're driving in a downtown area

18    and there's an obstruction in front of you, regardless of what

19    you're driving, you don't have to have somebody tell you don't

20    drive up on the sidewalk to go around it before that is punitive

21    conduct.  If you drive up on the sidewalk, you're going to run

22    over somebody, or you're likely to.

23            THE COURT:  Now you're impugning Winston Churchill.

24    Did you know that was something that he regularly did when

25    traffic got in his way, was drive on sidewalks and everywhere

1    else to get where he was going?

2         MR. BROOKS:  I have read a lot about Mr. Churchill.  I

3    have not read that one.

4         THE COURT:  Okay.  I'd like a last word from one or

5    both sides of the defense on this.

6       Mr. Cox, did you want to come again?

7         MR. COX:  Yes, your Honor.  And I think the argument

8    was exactly as I characterized it earlier, the speed and the

9    weather.  The problem with both those arguments is, they have

10   already been addressed under Arkansas law.  This is not an issue

11   of first impression.  The *Riffey* case handles this almost

12   squarely about the fact that the driver drove in snow for three

13   or four hours.  One of the facts is, he passed several prior

14   accidents while doing it.

15        THE COURT:  Other vehicles in the ditch.

16        MR. COX:  People all over the way, and the fact that

17   he continued driving at -- and I think the case said about 45

18   miles an hour was the proof.  And the Court still said that

19   doesn't give that rise to the level of it being punitive.  It

20   may have been negligent, it may have made -- should have made

21   different decisions, arguably, but that's not punitive.

22      And then we have the *Bizzell* case, that is another case

23   that's directly on point.  And your Honor knows about them,

24   where the speed within a certain range, the courts have already

25   addressed this issue.  If Mr. Woodall had gone -- was going a

1    hundred miles an hour, the argument might be different.

2              THE COURT:  Racing.

3              MR. COX:  Right.  He is racing through there and

4    he's -- "By God, I'm going through."  But those aren't the facts

5    here, your Honor, and case after case after case in Arkansas law

6    has handled this issue about speed, and the *Riffey* case clearly

7    about inclement weather.  This just isn't a case for punitive

8    damages.

9              THE COURT:  Would Optimum like to be heard on this?

10   Ms. Jones?

11             MS. JONES:  Your Honor, the only thing I would add to

12   what Mr. Cox has said, as this Court has mentioned, the Erie

13   Doctrine applies, and the Arkansas Supreme Court has already

14   answered this question in *National By-Products*.  And, in fact,

15   in *National By-Products*, not only did they set the standard of

16   wantonness, but where they looked specifically at there needs to

17   be some clear and convincing evidence to show that Woodall was

18   disposed to perversity.  But they look specifically at factors

19   that Mr. Brooks is mentioning.

20        This idea that he can see it and still disregard it, the

21   Court in *National By-Products* looked at a fact situation very

22   similar where the Court details out where the driver can see and

23   has a clear understanding, according to the facts in that case,

24   of what's coming up ahead, yet doesn't brake and doesn't slow

25   down.  And in that case, the Arkansas Supreme Court held that

1  that was not enough to establish punitive damages under Arkansas

2  law.

3  THE COURT:  Thank you, Ms. Jones.

4  Counsel, it's well argued, and if the facts as proven -- if

5  the plaintiff proves the facts that she believes she can about

6  driving into the wall of dust knowing that it was there and

7  going forward nonetheless and not decreasing speed or doing

8  anything else, then in my view, the jury would certainly be on

9  firm ground by finding negligence and will probably -- would

10  probably say this is gross negligence.  But I do not believe,

11  following the Arkansas precedent, that the circumstances

12  presented are sufficient to support a punitive instruction,

13  reckless disregard such that malice can be inferred.  And we've

14  discussed all of the relevant precedent here which binds me,

15  especially the *National By-Products* case, and the others that

16  have been discussed -- *D'Arbonne* is the leading case -- and then

17  my colleagues' opinions in *Wheeler* and *Riffey* as well.

18  So the motions 202 and 252 on punitive damages are granted.

19  Okay.  Anybody need a break?

20  We'll take a break.  Let's take a true ten minutes, given

21  our volume of work.  We'll make it 12, and then come back.

22  (Recess from 10:06 a.m. until 10:15 a.m.)

23  THE COURT:  Thank you.  Y'all can be seated, or stand,

24  as you choose.

25  Counsel, as much as I enjoyed that, my courtroom deputy has

1    just reminded me that we've spent an hour on three motions.  I

2    told her they were important motions, but she is right that we

3    do need to pick up the pace a little bit as we head into these

4    experts.

5        Okay.  As I said, let's do the defense experts first.

6        On No. 189, as to Breck McDaniel, this seems to be a

7    grant -- or, I'm sorry, a deny as moot, that he's not going to

8    be called.  Is that correct?

9            MS. WALAS:  That is correct, your Honor.

10           THE COURT:  Okay.  So 189 is denied as moot.

11       193, on the cumulative Jackson experts, if I'm reading the

12   papers right, that's grant as unopposed because we'll only have

13   one Jackson who will talk about all of the Jacksons' work.  Yes?

14       Good.  Very good.  So 193 is granted.

15       See, Ms. Black, we're making better progress now.

16       Okay.  Barry Grant, this is motion in limine 195 by Optimum

17   and Woodall, and 221 by UPS covers some of the same ground.  So

18   let's take our accountant and those two motions.  Let's handle

19   him.  And I need counsel to indulge me for a minute while I get

20   my Grant stack of stuff.

21       Do y'all think we have enough paper in this case?  Wow.

22   I'm just kidding.

23       Thank you for your patience with me, counsel.  I know that

24   I try to minimize surprises, but it occurs to me that I should

25   have alerted counsel about my order on an expert named Jay Marsh

1     in the Herron case, or what was left in the Herron case.

2     Mr. Cox got out the door early in the case.  I don't know if

3     y'all have seen that order.  Similar issues about the projection

4     of future damages and, in particular, an issue that's on my mind

5     about taxes.

6          Ms. Jones, do you know the order?  Are you on this?

7               MS. JONES:  I do not know the order and I wish I did,

8     but I'm familiar with the issue with the gross wage loss problem

9     that Mr. Grant has in this case.

10              THE COURT:  Okay.  Maybe, Caroline, we could print --

11    it's a short order.

12              THE LAW CLERK:  It is.  Sure.

13              THE COURT:  If you could make a dozen copies and

14    distribute it.

15              THE LAW CLERK:  Yes, sir.

16              THE COURT:  Okay.  Who wants to go first from the

17    defense side on the Grant issues?

18              MS. JONES:  Your Honor, I believe that is my motion.

19              THE COURT:  I think you're right.  195.

20              MS. JONES:  Yes, your Honor.

21              THE COURT:  Okay.  Go ahead.

22              MS. JONES:  May I proceed?

23              THE COURT:  Yes, please.

24              MS. JONES:  Your Honor, Mr. Grant is a CPA, and he

25    really does two main things in this case, and the first is that

1    he has a future wage loss opinion and then, secondly, has a loss

2    of services opinion.  I'll focus on the future wage loss opinion

3    first.

4        It really is a pecuniary claim because, of course, under

5    Arkansas law, the wrongful death statute doesn't allow an estate

6    to bring a claim of future wage loss.  So the claim is really a

7    pecuniary loss, and the standard under pecuniary loss under

8    Arkansas law is would have contributed to the statutory

9    beneficiaries.

10        THE COURT:  Can't we look past the loose language

11   since he gets it right at one place in the opinion and is a

12   little fuzzy in another?

13        MS. JONES:  No, because it's the standard, and if you

14   look at cases such as the *Missouri Pacific* case in which they

15   talk about how you have to prove your future wage loss and it

16   can't be speculative, the issue is really this:  He doesn't do a

17   true would have contributed -- in fact, he assumes that

18   87.9 percent of every future dollar would go to the spouse.  On

19   its face that shows that that's, one, a lack of applying the

20   correct standard, and, two, a lack of a reliable methodology in

21   applying the standard.  So it really shows flatly that there's a

22   problem in how he's applying this.

23        He further makes a problem where he's -- he has a portion

24   of valuation opinion in which he gives the minor daughter at the

25   time of the accident a portion of that, and then upon her

1    majority gives that full portion back to the surviving spouse.

2    Logically some of that portion would have gone back to

3    Mr. Brantley and not all, a hundred percent of that gone to the

4    surviving spouse.

5         So it's clear that really what he did is, he calculated not

6    even a real future wage loss claim.  What he did was do or try

7    to do a business valuation of IES.  And he takes this business

8    valuation -- and I'll get to the problems of calling this a true

9    business valuation anyway, but he takes this business valuation

10   of IES and then gives 87.9 percent of that to the surviving

11   spouse going forward.  So it facially doesn't meet the standard

12   of would have contributed.  And then there's methodology

13   problems underneath that, and if the Court would like, I can

14   start addressing those issues.

15             THE COURT:  I think I would like to -- I'd like to

16   deal with this at a more -- at a higher level.  I understand

17   that you've got valuation issues.  I wonder if that couldn't be

18   ventilated on cross.  But I'm concerned with these issues that

19   you've just highlighted about allowing the estate to recover,

20   the nature of this claim, and then a point from my Marsh order,

21   which will be here shortly, and that is that none of this is

22   after-tax dollars.

23             MS. JONES:  Yes.

24             THE COURT:  And death and taxes, that's what Ben

25   Franklin told us, it's certain.  Am I right that none of it is

1    after-tax dollars, Ms. Jones?

2            MS. JONES:  That's right, and that shows again a flaw

3    in the methodology in applying the standard because he uses only

4    gross numbers.  And, of course, as the Court has alluded to,

5    those gross numbers would never be contributed to the surviving

6    statutory beneficiaries.

7            THE COURT:  If the United States is entitled to the

8    money, then the spouse or the daughter, until she reaches

9    majority, they're not going to get them.

10           MS. JONES:  Correct.

11           THE COURT:  What about the -- on the loss of services

12   piece, the defendants' argument that this is just made up,

13   essentially?  I don't mean to be glib, but that's what I took

14   from the papers.

15           MS. JONES:  Well, the real issue, I guess, is twofold:

16   One, there's no documentation that there was any actual loss of

17   these services.  There's no receipt to show that there was a

18   loss of these services.

19           THE COURT:  Well, but, you know, my wife doesn't give

20   me a receipt when she goes to the grocery store, or I don't give

21   her one when I do.

22           MS. JONES:  Well, what I mean by receipt is, it

23   doesn't show that she, for example, has a receipt that she went

24   out and paid for these services now.  There's no receipt showing

25   that she's paid a CPA to do the checkbook accounting.

1          THE COURT:  Oh.

2          MS. JONES:  As they claim that they're being paid for.

3     So the second issue is this:  So they take this idea of a loss

4     of services -- so, for example, balancing your checkbook, and

5     say, you know, Mr. Brantley's task was to balance the checkbook.

6     He's not here to do that anymore, so we've got to compensate for

7     that.  So they give an accountant professional rate for that.

8     So the charge for it is a professional rate that is for services

9     they would never have received.  They weren't receiving an

10    accountant to do the checkbook.  They weren't receiving a

11    financial advisor to look at the 401(k).

12         And when asked, Mr. Grant, "If Mr. Brantley was to be paid

13    for these services that he was providing, what would he be paid

14    on the open market," Mr. Grant was honest in responding nothing.

15    He wouldn't get anything for those services on the open market.

16    So it's quite a jump to go from zero on an open market to a

17    professional rate.

18         THE COURT:  Okay.  Anything else, Ms. Jones, on

19    Mr. Grant?  And your arguments, of course, are preserved about

20    the business valuation issues and the allegedly speculative

21    nature of that.  I understand it, but --

22         MS. JONES:  Yeah.  The only one little point I'll add

23    on the business valuation is just going to using the business

24    model anyway, using those business numbers, because loss of the

25    business finances are not recoverable in a wrongful death as

1    well.  So that just shows facially a problem with him applying

2    the standard and using the damages he is using.  So beyond that,

3    all of the numbers we talked about, that's all in the briefs and

4    I've discussed that in detail.

5              THE COURT:  All right.  Thank you.  I think my Marsh

6    order has arrived.  Let me -- my clerk will pass that out and

7    I'll give y'all a minute or two to at least skim it.  It's not

8    long.  I think it's only on the first issue, the tax, the

9    after-tax dollars, rather than the loss of life damages that's

10   present here in this case.

11        Who will -- Ms. Walas?

12             MS. WALAS:  Yes, your Honor.  I'll go ahead and

13   address the tax issue first.

14             THE COURT:  Please.

15             MS. WALAS:  Mr. Grant actually does take into account

16   the tax, and he reduces the value by the income tax.  It's on

17   page 17 of his report.

18             THE COURT:  In the present value calculation.

19             MS. WALAS:  In his present value calculation.  He does

20   say, like, future value, when you read what he wrote, it's

21   future present value, and he does make a reduction.  And he

22   spells out how he has a column on the percentage he uses before

23   income taxes and the column of after income taxes.  And then he

24   goes on to say, see also the 2.3 reduction to present value

25   discount rate.

1          THE COURT:  And what page of the report?

2          MS. WALAS:  Page 17.  It will be document 222-12, page

3  18, because there was a cover page, I think.

4          THE COURT:  All right.  I'm in 222-10 that I believe

5  is his report, but that may be the first report.

6          MS. WALAS:  222-12 is his second report, your Honor.

7          THE COURT:  Okay.  Thank you.  And you said page 17.

8          MS. WALAS:  Yes, sir.

9          THE COURT:  Give me just a second here.

10     I see it there at the bottom of the page.  So does he use

11  these after-tax, after-income-tax figures, throughout all of his

12  calculations?

13         MS. WALAS:  That is my understanding, your Honor,

14  based upon his testimony and the report, which I will admit I'm

15  not great with numbers, but that's my understanding of what he

16  has done and what he testified to with respect to his reduction.

17         THE COURT:  Well, then maybe we don't have a Dr. Marsh

18  problem at all here.  Ms. Jones will enlighten me on that when I

19  switch back to her, or maybe one of her colleagues.

20     What about the other methodological challenges or critiques

21  that your colleague makes of Mr. Grant?

22         MS. WALAS:  With respect to the business valuation, I

23  believe that his methodology of using that is appropriate

24  because of the role that Mr. Brantley played with the company.

25  He received bonuses.  He received dividends.  He received

1   payouts.  And he went through, I want to say it was ten years of

2   the company's tax returns and looked at what was paid out and

3   looked at how they gave out the money and all of those things.

4   And on page 26 of that same report, he talks about the company

5   earnings and the growth and kind of lays out those previous tax

6   years of how the money was paid out to the various people within

7   the company, including what Mr. Brantley received.

8        Based on his experience and his qualifications and his

9   forensic accounting, which he goes through in specifics both in

10  his deposition and his report, and I don't want to bog down into

11  that because we got into that with the motion, he followed what

12  a normal person would do in calculating what somebody's future

13  potential earnings are.  This isn't a gentleman who was limited

14  to just driving the truck and working at the electrical company

15  and doing those sorts of things.  He had a valid stake in the

16  company where he received money as well, and so he -- since he

17  received those things in the past, it is perfectly logical for

18  the expert to make the assumption that he would continue to

19  receive those, especially with the primary owner, Ronnie

20  Brantley, saying that this is what he would have gotten.  And

21  then when he would have retired, he would have had the full

22  company, so he would have received more things.

23       So I believe that incorporating that into the future

24  earnings is appropriate in this case and that Mr. Grant applied

25  generally accepted accounting principles.  While they disagree

1  with his calculations, what he valued, all of those things, his

2  methodology is sound, and they can attack all those valuations

3  and calculations on cross-examination, like you've referred to.

4      THE COURT:  Same thing on the loss of services point?

5      MS. WALAS:  Going to the loss of services point, which

6  this isn't made up, he has a methodology, and I would point out

7  that we quoted directly from the Martin case in -- I believe it

8  was the response to UPS, and it was discussed in this response.

9  There was a lot of overlap here.  But there was a statement that

10  said that that wasn't previously disclosed, and I do want to

11  make a point of putting on the record that that was placeholder

12  Exhibit 10 and placeholder Exhibit 7 to his deposition where he

13  referenced those chapters, he referred to Mr. Martin, and it was

14  provided to defense counsel by email from Mr. Grant the day

15  after his deposition following an email that he received that

16  night reminding him to please provide us with those chapters.

17      So that was not newly come up with for this where it

18  describes his methodology as to the loss of services.

19      What he did is, with respect to the loss of services to his

20  wife, as you alluded to, we don't give receipts to our spouses

21  when we do things.  As to the amount of money that he assessed

22  for each of those services, he followed this methodology that

23  Mr. Martin has.  He has two.  He followed the alternative.  He

24  looked up what the general price for those services are in

25  Florida, where Mr. Brantley lived, and I don't believe nor have

1   I found anything under Arkansas law that requires that the

2   spouse prove that she's already lost those services in order to

3   recover for them.  Those are services that are considered to be

4   lost, you know, because of the loss of her husband.  And those

5   are the things she says that this is what he did for her, and

6   that is perfectly okay for him to then take that list and make

7   an assessment as to the loss of services to the wife.

8        Going to the loss of services that he discusses for the

9   children, I believe it's the adult children, he refers to a --

10  he refers to a loss of having that, the parent around, and he

11  calculates what that loss is based upon the general price for

12  phone calls at the time, and that's where he gets to coming up

13  with, you know, the loss of the ability to talk to that -- to

14  talk to your parent.  So it goes --

15            THE COURT:  I'm not sure -- pardon me.  I'll interrupt

16  for a joke.  I'm not sure my adult children would agree that my

17  being available is worth that amount that's in the report, but

18  maybe, you know, that's a -- anyhow --

19            MS. WALAS:  And, your Honor, I would say to you what I

20  would probably say to defense counsel was, well, you can press

21  him on that on cross-examination.

22            THE COURT:  Yes.

23            MS. WALAS:  But I think that his methodology is sound.

24  He goes through it in detail going back to the services to the

25  wife and minor child.  Page 10 to 13, 14, of the report.

1   There's some details.  It's not just an, oh, he did the

2   housework.  It's the specifics of what he did.

3       Again, looking at this Martin chapter and Mr. Grant's

4   testimony and his report, his methodology satisfies what normal

5   forensic accounting does in these situations.  There's always a

6   little bit of guesswork and speculation, for lack of a better

7   word, when it comes to projecting what a person is going to make

8   and do in the future, but it's based on the sound data that he

9   has and on a sound methodology.  This isn't just like he sat

10  down one day and wrote out a list of numbers.  He did what he

11  was supposed to do and he followed what other forensic

12  accountings would do.

13          THE COURT:  I understand.  What about your sister

14  Jones's earlier points on the estate not being able to recover

15  for future wage loss and the statutory beneficiary's variation

16  on that?  Is that a torpedo to Mr. Grant's opinions or to some

17  of them or what?

18          MS. WALAS:  I don't believe it's a torpedo.  I believe

19  that that's an issue of law.  I don't believe that Arkansas law

20  is as clear-cut that loss of life doesn't involve the

21  consideration of lost future earnings, in looking at the cases.

22  I don't believe it's that clear.

23          THE COURT:  Look at my Marsh order.  I mean, it's --

24  I'm not sure it is clear, but if that's -- so this issue may be

25  lurking in this case as well.

1        MS. WALAS:  Yes, your Honor, and I will say because it

2    is clear-cut with the pecuniary damages, if you look at -- let

3    me grab -- hold on one second, your Honor.  I have this marked.

4        If you look in the wrongful death jury instruction at what

5    can be considered, lost future earnings is specifically listed.

6    I want to say it's subsection C.

7        THE COURT:  Are you in 2216?

8        MS. WALAS:  Yes, your Honor.

9        THE COURT:  I think it's lost past earnings prior to

10    death.

11        MS. WALAS:  What the deceased earned and might have

12    been reasonably expected to earn in the future.

13        THE COURT:  Hold on.  You may have me here.  Let me

14    get my AMI.

15        As part of pecuniary injuries; right?

16        MS. WALAS:  Yes, your Honor.

17        THE COURT:  But don't those flow -- that's not to the

18    estate itself.  That's to the spouse and the daughter until she

19    becomes an adult; right?

20        MS. WALAS:  Yes, your Honor, and that's why we're

21    saying that it can be considered as part of the pecuniary

22    injuries to be awarded to the spouse and going forward and the

23    minor child.  The estate can recover -- I believe that Arkansas

24    law leaves it open for the loss of life.  Under your Marsh

25    opinion, I think that you disagree.  I'm preserving the record

1    on that.

2        Looking specifically at the pecuniary injuries that are

3    available to the statutory beneficiaries, the wife specifically,

4    these -- the future earnings I believe are permitted to be

5    considered as a factor concerning the deceased in the jury

6    deciding how much to award and that Mr. Grant's testimony

7    specifically goes to that factor.

8            THE COURT:  But it's -- to build on your point, is he

9    sufficiently clear that it's a factor for the jury to consider

10   in deciding pecuniary loss for wife and daughter as opposed to a

11   freestanding element of damage that is flowing to the estate?

12           MS. WALAS:  I believe that his opinion is sufficiently

13   clear on that based upon how he breaks it down.

14           THE COURT:  Can you point me, as you helpfully did on

15   the tax issue, can you point me to chapter and verse in the

16   opinion?

17           MS. WALAS:  I believe that his section where he

18   lists -- and it's page 1, your Honor -- where he lays out

19   pecuniary injuries as the title to the -- the first title to the

20   right column, and then loss of financial contribution, and then

21   A and B going across there, I believe that is sufficiently

22   definite to fall within that this is clear that this is a

23   pecuniary injury to be considered, just like the loss of

24   services.  It is one of the factors.  And I think that, you

25   know, the way he has it laid out under pecuniary injuries and

1    it's a separate factor than the others makes that clear enough
2    for purposes of 2216.
3              THE COURT:  Anything else, Ms. Walas?
4              MS. WALAS:  No, sir.
5              THE COURT:  Thank you.  Ms. Jones?
6              MS. JONES:  First a few specific things about the
7    gross numbers.  As background, we deposed Mr. Grant twice.  The
8    first time we deposed him, he realized he had made an error in
9    his calculation and he had to redo it.  He redid it and we took
10   it the second time.  In the second deposition, I specifically
11   asked him, on page 78 we were discussing his base number.  He
12   takes the base salary and he multiplies it by four.  That's his
13   methodology.  And we're discussing this, and I say:  "And these
14   are gross numbers; correct?  These are gross numbers without
15   taxes being paid out of them?"
16       His response:  "Correct.  There is no income tax in this
17   discussion."
18       I asked:  "And what is your understanding of what Arkansas
19   allows for wrongful death?  Does that include gross numbers?"
20       He responds:  "I believe I was to, one, work with gross
21   numbers.  The second is, my analysis of taxes is the taxes are
22   an issue between the family and the taxing authority.  The State
23   of Florida has no income tax, and, of course, U. S. Federal
24   Government has income tax."
25       So my understanding from his testimony is, he did not deal

1    with net numbers in his analysis.  He was dealing with gross

2    numbers.

3          THE COURT:  How do you reconcile that with page 17 of

4    his second report where he says he backs out -- as I read it

5    quickly, he says he backs out 22 percent income tax.  I assume

6    that's the federal, his ballpark of the federal tax rate

7    applicable.

8          MS. JONES:  I can only go with what his testimony was

9    to me.  I assume that maybe there's portions that he backed out

10   and portions he didn't, and it's not clear what he did and did

11   not do.

12         THE COURT:  Okay.  What about on the -- your initial

13   points on -- about the estate recovering future wage loss and it

14   being in service only of pecuniary injuries?  That's, sorry,

15   clear as mud.  You know the issue I'm concerned about.  State it

16   better, and then answer it.

17         MS. JONES:  Okay.  I believe that the issue was that

18   under Arkansas law, the estate cannot recover future wage loss.

19   Therefore, the only way that it's recoverable under Arkansas law

20   under the wrongful death statute is a pecuniary loss.  But the

21   standard under the pecuniary loss is, it has to be what would

22   have been contributed, not what was available.  That's the

23   problem that Grant makes here and his fatal mistake.  He doesn't

24   calculate what would have been available, and that's the big

25   issue and flaw with his analysis.

1          THE COURT:  Why is there enough daylight between those

2    two phrasings of availability and would have been contributed?

3    Why is there enough daylight in there to make that much

4    difference, Ms. Jones?

5          MS. JONES:  Well, the only thing that's backed out is

6    12.1 percent to keep Mr. Brantley alive.  The literature, if you

7    look at appropriate economic analysis, is, there's certainly

8    going to be things beyond keeping somebody alive that are going

9    to be taken out of the pot of availability to go towards the

10   surviving statutory beneficiaries.  And there's really just not

11   an analysis of what would have gone to the statutory

12   beneficiaries moving forward and what he would have used for

13   other things.  He was a bowler.  Those types of issues.  And he

14   certainly would have had himself --

15         THE COURT:  A fly fisherman.

16         MS. JONES:  A fly fisherman.  A skier.  You know,

17   other things that you take up in life that go beyond just living

18   and breathing.

19      Your Honor, I have a few other responses, but I'll wait and

20   see if there are specific questions that you have.

21         THE COURT:  I was starting to think, but you stopped

22   me, but that's a good thing.  I'll hear the other responses, and

23   then I'll think.

24         MS. JONES:  There was some discussion about cross-

25   examination and methodology, but it's important to understand

1    that there isn't a forensic accounting that was done here.  The

2    methodology is simply taking a base salary that he has chosen

3    for him and multiplying that by four, and that isn't a proper

4    accounting measure.  He doesn't give any authority to establish

5    that as a proper accounting measure.  He doesn't do -- in terms

6    of data, there's no foundation.  So it's more than a cross-

7    examination issue.  It goes to the foundation and reliability of

8    the opinion.  He doesn't, for example, do an audit.  He doesn't

9    do any determination if the business was viable.  What he does

10   instead is, he accepts solely the testimony of Mr. Brantley,

11   Ronnie Brantley, the father, as to how the business was doing,

12   what the business numbers were, and what it would be going

13   forward.  And he continues, even using that data, to make

14   serious calculation errors, as we noted in the first opinion.

15   There had to be a redo.  And then in the second opinion, he

16   still has, for example, a 245,000 mistake in calculating cash

17   flow.

18        These are more than just cross-examination points.  They go

19   to the reliability and the foundation of the opinion, and if

20   there is no reliability and foundation, it's simply not helpful

21   to the jury, and it's confusing to them as to what's available

22   and what the standard in Arkansas is.

23        THE COURT:  Thank you, Ms. Jones.

24   Ms. Walas, a last word on this.  Oh, I'm sorry.  Before

25   you -- you may hold your rebuttal because Mr. Cox wants to chime

1   in.

2           MR. COX:  I want to be brief, your Honor.

3       To simply state this, I think the biggest problem we had

4   with Mr. Grant is the overall understanding or lack thereof of

5   his methodology, that we shouldn't be sitting here guessing

6   about what that methodology was.  For example, basically what he

7   did in a nutshell was, he talked to Ms. Brantley, she gave him

8   numbers, and then he cloaked those numbers in an expert opinion.

9   And that's what he did on the business evaluation with

10  Mr. Brantley.  He took what Mr. Brantley said, and then he

11  cloaked that in an expert opinion.  And that is not a proper

12  methodology, your Honor.  So it doesn't just go into the -- one

13  of your questions was, is that enough daylight to exclude him.

14          THE COURT:  Yes.

15          MR. COX:  And I think that's what goes to the crux of

16  this, is that when you take it in its totality, that is enough

17  daylight to exclude him.

18          THE COURT:  Thank you, Mr. Cox.

19      Ms. Walas?

20          MS. WALAS:  Yes, your Honor.  I'll work backwards from

21  Mr. Cox to what Ms. Jones said at the beginning.

22      Methodology.  It's not just that he talked with

23  Ms. Brantley and came up with numbers and did some multiplying.

24  I mean, on page 53 of his report, he spells out what the

25  methodology of financial forecast of measure of damages is.  He

1    considers -- they're all in the report -- a ton of different

2    numbers.  Social Security, personal consumption, and what he

3    would use for himself.  He didn't -- he did perform an audit.

4    He looked through all those tax records.  He says this in his

5    deposition.  He explains what he did to get to the numbers that

6    he reached.  He used the data that he had before him.

7         This assertion that his methodology is so unclear that he's

8    just talking in circles or, you know, there's nothing in here is

9    just contrary to what is in his report and what he talked about

10   during his deposition.  He talked about the articles that he

11   relied on.  He talked about this Martin book that I've discussed

12   earlier, about how he gets to his calculations.  And these are

13   books and methods that are commonly used within his forensic

14   accounting profession.

15        That brings me to this next thing of what he would have

16   contributed versus what was available to him.  He, one, reduced

17   it by taxes, which we've already gone through, and he reduces a

18   percentage for personal consumption, for what Mr. Brantley would

19   have used for himself.  They disagree with the percentage that

20   he picked and that he utilized based on the information he had

21   available to him, but he does reduce it for that on what would

22   have likely been contributed to his spouse and to the minor

23   child.

24        In going back to the tax issue, Ms. Jones read from page 78

25   of his deposition where he discussed this.  He went on to say --

1    he was asked if he took out the FICA tax.  He says:  Yes, I took

2    out the FICA tax.  He talks about how when you get to page 4 and

3    5 and look at the loss of financial contribution.  He has one

4    table where he does a 2.6 reduction.  He has one table where he

5    does a 5 percent reduction, where he discusses how he took out

6    for -- subtracted for Social Security.

7         So to say that those weren't taken into consideration I

8    believe is contrary to not just the report, but contrary to his

9    deposition testimony as well.

10             THE COURT:  Thank you, Ms. Walas.

11        Counsel, I appreciate your help.  Either because of

12   inattention or sleepiness or whatever it may have been, I missed

13   the tax issue that's in the report.  I thought we had no

14   accounting for taxes, and as I ruled in the Herron case as to

15   Dr. Marsh, that would have been a deal breaker.  I do conclude

16   that Mr. Grant did take those into account.

17        Ms. Jones, you make very strong attacks on Grant, but I do

18   not believe that they are so foundational that it undermines the

19   reliability of his opinions.  I think the opinions could help

20   the jury, which is the point of all of this expert testimony,

21   although I would be remiss if I did not tell plaintiff's counsel

22   what I think they already know, and that is, Mr. Grant is

23   reaching in a few places here and I'm not sure how that's going

24   to play with the jury.

25        But the motion as to Grant is denied, with this

1    instruction:  His testimony needs to be clear that the future

2    wage loss is only in service of the pecuniary losses claim, that

3    it doesn't go beyond that.  I think we would be headed into

4    legal error if it were otherwise, if it were some kind of stand-

5    alone element.

6        And so, Ms. Walas, to draw out your point on that page 1 of

7    the report, it needs to be drawn in much brighter colors when

8    it's presented to the jury.

9            MS. WALAS:  Yes, your Honor.

10           THE COURT:  Okay.  So I believe that takes care of

11   195.  It's a deny, with instructions.  Maybe on 221 as well.

12   Yes.  I believe that handles 221 as well.  It's also denied with

13   the instructions.

14       Defendants are, of course -- Mr. Cox, this is on your and

15   my daylight point, defendants are free to make as much hay as

16   they can about this availability contribution issue, but I think

17   it's a matter of cross and pushing the expert on that rather

18   than exclusion.

19           MR. COX:  Thank you, your Honor.

20           THE COURT:  All right.  I know that it seems like we

21   just had a break, but before we jump off into Mr. Meyerhoff, I

22   would like to take five minutes, and anybody that wants to is

23   free to step down the hall as well.

24       Y'all can keep your seats.

25       (Recess from 10:56 a.m. until 11:02 a.m.)

1    THE COURT:  We are back in session, if everybody is

2  getting ready to go.

3    Let me -- before we move on to Meyerhoff, let me say two

4  more things about Mr. Grant.  One is, I'm going to attach my

5  order in the Herron case to the order that I file in this case

6  so we'll have it of record.  And two is, as y'all will --

7  actually, three things.  Two is, as y'all will see, this tax

8  issue concerns me.  And I made my ruling before the break on the

9  basis, Ms. Walas, that, as the report says, that he was using

10  after-tax dollars to account for federal income tax.  If it

11  turns out that that is not the case at trial, then I want

12  plaintiffs to be aware that I will probably strike his

13  testimony, which would involve a lot of wasted effort for all of

14  us, and I would tell the jury to disregard it, of course, and

15  I'm sure they would do their best to do so.

16    But I would -- I would encourage counsel to think about

17  this issue further before we get to trial and cover with

18  Mr. Grant, confirm, given the excerpts from the deposition that

19  Ms. Jones read -- and we all know that witnesses get confused

20  and they don't say exactly what they mean sometimes, but please

21  sort that out and just be aware that I'm strongly of the opinion

22  that Arkansas law requires after-tax dollars, and if we don't

23  have that here, I need to know that sooner rather than later and

24  it's going to present a problem.

25    The third clarification on Grant is on loss of life.  I do

1   not believe that the wage information is properly admissible on

2   loss of life, and there's a potential for double recovery there.

3   I spelled it out as best as I could in the Herron order about

4   Dr. Marsh, and I would ask counsel to study that and conform to

5   that ruling in presenting the proof to the jury.

6      Request for clarification on Grant?

7          MS. WALAS:  No, your Honor.

8          THE COURT:  Ms. Jones?

9          MS. JONES:  No, your Honor.

10         THE COURT:  Okay.  Let's talk about Meyerhoff.  This

11   is UPS motion 223, and then I think Optimum motion 197 in

12   particular on the contract issues.  I think we can get a hold of

13   all of these at the same time.

14      Who would like to go first?

15          MR. GALAS:  I'll take it, Judge.

16         THE COURT:  All right, Mr. Galas.

17         MR. GALAS:  So, your Honor, we moved on Mr. Meyerhoff

18   for several -- on several grounds.

19         THE COURT:  Is your mike close to you?  I'm having

20   trouble.

21         MR. GALAS:  Yes, Judge.

22     So we moved against Mr. Meyerhoff on several points,

23   several subpoints.  I'll just take those in the order in which

24   they're briefed.

25     There we go.

1    THE COURT:  Thank you, Mr. Cox.  That's why we were

2  having a little bit of trouble hearing.

3    MR. COX:  There it is.

4    MR. GALAS:  The first point that we moved on is that

5  he basically talks about a series of driving errors which he

6  tries to couch in fancy expert terms as accident avoidance

7  countermeasures and fundamental accident avoidance techniques.

8  And the plaintiff in her opposition tried to really draw this

9  distinction between driving errors and fundamental accident

10  avoidance techniques.  There's no difference, Judge.  It's just

11  a fancy way of calling a car an automobile.

12    We're talking about he's saying that he should be able to

13  testify to a jury that a driver should never drive blind, that a

14  driver should be able to stop within their sight distance, that

15  they should adjust their speed, they should not exceed the

16  maximum speed limit, they should scan ahead.  These are the

17  accident avoidance countermeasures that are supposedly specific

18  only to truck drivers in which Mr. Meyerhoff argues and the

19  plaintiff argues in her brief that the jury needs to hear about

20  because they don't understand.  And we say that that's just

21  wrong.  And Mr. Meyerhoff, as we'll see in a lot of these

22  subpoints, has been barred by at least one other federal court

23  from offering such opinions because the Court realized in

24  *Sanchez v. Swift Transportation* that they don't help the jury,

25  the jury doesn't need expert testimony to evaluate whether the

driving errors contributed to the accident, whether they were

driving errors in the first place.  That's the first basis on

which Mr. Meyerhoff should be stricken.

As well, sort of hand in hand in that in our subpoint one,

he should also be stricken from testifying that Mr. Woodall

could have avoided the accident by pulling into the shoulder of

the roadway.  He admitted he has not visited the scene.  He's

never -- he took no measurements, doesn't know the width, the

grade of the slope, didn't inspect any vehicle.  It's kind of

amazing.  At deposition and as even pointed out in plaintiff's

opposition, he says:  I don't need to.  I'm an expert.  I don't

need to do any of that stuff.  I can look at Google Maps.

That's the definition, your Honor, of the term ipse dixit,

the definition of it.  So his opinion on that front should be

stricken as well, and that's our subpoint one in our motion.

THE COURT:  And I'll stop you there.  I've broken it

into two points, but maybe it is only one larger point.  I'd

like to hear from the plaintiffs about driving errors and

preventability.  It does seem mostly common sense, and I'm

wondering why the jury needs help from an expert on this.

MS. WALAS:  So, your Honor, this goes beyond just a

jury common sense point because Mr. Meyerhoff -- these specific

accident avoidance countermeasures that we're talking about are

applicable to commercial truck drivers in hazardous conditions.

This isn't like the *Sanchez* case where it was a stop sign and

1  fatigue.  This is a situation where there are regulations in

2  place, there are things within the trucking industry that are

3  specific to driving in hazardous conditions and what you're

4  supposed to do.  And the example of pulling off to the side of

5  the road is one of those such things.

6      Truck drivers are taught and instructed when you're

7  approaching a hazardous condition that you are supposed to

8  assess it, pull to the side, figure out what to do, all of those

9  things.  Those are beyond what we do as common drivers.  Like,

10 this isn't a car versus an automobile.  This is a car versus a

11 tractor-trailer, and tractor-trailers have different issues

12 or -- I can't think of a better word than things, so give me one

13 moment.  There's different mechanics involved.  The stopping

14 distance, the various things, those are matters which are

15 outside the purview of a general jury and drivers.

16     That's what Mr. Meyerhoff is talking about here.  This

17 isn't just, oh, a driving error that he didn't stop at a stop

18 sign.  This is what you're supposed to do as a truck driver when

19 you are faced with the hazardous condition that we have here,

20 and I believe that that goes beyond -- it will be helpful to the

21 jury, is essentially what I'm saying.

22          THE COURT:  Is it in the category of industry

23 standards and practices as opposed to just the common sense

24 about driving and rules of the road?

25          MS. WALAS:  I believe it is.  I think that much of

1    what this attack on his opinion number four of that opinion goes

2    to is taking it out, trying to take it out of that context of

3    the industry standards, that what he's talking about here, you

4    know, what applies in this industry, what's supposed to be done

5    in this industry, what a reasonable driver is supposed to do in

6    this industry, and Woodall's failure to do that.

7                THE COURT:  How does that get past the law that

8    drivers are drivers as far as the law is concerned and everybody

9    is supposed to exercise ordinary care?

10               MS. WALAS:  I believe it gets beyond that because we

11   have the hazardous condition here and we have the FMCSR 392.14

12   and that the Arkansas law permits rules and regulations and

13   statutes to be considered as evidence of negligence.  Not proof,

14   but evidence of negligence.  It's not a law that if you violate

15   this, it's automatic negligence.  They get to consider it,

16   though.  And we have that here with that 392.14 that deals with

17   hazardous weather conditions that apply to professional drivers.

18        So these sorts -- what we were talking about here in these,

19   you know, accident avoidance techniques that he talks about,

20   it's not just, you know -- we aren't typically taught what

21   you're supposed to do as a truck driver to avoid accidents, how

22   you're supposed to deal with hazardous conditions the way that

23   they are, because they're -- they have a different standard

24   applied to them within their industry, not under the law, but

25   within their industry.  It's what a reasonable driver would do,

1    what would a reasonable truck driver do in this situation.

2        It's similar to, you know, what would a reasonable doctor

3    do in this situation.  It's that sort of standard, similarity

4    that can be analogous here as to how you go through why these

5    things are applicable.

6            THE COURT:  That's an interesting reference, to

7    doctors, who are subject to a standard of care and are among the

8    learned professions traditionally.  Truck drivers, not so much.

9    They're not -- there is no -- isn't the standard of care for a

10   truck driver just the standard of care for all of us who drive

11   on the roads?

12           MS. WALAS:  It is, your Honor.  Doctors was probably a

13   horrible analogy.

14           THE COURT:  I'm sorry.  I couldn't resist, Ms. Walas.

15   I had to hit that ball.

16           MS. WALAS:  It's fine, your Honor.  It was a horrible

17   analogy.  What I'm thinking more is your basic hospital staff

18   that's held to a general standard, not the doctor standard, but

19   more the general standard within there is what I was thinking

20   about, you know, the -- that sort of analogy rather than

21   doctors.  But somebody that's at the same general but they have

22   different areas of what's reasonable for them as opposed to just

23   the general reasonableness of what the situation is.

24       And I think that we also have to look at what the facts of

25   this case are and what the different regulations are that the

1    jury can consider.  And a jury doesn't understand generally what

2    hazardous road conditions are and the relation of what a truck

3    driver is supposed to do in those situations, and that's why he

4    would be helpful, in explaining those, and that overlaps a

5    little bit into the why he can talk about the regulations

6    without it violating the standard that he's telling them the

7    law.

8              THE COURT:  So how do you -- go with me down the path

9    into the trial, Ms. Walas.  Mr. Meyerhoff is on the stand and

10   this hazardous situation regulation, you want to talk to him

11   about that.  How is the examination going to go?  Reg up on the

12   ELMO and he walks through it and why it applies?  Is that what

13   you would envision?

14             MS. WALAS:  Your Honor, what I would envision is

15   asking him what our truck driver is supposed to do when they're

16   facing hazardous conditions, and my assumption and hope is that

17   he's going to explain what the regulation says.  And I can ask

18   him, "Where does that come from?"  And he'll say the regulation

19   and the CDL manuals and all the things he says in his report he

20   relies upon in explaining why the truck drivers are supposed to

21   do certain things in these hazardous conditions.

22       I don't envision popping the regulation up on the board and

23   having him read it back, but, rather, asking him the question

24   and then having him say what he bases that upon.

25             THE COURT:  Good answer.  I wonder if -- I think it

1   would benefit me to hear argument on all of these Meyerhoff

2   subpoints and then try to rule at the end, as opposed to doing

3   it bit by bit.  It's helpful to do the argument bit by bit, but

4   I think the ruling is going to be relational.

5        So, Mr. Galas, anything else on those points?

6           MR. GALAS:  Yes, Judge, and I would just direct your

7   Honor to ECF Doc 343 at pages 2-3 where we bullet quite clearly

8   that every single supposed accident avoidance countermeasure

9   that my colleague says is somehow specific to the trucking

10  industry is actually in the ordinary driving CDL manual -- not

11  CDL.  Sorry.  In the ordinary driving manual for Arkansas, where

12  it tells you if a hazard is in your path, you stop.  It tells

13  you at 50 miles per hour, here's your stopping distance.  Here's

14  your stopping distance at 30.  It tells you that if you

15  encounter rain in this example or a snowstorm or thick fog in

16  the example in this manual, you pull off the road, wait until

17  the weather clears.

18       This is nothing novel.  This is nothing high level.  This

19  isn't rocket science.  This is not, in fact, any sort of science

20  or anything special that requires any expert knowledge to talk

21  to the jury about.  These are very simple things that, again,

22  plaintiffs try to dress up, and I heard nothing different in the

23  response.

24          THE COURT:  Would it be okay for the expert to say

25  these -- this is the way the industry -- these are our

1    practices?  We're just like every driver, and we -- you're

2    supposed to pull off and you're supposed to slow down and ya da,

3    ya da?  Your point is, the jury just doesn't need that from an

4    expert?

5              MR. GALAS:  The jury does not need that from the

6    expert, and this expert has been stricken in the *Sanchez* case

7    from giving it in a federal court, and he doesn't care.  He just

8    keeps doing -- he doesn't care how many times, how many federal

9    judges strike his opinions on these things.  He offers it

10   anyway.  Your Honor we respectfully suggest should apply

11   *Sanchez.*  That stuff, none of this testimony we just discussed

12   requires any expertise period.

13             THE COURT:  All right.  Thank you.

14             MR. GALAS:  The next subpoint then is his opinion

15   number five, that the accident was preventable.  You know, this

16   is an issue, one of these issues that recurs in a couple

17   different motions, but so Mr. Meyerhoff is the one who in this

18   case injects the concept or attempts to inject the concept of

19   whether this accident was preventable, so to speak.  And, again,

20   Mr. Meyerhoff has been barred in at least one other federal

21   court, if not two other federal courts, from offering this very

22   opinion.  He just doesn't care that the judges tell him no.

23        So he's been barred from offering it, and his own

24   materials -- so they try to dress this up as something industry

25   specific the jury needs to hear from the industry, from an

1    expert in this industry about.  But his own materials say things

2    like:  Preventable is not based on or determined by legal

3    liability.  It's not related to legal liability.  Legal

4    liability has no bearing on the preventability of an accident.

5        His materials could not make clearer that the injection of

6    the concept of preventability has no place in a civil legal

7    action where the jury is tasked with deciding whether a party,

8    my client in this case, or another party, in this case their

9    client, was negligent or whether the other drivers involved in

10   this accident sequence on which the jury is going to hear about

11   and be instructed about were negligent.  Preventability has

12   nothing to do with anything.  Its injection into trial

13   impermissibly and prejudicially suggests to the jury that

14   perhaps there's some other standard they need to consider here:

15   Yeah, we're being instructed on negligence, but, oh, I've heard

16   a lot about preventability.  So I guess that has to do with the

17   concept of negligence.  I guess if the accident was preventable,

18   as Meyerhoff told me, I guess that means Mr. Woodall was

19   negligent.  And that's the problem, because they have nothing to

20   do with each other, as Mr. Meyerhoff's own materials make clear

21   and as other federal courts have barred him from so injecting

22   the topic.

23              THE COURT:  Let me move you to a third point.  Do you

24   agree with the Court telegraphing its intentions about the law

25   and that it's not the expert's place, not any expert's place for

1    either party to school the jury on the law, state or federal?

2              MR. GALAS:  Absolutely, Judge.  We couldn't have

3    briefed it any better, and we did it, and we agreed in our

4    briefs.  So we agree.

5         And following your Honor's preview, you know, when we get

6    to our experts, assuming your Honor has already stricken

7    Mr. Meyerhoff's endeavors to offer such testimony, we'll tell

8    your Honor that we're not going to offer our expert on such

9    rebuttal testimony.  That's our preview on that as well.

10             THE COURT:  And it's appreciated.  The door -- almost

11   all doors in the trial need to swing both ways, and I want and I

12   will do my best to be fair to each side.

13        Ms. Walas, on preventability or the experts in the -- and

14   the law issues.

15             MS. WALAS:  Yes, your Honor.  On preventability,

16   essentially preventability is the same as avoidable.  I don't

17   think the fact that preventability is used within the industry,

18   it's a term used within the industry, the mere fact that they

19   use that, I don't think the word itself should kick out his

20   opinions.

21        I think that it is very clear that preventability is not

22   legal liability.  It says that when he discusses it, we -- I

23   believe that we cross over and, you know, we're trying -- we're

24   not trying to say that this is the legal standard.  We don't say

25   that this is the legal standard.  But it is -- the

1    preventability is relevant to -- especially based on the Court's

2    ruling, whether this -- about the direct liability of the

3    companies as to the monitoring of the subcontractors and the

4    alerting.  You know, the preventability question, was this

5    avoidable?

6        I believe that that's not telling the jury that this is a

7    different standard that's out there.  I think it would be clear.

8    If that is the Court's fear, I do believe that that is something

9    that could be potentially remedied with a jury instruction that

10   specifically says preventability is not the same as negligence

11   based on what the industry standard is saying, that it's not

12   legal liability, but that it's a term that is used within the

13   industry to look at whether -- how things are -- you know,

14   collisions are preventable and what the companies are supposed

15   to do with respect to their drivers and with respect to

16   overseeing one another in these outsourcing situations.

17       Going to the question of the regs and talking about the

18   law, I think that my example earlier is relevant there.  We

19   don't have an expert -- I don't believe Mr. Meyerhoff is saying

20   this is the law and this is what has to happen; I think that

21   this is saying these are regulations that are considered and

22   part of the trucking industry, just like statutes are considered

23   and part of, you know, the regular driving industry.  And

24   Arkansas law recognizes that regulations can be evidence of

25   negligence.  It's not -- there's a jury instruction specifically

1    to that point, and then all the regulations that were discussed

2    during trial are usually listed within that jury instruction.

3         So the jury is clearly told that a violation of this does

4    not equate to negligence, but it is something you can consider

5    as part of it.  And when -- in our motions regarding the two

6    defense experts where we talk about this rule of law thing,

7    we're not saying they can't talk about the laws themselves.

8    Their testimony went a little bit further into saying what is

9    and what is not the legal standard, and that's the line that

10   we're drawing there.  We're not saying that Mr. Meyerhoff can

11   say that this is the legal standard, and we're asking that their

12   experts can't say that, but both sides of experts can talk about

13   these regulations and their interplay within the industry

14   itself.

15            THE COURT:  Assume that I agree with you that the

16   regulations can be mentioned and that an expert could say that

17   these industry practices or policies are rooted in the federal

18   law.  Isn't that different from what Mr. Meyerhoff proposes, for

19   example, in opinion seven where he comes flat out and says that

20   Woodall and UPS violated one, two -- two different federal

21   regulations and then explains why?

22            MS. WALAS:  I believe that he can say that those

23   regulations were violated.  It's up to the jury to determine

24   whether that violation is negligence.  But he can explain that

25   these are what the regulations are and that the conduct in this

1   case violated those regulations, again with the jury instruction

2   leaving it up to the jury to decide whether that rises to the

3   level of negligence.

4           THE COURT:  How is that argument, how do you square

5   that argument with the Court of Appeals decision in *Southern*

6   *Pine*, for example, which is 320 F.3d 838?  And I'm quoting:  As

7   we have had occasion to remark before, however, expert testimony

8   on legal matters is not admissible.  Matters of law are for the

9   trial judge, and it is the judge's job to instruct the jury on

10  them.

11      And then, skipping:  "Of course, industry practice or

12  standards may often be relevant in cases like the present one,

13  and expert or fact testimony on what these are is often

14  admissible."  Industry practice or standards.

15      But then concluding:  "But that is not what this case was

16  about.  This case was about whether federal law was contravened,

17  and expert opinion as to that was simply inadmissible."

18          MS. WALAS:  I believe there is a distinction, your

19  Honor, because this isn't a matter of saying whether federal law

20  was contravened.  These regulations are made and are part of the

21  industry itself and what is supposed to be complied with.  We

22  don't have a situation where we're saying that the violation of

23  a federal law equals negligence here.  We're just having an

24  expert explain what they're supposed to do in the industry.

25  This regulation is one of the things that governs what's

1  supposed to be done in the industry.  It wasn't followed here.

2  It was violated.  Those terms were used by our expert.  And I

3  believe that that's okay under *Southern Pine*.  It's not a

4  specific -- I don't believe it goes as specific as they're

5  discussing there.  I think that these regulations meet within

6  Arkansas law of what is permitted.

7          THE COURT:  What about the *Police Retirement System*

8  case, 940 F.2d 351?  I'm at 357, where an expert's testimony was

9  criticized by the Court of Appeals and the Court speaks of the

10  expert.  Quote:  He was the ideal witness to explain the history

11  and purpose of that provision.  Of securities law.  "He also had

12  helpful knowledge of how the securities industry responded to

13  Section 28(e), its practices and procedures involving soft-

14  dollar arrangements.  Pickard's testimony, however, went

15  farther.  He lectured the jury on what Section 28(e) meant.  He

16  gave extended explanations of why the defendants' conduct was

17  completely sheltered by that provision."

18      It seems to me that that's what, to some extent, is being

19  offered by the experts from both sides here; that is, where not

20  only are the regulations mentioned, but the argument is either

21  they shelter or do not shelter what Woodall did in the

22  circumstances.  That's the point the experts want to make, I

23  think.

24          MS. WALAS:  Your Honor, I believe -- I'm not familiar

25  with the case that you're discussing, so I wouldn't -- if I

1    could ask a question about it.

2              THE COURT:  Sure.

3              MS. WALAS:  You discussed securities regulations?

4              THE COURT:  Yes.

5              MS. WALAS:  What was the tort or the cause of action

6    in that case?

7              THE COURT:  So as I recall, the -- there was a pension

8    plan that grew dissatisfied with its investment advisors and

9    ultimately fired them, and the argument was that the

10   compensation structure that had been set up involving those

11   investment advisors and various funds, soft-dollar arrangements,

12   that those violated Missouri law.  I don't remember whether it

13   was a breach of fiduciary duty or maybe of Section 28(e).  Maybe

14   that provision of federal law.  I don't recall.  But, you see,

15   the expert was testifying on the root issue in the case, the

16   root law, and whether the conduct violated the law or did not

17   violate the law.  That's what frightens me about what's being

18   proposed here.

19             MS. WALAS:  So I think that that's the distinction, is

20   that if -- if that cause of action was for violation of that

21   statute or even, I would say, breach of fiduciary duty related

22   to the financial stuff.

23             THE COURT:  Uh-huh.

24             MS. WALAS:  I believe that that makes that a different

25   type of case than what we have here, which is an ordinary

1   negligence case.  In that case, if they're alleging that it

2   violated such and such statute and that was the cause of action

3   in and of itself, then, yes, I would say it would be proper to

4   exclude the expert under that case because the specific cause of

5   action is for a violation of that statute.

6        In this instance, we have an ordinary negligence claim

7   against the driver of the company's, and these regulations are

8   not what -- are not the specific cause of action being violated;

9   they are just evidence we would like to put forth of what

10  negligence occurred here.  And I believe that would be the

11  distinction between allowing an expert to testify here and not

12  allowing an expert to testify in a case where the specific cause

13  of action is related to a violation of that law.

14            THE COURT:  All right.  What else?

15            MS. WALAS:  I believe that's all I have on

16  preventability and regs.

17            THE COURT:  I'm sorry.  I didn't hear the last part.

18            MS. WALAS:  And the regs.

19            THE COURT:  Okay.  Mr. McDaniel, do you need some

20  water?  Are you okay?

21            MR. BOBBY MCDANIEL:  Yeah, your Honor.

22            THE COURT:  We've got cough drops on offer, too, if

23  you need one of those.

24            MR. BOBBY MCDANIEL:  I got one and it didn't do the

25  job.

1          THE COURT:  Okay.

2          MR. BOBBY MCDANIEL:  Thank you, your Honor.

3          THE COURT:  Certainly.

4     Mr. Galas, is your sister Walas right about the distinction

5     in these authorities that the Court quoted, the *Police*

6     *Retirement System* case and the *Southern Pine* case, that the

7     testimony from the experts mentioning the law and even going so

8     far as to say Optimum or Woodall violated the law, that's okay

9     here because it's only evidence of negligence, it's not

10    negligence?

11         MR. GALAS:  Absolutely not, Judge, and we actually

12    have briefed this issue as it pertains specifically not just to

13    the trucking industry, not just as to this specific regulation,

14    but as specific to, again, Mr. Meyerhoff, who, again, another

15    federal court barred him from offering testimony.  I'll quote

16    it:  Mr. Meyerhoff may not testify as to whether or not any

17    actions by defendants would constitute a violation of laws.

18    That is an issue for the jury.

19    That's on pages 12 to 13 of our opening brief, and that's

20    the *Rutstein v. Cindy's Trucking* case.

21    It's clear as day -- and, again, Mr. Meyerhoff is, frankly,

22    one of the most brazen experts I've seen.  He doesn't care how

23    many times he gets excluded; he'll just keep on doing it.  And

24    this Court, not necessarily your Honor, but in *McLane v. Rich*

25    *Transport*, and that's on page 13 of our opening brief, the Court

excluded all expert testimony about 392.14, hazardous
conditions, because the Court did not see how the testimony on
the lay meaning of hazardous conditions is helpful to the jury.
It's not.

We don't need an expert to talk about what hazardous
conditions are.  We don't need an expert to come in and testify
about whether our defendant here violated the regulation.
That's just universally disallowed.  And I think the plaintiff
recognized it, and at page 24 of their brief is where it gets
really amazing.  They try to say that his testimony,
Mr. Meyerhoff's testimony that our clients were, quote, in
violation -- that's what he says, in violation -- is not the
same as saying that they violated a law.

I mean, Judge, we're playing word games here.  Sure, "in
violation" is not the same phrasing "as violated the law"?  But
it's the same thing, Judge.  There's no distinction to be drawn
here.  And, again, we're prepared, anticipating withdrawing our
expert testimony rebutting this the second your Honor strikes
this, as we believe your Honor should.

THE COURT:  Thank you, Mr. Galas.  What about on the
drug screens, items -- I have them numbered as four and five,
that Woodall shouldn't have been hired because of the past drug
screen and this notion of a high-risk driver?  Given the Court's
ruling, *Elrod*-based ruling, doesn't any testimony about hiring
drop out?  Mr. Galas?

1          MR. GALAS:  We certainly believe so, and, in fact,

2    they even admitted -- they didn't even oppose that part of *Elrod*

3    where they said this case doesn't involve a negligent hiring

4    claim.  And that's a point we make repeatedly in our reply

5    briefs, that once they told the Court they don't make a

6    negligent hiring claim, that every time in other briefs they try

7    to say this is relevant to a negligent hiring claim, it's out.

8          THE COURT:  And the high-risk driver opinion by

9    Meyerhoff, or proposed opinion?

10         MR. GALAS:  Same thing, Judge.

11         THE COURT:  Isn't it rooted in the drug screen?

12         MR. GALAS:  Same thing.  Yes.

13         THE COURT:  Okay.  Ms. Walas?

14         MS. WALAS:  Your Honor, if I may indulge just a second

15   on the previous issue of the regulations?

16         THE COURT:  Sure.

17         MS. WALAS:  My colleague pointed out Federal Rule 704

18   dealing with experts, that the opinion is not objectionable just

19   because it embraces an ultimate issue.  And I believe that that

20   is what we kind of have here with this issue of the regulations,

21   and I just wanted to go ahead and throw that out there for the

22   Court 's consideration.

23         THE COURT:  It's helpful.  Thank you, Ms. Walas.

24         MS. WALAS:  On four and five, while we disagree with

25   the Court's ruling on *Elrod*, I will concede, based on the

 1    Court's ruling, that I believe that four and five come out.  We

 2    stand on the arguments we made in our brief as to their

 3    relevance and helpfulness, but based on your ruling, I don't

 4    think that Mr. Meyerhoff could testify about those things.

 5          THE COURT:  And your record is well preserved on how

 6    that evidentiary issue would go if the Court had ruled

 7    otherwise.

 8          MS. WALAS:  Thank you.

 9          THE COURT:  What about on the CDL manual and

10    establishing a legal duty?  Mr. Galas, if the Court goes down

11    the path that it seems to be headed on, that experts shouldn't

12    testify about the law and that's the Court's business, why,

13    though, shouldn't the experts have full rein, including with the

14    CDL manual, on industry practices and policies and things that

15    are not law but inform how this commercial world works?

16          MR. GALAS:  Sure, Judge.  And so the reason is that --

17    the reason why it should be disallowed is because the reason

18    it's being offered is to back door it in as a suggestion that

19    it's a legal requirement, that this is what drivers are required

20    to do.  And there's case law cited in our brief, opening brief

21    pages 18 and 19, making clear that a CDL cannot be used to

22    establish negligence, either per se or otherwise.  And that's

23    case law from another jurisdiction, but it's a federal court,

24    and another federal court holding that a CDL manual does not

25    carry the force of law.

1        The problem is that it's being offered to ultimately try to

2   do that, and that's why it should be disallowed.

3        The authors of the CDL manual -- first of all, we'll take a

4   step back.  What CDL manual are we using?  Some general CDL

5   manual from 2005?  Every state has got a different CDL manual.

6   So we never even nailed down in this case which one supposedly

7   applies.  Mr. Meyerhoff certainly doesn't.  He attaches a

8   generic one.

9        So beyond that -- I lost my train of thought.

10       It's just the generic CDL manual that doesn't carry the

11  force of law and that's ultimately what it's being used to try

12  to do.

13       By that same token, if we go down the road of offering

14  provisions of the CDL manual, then we'll necessarily have to

15  counteroffer through our defense case provisions of the regular

16  driving manual and/or the Florida CDL manual, which is

17  applicable to Mr. Brantley because he had a CDL license, and

18  this whole trial is going to evolve into a case where we're

19  talking about CDL provisions, and that's not -- and that's a

20  negligence case.  So it's also is a 403 argument in that it

21  becomes a matter of whirly procession, and we're going to lose

22  control of the trial if we're all offering evidence about what a

23  CDL manual says.

24            THE COURT:  I understand your point there.  The last

25  point is, as I read the briefing, is that UPS wants to prevent

1  Meyerhoff from mentioning industry standards.  True?

2          MR. GALAS:  Yes, Judge, and so the reason being there,

3  and we quoted testimony from Mr. Meyerhoff on this point, is

4  that even he can see that there's no consensus industry

5  standard.  What he's ultimately doing through his report and his

6  numerous attachments is kind of picking and choosing from some

7  companies, some motor carriers.  There's hundreds of thousands

8  of licensed motor carriers in this country.  He picks a couple

9  and says, look, here's what they did.  This is what UPS should

10  do.  Or here is a CDL manual.  Again -- and that takes me back

11  to what my train of thought was.  The CDL manual authors

12  themselves say this manual offers the opinions of the authors

13  only.  It should not be read as anything more than that.  And

14  these things are only used, as Mr. Meyerhoff admits, to help CDL

15  drivers pass a test for their CDL.

16      So, again, the idea that they are carrying the force of law

17  or that they carry even the force of an industry standard,

18  they're just trying to get things in to help smear some mud on

19  Mr. Woodall, and that's really all it is.  I know Mr. Baker's

20  brief also talks about the industry standards as well, so I

21  don't know if Mr. Baker wants to add anything on that point, but

22  that was the one area where our briefs overlapped, even though

23  we have different briefs, different motions.

24          THE COURT:  Thank you.  Mr. Baker?

25          MR. BAKER:  We've got a couple of different issues.  I

1  agree with UPS's position that the CDL manual doesn't create any

2  obligations and it has no relevance in this case.  Again, it's

3  hazardous driving in light of weather conditions.  So that's an

4  issue that's within the general understanding of a jury and

5  Meyerhoff's opinion on this is not helpful, it's not

6  specialized, it's not technical, and it's not aided or enhanced

7  by the CDL manual.

8          THE COURT:  Thank you, sir.

9      Ms. Walas?

10          MS. WALAS:  Yes, your Honor.  On the CDL manual, I

11  can't help but just go to Rule 703.  An expert can rely on the

12  things generally relied upon by other experts in the field,

13  whether it's admissible or not.

14      CDL manuals have been accepted by the FMCSA.  The

15  regulation 383.131 says that the State must provide a CDL manual

16  and it must be comparable to the American Association of Motor

17  Vehicle Administrators.

18      Mr. Meyerhoff talked about how most CDL manuals are pretty

19  much the same across the board and it's part of this industry

20  standard, and it's what he is looking at as part of formulating

21  his opinions as to whether what was done in this case complied

22  with the industry standard, what a reasonable truck driver would

23  do in the situation, what a reasonable trucking company would do

24  under situations.

25      And I think that is important, because even if the Court

1    disagrees with me and says that the matter of driving is common

2    knowledge, the what a trucking company is supposed to do in

3    these situations is not a matter of common knowledge.  And

4    Mr. Meyerhoff is explaining and offering testimony and opinions

5    about what is supposed to be done.  He relies on the CDL manual

6    that he attached to his report so that they would have it.  If

7    they don't like that one, they can throw all the other ones at

8    him that they want on cross-examination.  But he backs up his

9    opinion with that.

10        When he talks about going into these industry standards, I

11   don't know if they just don't like the term or what, but he's --

12   I mean, he's looking at what experts look at.  He says that.  He

13   explains it.  He goes through his methodology.  He's done this

14   for companies.  He's prepared these manuals for companies.  This

15   is what he's done for his work and this is what he looked at to

16   decide those exact things that I just talked about.

17        I mean, I don't know how you can have an expert testify

18   about what is common and reasonable in an industry and then tell

19   him he can't use the words "industry standards."  I think that

20   that -- I mean, with all due respect to my opposing counsel,

21   they're talking about playing with words.  I think that we're

22   getting into that area.

23        All you've got to do is look at 703, and they can rely upon

24   anything normally relied upon, admissible or not.  That's what

25   he does here.  And he can talk about the things that he relied

1    upon in formulating his opinions.  Otherwise, the jury is just

2    going to be left to wonder, well, how did he come up with these

3    ideas?

4         So I don't see how those things can be grounds for

5    excluding his opinion here or telling him he can't talk about

6    the foundation of his opinions.

7              THE COURT:  Thank you, Ms. Walas.

8         The exchange here about Meyerhoff from both sides reminds

9    me again to say what I said at the beginning and how much it is

10   I benefit from having counsel in the room and talking through

11   these.

12        So the motion as to Meyerhoff, 223 on the noncontract

13   issues, the motion is partly granted and partly denied.  I think

14   UPS has the better of the argument on this point one, to the

15   extent that these are common driving issues about hazards and so

16   forth.  I don't think that that's going to help the jury.

17        On preventable, the motion is granted on that as well, but

18   for a slightly different reason.  I think the potential there is

19   to confuse the jury.  The negligence issue is what's going to be

20   the core of the case, and I feel certain that I will instruct

21   the jury that the fact that an accident happened is -- in and of

22   itself is not evidence of negligence, and I'm afraid about

23   injecting this other concept of preventability and how that

24   might cloud things.

25        On the third point, as to Meyerhoff and all of the other

1    experts, the Court intends to strictly enforce the rule that

2    experts are not the experts on the law and they cannot tell the

3    jury what the law is or explain the law to them, and I do not

4    believe it is proper for the expert to say that X conduct

5    violated the law.  The conduct is going to come out.  The law is

6    going to go to the jury in the instructions.  And it's for

7    counsel to argue that there was a violation.  But that's not for

8    the expert.

9         I would rely on the two cases that I cross-examined

10   Ms. Walas with and the others cited in the parties' briefs about

11   that.

12        That's the third point.

13        Four and five, it's a grant, but with the caveat that all

14   of -- that it flows from the Court's ruling on *Elrod* and that

15   the issues might well come out differently if I had agreed with

16   the plaintiffs on *Elrod*.

17        On six and seven, though, the motion is mostly denied.

18   Mr. Galas, I agree with you and Mr. Baker absolutely that the

19   CDL -- that neither the CDL nor the industry standards establish

20   legal duties.  At the same time, the "experts are not to testify

21   about the law" cases are equally stout that they should have a

22   wide range of maneuvering in educating the jury about industry

23   practices and standards.  And I think that that's where they can

24   be -- the experts can be particularly helpful to the jury.

25   We're not talking about just slowing down or stopping to avoid a

1   hazard.  Instead, Ms. Walas, as you put it, we're talking about

2   the particulars that might be involved with a truck that weighs

3   thousands and thousands of pounds and the different kind of

4   brakes that you would be using.

5       I hear you, Mr. Galas, about the sample size for Meyerhoff,

6   but that's a good point for cross.  It's not, I don't think, a

7   ground to exclude him.

8       The same thing on the CDL manual.  It does not establish a

9   legal duty, but, Ms. Walas, you're exactly right that it's the

10  proper thing for an expert to rely on, and so he can testify

11  about it.

12      Long story short, I think on Meyerhoff on these issues, for

13  his testimony to be -- to come in, it's going to have to be

14  trimmed up, polished, get the law distilled out of it, and focus

15  him in on industry standards and practices.

16      Questions about that or requests for clarification?

17          MS. WALAS:  Your Honor, if I may get a clarification/

18  question.  My understanding of Mr. Meyerhoff's testimony is that

19  the Federal Regulations are guidelines within the trucking

20  industry that kind of guides their practices and whatnot.  I

21  want to make sure that his testimony complies with your ruling.

22  So, I guess, how far can he go in talking about how those

23  regulations inform the practices of the trucking company?

24          THE COURT:  He can mention them in passing.  He can

25  speak their name and draw some connection, perhaps.  But that's

1    it.

2         MS. WALAS:  Thank you.

3         THE COURT:  Sure.  And, Mr. Galas, as you -- as we

4    discussed before, that's my ruling, too, on the defense experts,

5    and same thing for them.  They can mention them in passing, draw

6    some connection to let the jury see how it might relate to

7    practices or standards.  But it's salt in oatmeal:  Just a light

8    touch, and move on when the law starts coming out.  You need

9    just a little bit.  Okay?

10        MR. GALAS:  Thank you, Judge.

11        MS. WALAS:  Thank you.

12        THE COURT:  Good.  Let's try and get through

13   Mr. Meyerhoff and the contract issues and then maybe get some

14   dinner, how about?

15        This is an Optimum motion, as I understand it.  Mr. Cox or

16   Mr. Galas, would you like to be heard briefly?  Or, I'm sorry,

17   Mr. Baker and Ms. Jones.  And I guess I would ask you to let

18   sink in -- I'm sure you've already thought about this -- the

19   Court's ruling on the direct and indirect negligence point.  How

20   is that going to affect the arguments here on the contract?

21        MR. BAKER:  Well, I was -- that was what I was going

22   to ask you to start off.  I think the distillation of our

23   primary concern is the MSA between UPS and OSI contains kind of

24   the typical boilerplate language that says OSI's performance

25   under the agreement will be in accordance with industry

1    standards.  Now, later on it clarifies it means the providers

2    industry.  But before we dive off into all of that, what

3    Meyerhoff has done is, he's grabbed that language and he's used

4    it to try to impose upon OSI a duty not to hire Woodall because

5    of his drug screen, a duty to establish training policies, and a

6    duty to train Woodall beyond whatever training he has.  So those

7    are the three particulars.

8        It appears to me your *Elrod* ruling covers that, but I have

9    no business speaking for the Court.

10              THE COURT:  I appreciate the gentle way that you came

11   up on that, Mr. Baker.  It was on little cat feet.

12       Let me get my right pile of paper in front of me, and then

13   I'll do my best to answer your question.

14       I think, to be as pithy as I can, Mr. Baker, I think you're

15   right.  I think the Court's -- if followed faithfully by the

16   Court and the parties, the Court's ruling on the *Elrod* issues

17   about hiring, retention, anything that sounds in a negligent

18   entrustment is out.  And, therefore, any Meyerhoff critique of

19   UPS and Optimum related to those issues that are now out is no

20   longer relevant and shouldn't come in.

21              MR. BAKER:  Thank you, your Honor.  There is a second

22   aspect to our motion that addresses the TDI manual.

23              THE COURT:  Yes.

24              MR. BAKER:  And so, again, to see if we can shortcut

25   it, to the extent that Meyerhoff levels his criticisms against

1   OSI arising out of that TDI manual, that you should have

2   followed your manual and given your drivers this training, it

3   again appears to me that's covered by your *Elrod* ruling.  And to

4   the extent that he uses the content of the TDI manual to

5   criticize what Woodall did in his driving behavior, it appears

6   that that is covered by your rulings on UPS's Meyerhoff, that he

7   can make reference to it, but he can't say that it's some sort

8   of legal standard that created a duty that redounds to the

9   plaintiff in this case.

10          THE COURT:  I think that's -- I think that's well put.

11  I want to hear from the plaintiff to see if she agrees with you

12  on this, Ms. Brantley agrees with you, but that's what I have --

13  what I believe I was driving at, that the manual is admissible,

14  probably, that it -- Meyerhoff can use it as part of the basis

15  of his opinions that it's among industry standards and

16  practices, but that it can't be a basis for testimony about

17  hiring problems or retention problems or any kind of failure

18  there because that claim is gone.  And it can't be argued that

19  it creates a legal duty because the Court's the only one that's

20  going to talk to the jury about law and duties.

21      Ms. Walas, are you still carrying the ball on this?

22          MS. WALAS:  Yes, I am, your Honor.  I love *Daubert*.

23          MR. BROOKS:  I can't even spell *Daubert*.

24          THE COURT:  What would you quarrel with on the

25  exchange that I just had with your brother Baker?  Preserving

1    all of your prior arguments, of course.

2           MS. WALAS:  Right.  With the TDI manual, I don't think

3    a limitation is necessary here or should be permitted.  My

4    understanding of the Court's ruling on the direct negligence

5    claim is that our theory of the monitoring of the

6    subcontractor's work to see if it is complying with the terms of

7    the agreement, I believe that the TDI manual here, the evidence

8    shows that this was not just, you know, some random manual out

9    there, but TDI -- OSI is an affiliate of TDI.  This TDI manual

10   was given to Mr. Woodall and it has a relation to what has

11   occurred in this case and to what, as I was saying with the CDL

12   manual, what an expert would normally base its opinions on.  And

13   this is a specific manual related to these companies and to the

14   matters that Mr. Meyerhoff is testifying about.

15       I think that that goes along the same lines with the MSA,

16   the staffing agreement.  I don't -- I don't go so far as to say

17   that, you know, the issue of whether they breached this

18   contract, you know, is out there, it was evidence of negligence,

19   but I do think his knowledge of the industry and how these

20   agreements are coming into place and what they mean to people

21   within the industry is helpful and relevant to the issues that

22   remain having to do with the direct negligence.  While I think

23   they're also, obviously, related to *Elrod* and that kind of

24   thing, but I think that they should not be just taken out

25   completely from the discussion because they still relate to that

1    direct negligence claim that is still in play here.

2        So I don't think it's as clear-cut as, say, Mr. Baker put

3    it.  I think that there is a little bit of wiggle room with what

4    Mr. Meyerhoff can say with relation to those things, obviously

5    taking into account the hiring, the training ruling that you've

6    already made, but he can talk about it in relation to what OSI

7    and UPS have done in this instance here.  If that makes sense.

8            THE COURT:  It makes perfect sense.  What I hear and

9    see you doing is supplementing the discussion that I had with

10   Mr. Baker and trying to spin it out in terms of these -- the

11   monitoring claims, what obligation did UPS have to monitor

12   Optimum's work.

13       I see that door and I think I'm a strong maybe on that with

14   you because I see a lurking concern here, too, about legal

15   issues.  I'm not going to allow Mr. Meyerhoff to testify what

16   the contract means or to interpret the contract.  That's either

17   for the Court or for the jury, one or the other, depending upon

18   ambiguity and maybe other points, but it's certainly not for an

19   expert.

20       I think he can testify about industry practice and these

21   staffing arrangements, perhaps how common it is.  I confess that

22   I did not get to read every word of his deposition, and so I

23   don't know how much of this was covered.  But there may be --

24   there may be aspects of the TDI manual and the master services

25   agreement that it's permissible for him to touch on, but I can't

1   give you specifics.  That's why I'm a strong maybe with you on

2   that.

3          MS. WALAS:  Okay.  And also, your Honor, I just put

4   out there with the TDI manual that OSI adopted that manual as

5   their own during -- I believe it was during the 30(b)(6)

6   deposition.  So to further, you know, support my argument that

7   this isn't such a random manual.  It has been adopted by OSI.

8          THE COURT:  I'm not persuaded by the randomness point,

9   and I understand -- my memory of the record is, there's some

10  fuzziness there on manual was given to Mr. Woodall, but he was

11  not required to read it and he did not read it.

12      Those -- the was not required to and did not, that seems to

13  me to go to the *Elrod* point, Mr. Baker.  I mean, that's a core

14  training issue.  I'm not sure of the relevance on the monitoring

15  point, but there may be -- it may be that there may be testimony

16  about Optimum telling UPS, "Here's our manual that we've given

17  to all of our drivers."  I don't know.  I'm shooting in if not

18  the dark, at least the dusk on that.

19      Is there anything else that you would want to add or

20  clarify on the contract Meyerhoff issues?

21          MR. GALAS:  May I, Judge?

22          THE COURT:  Oh, yes.

23          MR. GALAS:  Only because we didn't take a position on

24  this motion because it didn't pertain to us, but suddenly I'm

25  hearing or maybe I think I'm hearing that OSI's manual might

1    somehow be applicable to UPS.  I mean, there is zero evidence in

2    this case, not even Meyerhoff tried to say this, that UPS

3    somehow had knowledge of what was in OSI's manual and/or was

4    bound to apply whatever was in OSI's manual.

5        So we certainly object to any effort which would be a new-

6    found effort on the part of Mr. Meyerhoff, you know, in addition

7    to it never having been disclosed before, but any new-found

8    effort just on its merits and beyond the fact that it was never

9    disclosed to suggest that UPS is bound or in any way obligated

10   and in any way has any standard duty to apply what was in their

11   manual.  We a hundred percent object to that.

12            THE COURT:  I think I was being unclear, and I

13   apologize for that, Mr. Galas.

14            MR. GALAS:  That's okay, Judge.

15            THE COURT:  What I was trying to say was that the

16   manual or what's in the manual might be relevant on the

17   monitoring claim that I have allowed, and I don't know exactly

18   how, but I was hypothesizing that if Optimum had told UPS that

19   it was distributing the manual and making its folks read it and

20   UPS then relied on that or it didn't rely on that or it followed

21   up on that or it didn't follow up on that -- and, again, I don't

22   know what the proof is exactly.  I don't -- I don't know what

23   the proof is on this.  I was trying to say in response to -- to

24   your sister Walas's point that the manual and services agreement

25   both may have some relevance on the monitoring claim.

1          MR. GALAS:  Yeah, and so that's -- you know, I think

2    it's their burden on this in opposing this motion to not leave

3    it to your Honor to shoot from the hip, as your Honor said,

4    about how it might possibly be relevant to a claim that your

5    Honor has left in.

6          I mean, if that was a claim that they had been aggressively

7    pursuing as opposed to kind of being allowed to pursue it and

8    they thought that this manual was evidence to support such a

9    claim, one would have thought that they would have put that in

10   their brief, but they didn't, Judge.  And, you know, I'm telling

11   your Honor as an officer of the Court there is no such proof of

12   any distribution of this manual at UPS that they've pointed to

13   in the briefings before, your Honor, or that they could ever

14   point to in even hypothetical supplemental briefings.

15         So to the extent that it's being suggested that the manual

16   perhaps has a relevance to this claim that your Honor has

17   allowed, well, we then join in on the objection to the manual.

18         THE COURT:  Got it.  And that objection is overruled

19   without prejudice until I see how the proof fits together.  I

20   can't do any better in the circumstances.  I'm going to allow

21   the manual and the contract, too, in, but the manual -- I'll

22   stick with that for a moment, as it's one of the bases for

23   Meyerhoff's opinions.  Ms. Walas and I had this exchange.  It's

24   also, I think, some evidence of industry practice and standards

25   and policies.  And so the outright request for exclusion of the

1    manual in total is denied.  We'll have to see what relevance, if

2    any, it has on the monitoring claim.

3          Mr. Cox, you wanted to speak?

4                MR. COX:  I just wanted to make sure, your Honor,

5    because -- I want to make sure we're interpreting your Honor's

6    ruling, and I think your Honor has clarified it, that we are

7    still limited by what the Rule 26 report said, what the

8    testimony was.  So although --

9                THE COURT:  Yes.

10                MR. COX:  -- there may be a monitoring claim, it is

11    still limited to what the facts are and the proof that we are

12    already confined to.

13                THE COURT:  Yes, yes.  And so -- yes.

14                MR. COX:  Thank you, your Honor.

15                THE COURT:  All right.  Do you wish to be heard,

16    Mr. Galas, or Mr. Cox, on this No. 197, the contract issue?  Do

17    you wish to be heard further on that, or do you understand

18    the -- how the Court's ruling so far would handle all these

19    issues?

20                MR. GALAS:  We understand, Judge.  Thank you.

21                MR. COX:  Thank you, your Honor.

22                THE COURT:  Very good.  And I think that it's a partly

23    grant and partly deny on No. 197, and I believe that may be it

24    on Meyerhoff.

25          Okay.  Hearing no objection, how about a break for some

1  lunch?  Yes?

2      Good.  Let's come back at 1:15 and pick up with the

3  Brantley motions about experts.

4                  MR. GALAS:  Judge, could I just put this out there for

5  your Honor's consideration for as we proceed today?

6                  THE COURT:  Yes.

7                  MR. GALAS:  I currently am booked for a 4:30 flight

8  which I've given up hope of making.  My last flight out option

9  is a 6:55 out of Memphis, so I just put that out there for you.

10                  THE COURT:  How badly do you need to make that flight?

11                  MR. GALAS:  We have the baby's one-year birthday party

12  tomorrow.

13                  THE COURT:  Real bad.

14                  MR. COX:  What we're asking, if we go longer, I'll, of

15  course, stay and handle all the regular motions.  We just want

16  to make sure that the Court is okay if Mr. Galas has to leave,

17  that it would not be frowned upon by the Court.

18                  THE COURT:  Not at all.  And, you know, Mr. Galas, you

19  do what you think best, but it took me 15 hours to get back from

20  Seattle on Saturday, and so I would encourage you to depart in

21  time to make that earlier flight if you can because of the

22  possibility of it being cancelled and all of those other things.

23  I do not want to interfere with your family celebration, and the

24  Court -- I will not hold it against your clients at all, and as

25  you know better than I, Mr. Cox is well able to row that boat,

1   though we would miss you, of course.

2          MR. GALAS:  Thank you, Judge.

3          THE COURT:  You're welcome.  We're in recess.

4      (Recess from 12:11 p.m. until 1:19 p.m.)

5          THE COURT:  Counsel, did anything occur to you over

6   the lunch break about the ground already covered that we need to

7   revisit?

8      Mr. McDaniel, anything from the plaintiff's side on issues

9   already covered?

10          MR. BOBBY MCDANIEL:  Let me look.  Let me have a

11   second and I'll get back with you.  Okay?

12          THE COURT:  Okay.

13          MR. BOBBY MCDANIEL:  I didn't look with that in mind.

14          THE COURT:  Mr. Cox, anything?

15          MR. COX:  Nothing on the defense side, subject to what

16   Mr. McDaniel may bring up, your Honor.

17          THE COURT:  Mr. Baker?

18          MR. BAKER:  No.

19          THE COURT:  Okay.

20          MR. BOBBY MCDANIEL:  Are you talking about anything

21   else on what we've already talked about?  Or new motions?

22          THE COURT:  On what we've already talked about.

23          MR. BOBBY MCDANIEL:  I'm sorry, your Honor.  I

24   misunderstood you.  No.  I apologize.

25          THE COURT:  That's okay.  It's on the channel of I

1  always did my best proofreading of my briefs the night before

2  oral argument, or I gave the best oral argument on the way home.

3  And so I wanted to know if y'all had thought of anything that we

4  missed on those issues already covered.

5          MR. BOBBY MCDANIEL:  Thank you, your Honor.

6          THE COURT:  All right.  Let's turn to Brantley's

7  motions about the various experts.  First is No. 225, about

8  Mr. Yakoubian.  Help me with the name, please.

9          MS. WALAS:  Yakoubian.

10          MR. BRETT MCDANIEL:  Yakoubian.

11          THE COURT:  Yakoubian.

12          MR. BRETT MCDANIEL:  Judge, that motion is very brief.

13  What we have asked, various photographs that he has utilized

14  within his report and refers to within his deposition be

15  excluded for simply the reason that they're not relevant and

16  that he says he didn't consider or apply them as it relates to

17  the opinions that he rendered in this case.  And, likewise, they

18  have no bearing upon the opinions that he has in this case.

19      So we would ask that they be excluded because, A, they're

20  not relevant, and, B, they have potential to confuse the jury

21  about what it is we're actually dealing with here.

22      Also, there was reference within his deposition that there

23  may be demonstrative exhibits that he has not yet produced that

24  he may seek to introduce at trial, and we would just ask that he

25  be limited to what was produced either within his report or

1    within his deposition.

2              THE COURT:  Thank you.

3              MR. BRETT MCDANIEL:  Yes, sir.

4              THE COURT:  Who will respond?

5              MS. JONES:  Your Honor, that will be I.

6         This is a pretty simple response for Mr. Yakoubian.  The

7    referenced photographs are not going to be used as evidence.

8    They were simply reference materials.  They were parts of

9    PowerPoint reference materials that have been made by

10   researchers looking at dust storms.  So there really isn't going

11   to be a need for those to go back to the jury box.  Those were

12   really just there in the event that there was discussions about

13   something -- dust storms always being uniform or something like

14   that, to show that dust storms are not always uniform, that here

15   is photographic evidence of different ways that dust storms can

16   manifest.  But beyond that, they really were just reference

17   materials.

18             THE COURT:  Very good.  So No. 225 will be granted,

19   with a caveat about potential rebuttal testimony, but the other

20   side and the Court will need to know sooner rather than later

21   about any intention in that regard.  Okay, Ms. Jones?

22             MS. JONES:  Yes, your Honor.

23             THE COURT:  Good.  On demonstratives, let me take an

24   opportunity to say a few words about that.  I'm generally

25   against them, and here's why:  I have yet to have a trial with a

1    demonstrative where the jury didn't ask to see the

2    demonstrative.  That is, they find is very hard to distinguish

3    between what's in evidence and what's a demonstrative.  It's

4    particularly so because of the way I like to run the evidence,

5    and that is, I'll try to wrangle y'all up on all of the exhibits

6    and handle admission, and so it's seamless.  You're not offering

7    evidence in front of the jury.  Instead, I tell them, ladies and

8    gentlemen, if you see it, it's evidence unless I tell you

9    otherwise.  In other words, I run the presumption the other way.

10        So there may be some things that cannot -- that you cannot

11   move into the category of evidence out of the category of

12   demonstrative, but please try to minimize those.

13        Next is No. 227 on defense experts, nondisclosure of

14   opinions.  I'm going to grant that as modified.  No expert

15   should testify about opinions that haven't been disclosed.  So

16   it applies to everyone.

17        Next is 229, a motion to exclude part of Andrew Sievers's

18   testimony.  The first part is about legal interpretations, and

19   that's already covered by my earlier rulings.  That's a grant.

20   He, like everyone else, is so bound.  Mr. Galas, you told me

21   this was going to be fine.  Right?

22             MR. GALAS:  Sievers isn't our expert, but --

23             THE COURT:  Oh, okay, well you didn't tell me it was

24   going to be fine then.  I'm sorry.  I have in my notes that he's

25   a defense expert.  I didn't connect him with one or the other.

1          Next, speculative testimony unsupported by the facts.  This

2     is on the visibility issue.  Who will -- Ms. Jones, do you want

3     to be heard?  Or, Ms. Walas, do you want to be heard first?

4              MS. WALAS:  Your Honor, I'll just briefly address what

5     we're talking about with this speculative testimony.  We're

6     asking that Mr. Sievers be limited to not being able to say what

7     the visibility was from the truck cab at the time of the

8     incident that he -- you know, he can't speculate as to, you

9     know, what the driver saw regarding visibility.

10             THE COURT:  What about general testimony that the

11    vehicle, this vehicle, the driver is sitting at place X, so many

12    feet off the ground, and in a pickup truck or a car, you're so

13    many feet off the ground and things look different from those

14    perspectives?  I don't know if that's what he has offered or

15    not, but --

16             MS. WALAS:  I think he does go into that somewhat, and

17    we're not objecting to the general concept of the mechanics of

18    the truck and the perspective issue.  What we're objecting to is

19    him specifically saying that you -- what Woodall saw on that

20    day.

21             THE COURT:  Got it.

22        Ms. Jones, any response on that or is that agreed, that he

23    can't put himself in the truck driver's place that day?

24             MR. BAKER:  If the Court will allow me to speak for

25    Ms. Jones, I don't think we've got an issue on this.  No, he's

1     not in a position to reconstruct what Woodall saw.  I think the

2     motion was triggered by some deposition testimony where he did

3     what you suggest and said there is a difference in elevation and

4     that can potentially affect what would be perceived by the

5     driver of a vehicle approaching it.  That would be the extent to

6     which he would testify.  So I don't think we have an issue.

7              THE COURT:  It will be -- that part of the motion then

8     will be granted as unopposed, and I think that generic -- that

9     kind of generic testimony is fine.  It would help the jury.

10    They don't know how big this Volvo tractor is and might not have

11    a sense of exactly how big the Ford -- was it a Ford Super Duty

12    that Mr. Brantley was in?  Have I got that right?  No?

13             MR. BAKER:  I think it was an F-250.

14             MR. BOBBY MCDANIEL:  250.

15             THE COURT:  Okay.  So the generics are fine, but the

16    expert shouldn't put himself in the place.  So 229 is agreed.

17        231, on the human factors expert, and is his name Arndt,

18    A-r-n-d-t.

19             MR. BRETT MCDANIEL:  Correct, your Honor.  Judge, on

20    Dr. Arndt, he is a human factors expert.  One thing that we want

21    to move as it relates to him as well is that no demonstrative

22    exhibits that have not yet been produced either at the time of

23    his deposition or before be introduced at trial.  I think that's

24    pretty straightforward and it looks like that may even be

25    subsumed within your prior ruling.

1          The next is, he does offer opinions or conclusions as to

2     the accuracy of certain eyewitnesses' testimony.  Certain

3     eyewitnesses have said that they can perceive this cloud of dust

4     approximately a mile away, moving in a certain direction.  And

5     what Mr. Arndt has testified is that that's inaccurate or a

6     misrepresentation, or it must be a mistake as it relates to a

7     separate witness talking about what he could perceive from a

8     field adjacent to the road based upon where he was and what he

9     thinks that the human eye could perceive or not perceive.

10         We believe that that's a commentary as to the witness's

11    accuracy and credibility, which is left for the jury.  Certainly

12    he's free to talk about scientific concepts of which he has

13    expertise, which goes into the next component of our motion, but

14    to offer an ultimate opinion as to whether this witness's

15    testimony can be believed or not believed we believe invades the

16    province of the jury.

17              THE COURT:  I don't think your colleagues are

18    expecting the expert to testify that pointedly or directly about

19    what -- whether witness X or witness Y saw this or can be

20    believed.  I think they'd agree with you that that's not

21    permissible.  But what about this deeper layer of, here's how

22    the eye works, here's how far away we can see things and they

23    get blurry after that, and it's hard to tell which way things

24    are moving given how our eyes work, all of that?

25              MR. BRETT MCDANIEL:  Presupposing he has the expertise

1    to do that, I think it's fair for him to talk about the

2    scientific principles, and if he's asked about, you know, "Well,

3    witness Jones has said X, and is that consistent with the

4    scientific principle that you've discussed," I think it's fair

5    for him to say that that's not consistent with the scientific

6    principle that I know and as I understand it.

7           THE COURT:  So you would let him go -- the plaintiffs

8    would be comfortable with Dr. Arndt going that far, saying it's

9    inconsistent with scientific principle?

10          MR. BRETT MCDANIEL:  Well, I see head shaking, and so

11   therefore I'll say no.  You know, I think ultimately it's the

12   decision for the jury to decide the accuracy or lack thereof of

13   what a witness is going to say.  Certainly I think he can talk

14   to scientific principles that have relevance.  I think it does

15   bring into play the question of extrinsic evidence as to a

16   certain witness's testimony that may be essentially a waste of

17   time or confusing to the jury.

18       We were discussing earlier how things could spin out of

19   control on things that are directly germane to the issues when

20   it comes to manuals and things like that.  So I think there has

21   to be some constraint on that when we get into what is

22   eyewitness perception and what is accurate and what's not

23   accurate.

24          THE COURT:  I'm concerned, frankly, about an expert

25   getting into the jury box and telling the jurors, giving the

1  jurors a credibility opinion about other witnesses.  I think I

2  agree in principle that the scientific principle testimony might

3  help the jury, but I'm concerned about going any farther than

4  that.  Mr. Baker, maybe you can -- maybe you or one of your

5  colleagues can show me where I'm wrong about this, but --

6  Mr. Galas?

7          MR. GALAS:  Yes, Judge.  We don't think your Honor is

8  wrong, and we basically said as much in the briefs in that we

9  appreciate that there's a distinction as to an expert testifying

10  as to a witness's credibility, believability, whatever word we

11  would use, whatever synonym of those.  We believe the case law

12  makes that clear.  And Mister -- he's a doctor.  So Dr. Arndt

13  was asked specifically at deposition several times if that's

14  what he was doing, and every time, he said point-blank:  No.  I

15  don't evaluate the truthfulness of any witness's testimony.

16      He was asked:  So you're making a credibility

17  determination; is that right?

18      He says:  No.  I'm just telling you what's consistent with

19  the science or not consistent with the science.

20      So I think the defense appreciates the distinction your

21  Honor is drawing and I think the expert appreciates the

22  distinction that your Honor is drawing, and I think that there

23  really isn't much -- there shouldn't really be much dispute

24  about that.

25          THE COURT:  I guess I remain a bit -- I appreciate

1    that, Mr. Galas.  I remain a bit concerned about that last

2    question, any question put in terms of a specific witness's

3    testimony:  Is Ms. Jones's testimony about what she saw

4    consistent with those scientific principles?

5         No.

6         That tells me and I think would tell the members of the

7    jury that either Witness Jones is lying or she's wrong, and

8    that's the piece that concerns me.

9              MR. GALAS:  Well, and even in your Honor's example,

10   lying versus wrong, the expert's not commenting on the lying

11   part because he specifically says he's not, and we would never

12   put him forward to do that.  But it's proper on the case law

13   summarized on pages 10 to 11 of our opposition brief to say, you

14   know, quoting from the Eighth Circuit here, to summarize the

15   medical evidence in this case, or the scientific evidence as it

16   would be in this case, in our case, and express his opinion that

17   his findings were consistent with the witness's account or, in

18   this case, not consistent.  That's acceptable under the case

19   law, to go that far without commenting on or trying to ascribe

20   any sort of motive to the witness about why they might be saying

21   what they're saying.  We would never suggest that.

22             THE COURT:  And maybe I'm fighting with a windmill

23   here.  Maybe the problem is in the word "wrong."  Lying, wrong.

24   If the question is phrased in terms of consistency, that that is

25   vague enough to be acceptable under the cases.

1          MR. GALAS:  Well, the word "consistent" is expressly

2    used by the Eighth Circuit.

3          THE COURT:  That's what I'm saying.

4          MR. GALAS:  Yeah.  Yeah.  Okay.  Yeah.

5          THE COURT:  Yes.

6          MR. GALAS:  And that's -- you know, we didn't -- we

7    agreed in substantial part with the plaintiff's motion.  Again,

8    the expert did, too.  Nobody on this side wants to cross that

9    line.  It's just we're allowed to put the doctor forward to say

10   that, look, you know, a witness a hundred yards away in a field

11   over here, for instance, isn't in a position to testify about

12   what the driver should have seen.  And, in fact, I think your

13   Honor's ruling just now about Mr. Sievers basically covers that

14   point, but probably no witness can try to put themselves in the

15   driver's seat and testify to that.  So then if that ruling does

16   so apply, then Dr. Arndt won't even need to testify about its

17   propriety or not, and then that would only leave the testimony

18   about -- because what it comes down to is this witness Richard

19   Mitchell.  He's the gentleman who was driving behind Mr. Woodall

20   some distance, and so this is the nub of it.  It's that he says

21   he -- well, he's shown a photograph, this "wall of dust"

22   photograph that we've been talking about and we'll talk more

23   about further later, and he is saying -- he's asked, you know,

24   "Is this exactly how it looked to you when you were a mile

25   back?"

1       And he said, "Yeah."

2       And what the human factors expert says is, well, it happens

3   to not be humanly possible that this photograph with this

4   resolution could be visible in this -- in the way it's shown in

5   this photograph from a mile back, and here's why:  Because dust

6   grains are only so big and you can only make them out so far,

7   from such a distance back.  And that's what he says.  And that's

8   completely, 100 percent scientifically accurate for him to do --

9   accurate and proper for him to do.  So that's kind of the nub of

10  this.

11      You know, I get that they don't like Dr. Arndt impeaching

12  the testimony of the witnesses, but he's not doing it in a way

13  that's commenting on their believability, their motives,

14  suggesting they're lying or making something up.  He's

15  absolutely not doing that.  All he's saying is, here's what the

16  science is.  So if somebody were to say that this picture is

17  visible from a mile back, well, that's just not within the realm

18  of human visual capability, and here are my qualifications to

19  tell you that.  And those are set forth ad nauseam in his CV,

20  which are reproduced in our opposition brief.

21              THE COURT:  Mr. McDaniel, any closing word?

22              MR. BRETT MCDANIEL:  Judge, finally, it also -- we

23  haven't discussed his qualifications to offer such an opinion.

24  He is a human factors expert.  He does have a CV in which he

25  addresses, you know, his qualifications within the realm of

1   human factors.

2       I think to be able to offer a specific opinion as to this

3   specific type of an event as to this specific scenario, I don't

4   know that he's shown that he's tested or employed any specific

5   methodology to reach that conclusion.  And, separately, where he

6   draws upon literature that purportedly supports it as referenced

7   within his report, when we go to his report, the report just by

8   basic review of the bibliography or of the titles of these

9   materials really don't address what the human eye is capable of

10  perceiving as it relates to dust or sand from a certain

11  distance, from a certain angle, in a certain degree of sunlight

12  or lack thereof.  And to be able to offer that opinion using

13  just those basic articles, which on just review do not address

14  those situations without any specific testing in that regard we

15  think has the potential to be confusing to the jury, to mislead

16  the jury, and to be unreliable for purposes of *Daubert* as has

17  been discussed earlier today.

18          THE COURT:  Mr. Galas, did you want to hit the *Daubert*

19  points?

20          MR. GALAS:  Well, we don't see the *Daubert* points

21  briefed in the original brief, so if it's we're shifting to a

22  *Daubert* argument, so be it, but we believe that these points are

23  contained in his CV.  Plaintiff will argue -- is arguing to the

24  Court that they don't see how some of these articles and some of

25  these materials listed in the CV apply to visual acuity, but

1   they didn't ask Dr. Arndt to explain that to them.  So just

2   because they didn't ask Dr. Arndt to explain to them, which he

3   would have, and he would have explained all the course work that

4   he's taken over the course of his long career in the field of

5   human factors and how that all applies.

6        So their decision not to, so to speak, voir dire the

7   witness doesn't somehow mean he's not qualified.  He plainly is.

8   It's plainly within the field of human factors to talk about

9   human visual acuity.  Again, it's all very clear from his expert

10  materials that we produced and that they had full opportunity

11  and decided not to, for whatever reason, to explore fully with

12  the witness at deposition.

13            THE COURT:  All right.  Thank you.

14       Counsel, as I said, I'm concerned about an expert passing

15  judgment on the credibility or believability of one of the

16  other -- of one of the lay witnesses, the true witnesses in the

17  case.  I do think that it's fine and the parties agree to cover

18  the general scientific principles that are involved in

19  perception at distance involving dust and movement.

20       Mr. Galas, the Court will allow you to ask whether -- I

21  assume that Arndt has reviewed Mitchell's deposition or his

22  statement?

23            MR. GALAS:  Yes.

24            THE COURT:  So in the context of Mitchell's testimony

25  about the picture, the "wall of dust" picture, you can ask, "Is

1   his testimony consistent with these scientific principles that

2   we've just covered?"  But that's it.  And I want you to please

3   walk very gingerly through this so that we don't get in a

4   situation of the expert, as I put it, getting into the jury box

5   and making a decision about the believability or credibility of

6   Mitchell or any other witness.

7          MR. GALAS:  Understood, Judge.  Thank you.

8          THE COURT:  You're welcome.  So on 231, on Dr. Arndt,

9   I think that's a partial grant and a partial deny.  The stuff

10  that hasn't been produced yet, demonstrative or otherwise, is

11  excluded.  And it's denied on Arndt, but with those directions,

12  and the same thing about visual acuity of any other witnesses.

13  Again, I want us to be very careful.

14         MR. GALAS:  Yes, Judge.  Thank you.

15         THE COURT:  On 238, Brantley's motion in limine about

16  Stephen Chewning, on timely production of materials, I think

17  that's withdrawn, that piece of the motion has been withdrawn.

18      Ms. Walas, is this you?

19         MS. WALAS:  Yes, your Honor.  I believe that the

20  specifics of that were similar to what we've already talked

21  about, nothing beyond what was given at the deposition, nothing

22  new at trial, like that, is what that covers.

23         THE COURT:  Yes.

24         MS. WALAS:  Then it's all the same as what you've

25  already ruled.

1          THE COURT:  And the second issue is applicable law,

2    and my ruling remains the same on that.  He, like all the

3    experts, needs to be very careful and not testify about what the

4    law is or the legal duties in the case.

5          On his experience directing traffic, Ms. Walas, did you

6    want to give me a sentence or two?

7              MS. WALAS:  Sure, your Honor.  Basically we're saying

8    that his traffic cop experience is not relevant because it's

9    simply for the purposes of bolstering Woodall's deposition

10   testimony in contradicting the statement he made after the

11   accident regarding that he knew there had been a pileup and

12   that's why he was diverted.

13         What you have said previously on the previous experts is

14   that he can't make that credibility judgment for the jury.  The

15   expert can't come in and say, well, you know, this is what would

16   have happened.  So him saying that the traffic cop -- yeah, him

17   saying that the traffic cop pushed him along and, "Well, that's

18   what I did as a traffic cop," you can't bring that in because it

19   just goes to the credibility of that witness's statement, and

20   that's beyond the expert.

21             THE COURT:  Would it be acceptable for Chewning to

22   say, "I was a traffic cop.  I directed traffic all the time.

23   And I often moved traffic along with a wave of the hand," that

24   that's my experience, that's a common way that officers behave

25   when you've got an accident or closed highway, without taking

1    the next step and invoking Woodall's name and saying that that's

2    why I believe what Woodall said here?

3           MS. WALAS:  No, your Honor.  I think that that would

4    go beyond what would be permissible under 403.  His experience

5    was about 30 years ago, but also it would -- I think it weighs

6    into the danger of kind of confusing the issues and misleading

7    the jury about what happened here.  This isn't necessarily about

8    the direction of the traffic.  We have whether, you know,

9    Mr. Woodall knew about what had happened and then saw the dust

10   cloud and still drove in.  This traffic direction thing is --

11   it's a misdirection.  It's not really super relevant, except for

12   the fact that Mr. Woodall said one thing immediately after and

13   then said something different during his deposition.

14       So I think any relevance that you might have referenced in

15   your question would be out -- would be substantially outweighed

16   by the danger of misleading the jury and confusing the issues

17   about what is really before them to decide.

18           THE COURT:  Who will respond on behalf of the

19   defendants?

20           MR. GALAS:  Me, Judge.  Roman Galas.

21           THE COURT:  Yes, Mr. Galas.

22           MR. GALAS:  The only thing we said in opposition on

23   this one was to just point out the context on which this arose.

24   And the context was, in just questioning on deposition cross-

25   examination of, well, you only accepted Mr. Woodall and you

1    believe necessarily his testimony?

2        And Mr. Chewning says that, well, yeah, I did, because, A,

3    there's nothing in the record that would lead me to disbelieve

4    his testimony, but, B, it's also consistent with my experience.

5        And that response is proper under the case law cited on

6    pages 11 to 12 of our reply brief, including an Eighth Circuit

7    case that says an expert can testify based on his extensive and

8    specialized experience.  And all the case law from the First

9    Circuit, from other district courts, makes clear that an expert

10   can draw upon his personal experiences to explain his testimony.

11       If this is an area that the plaintiff wants to challenge

12   Mr. Chewning on at trial, you know, because in the greater

13   context of, oh, did Mr. Woodall stop to talk to the officers

14   such that he would learn what might face him up ahead, that's

15   where that question about what Mr. Woodall said or experienced

16   with the officer comes up.  And they, I guess, don't like that

17   testimony and they want to challenge it, and if they want to

18   challenge it through Mr. Chewning, then he should be allowed to

19   testify about why he accepts it.  That's all.  And that includes

20   his experience as an expert.

21            THE COURT:  Thank you.  So I've covered the other two

22   issues about items not timely produced, and that's agreed.  The

23   world is stopping with what was produced at the depositions

24   unless there's some horse trading among the sides, which is okay

25   with me if you've come up with something new and one of you

1    says, well, that's fine, but I get to do this in return.  So I'm

2    not against horse trading.

3         The applicable law, I've covered.

4         As I looked at the deposition excerpt on this, Ms. Walas,

5    it was prompted by questions from Brantley's side of the case.

6    And so if y'all are going to open that up, I'm going to allow

7    Mr. Chewning to testify about his experience in directing

8    traffic.  We need to -- I would suggest that you not open it up

9    and that we stay away from experts passing judgment on the

10   credibility of witnesses.  But if y'all choose to cross him on

11   that, he can speak about his experience.  So it's denied on this

12   directing traffic issue.

13        Next is 240, the motion in limine about Al Dunn.  I think

14   the first issue is the 3D laser scan data and some other

15   depositions, people's opinions.  There's a whole list of things

16   here.  So who -- Ms. Walas, is this yours as well?

17             MS. WALAS:  No, your Honor.  I get a break.

18             THE COURT:  Oh, okay.  Mr. McDaniel.

19             MR. BOBBY MCDANIEL:  Your Honor, there's things that

20   we are asking for that I don't think are seriously in dispute

21   about excluding any materials, support for opinions not timely

22   produced.  I would assume that would be agreed.  And then

23   excluding these exhibits not timely produced, I think they

24   conceded to that in their motion.  So this was somewhat

25   peremptory, to not place something at trial without having made

1  an effort to avoid it.  And then to exclude the TV interviews.
2  I think they've conceded that.
3      Then he offered testimony about the speed, and as we know,
4  one of the issues in this case is what was the speed of
5  Mr. Woodall and what was his conduct and what was it related to.
6  And Mr. Dunn just says, well, his speedometer, he could have
7  looked at -- the needle could have been between 40, 45, and he
8  could have not noticed that, with no evidence to support that
9  whatsoever, including even from Woodall, who, as I recall, said
10  he wasn't looking at his speedometer.  And, in fact, the event
11  data recorder shows that he was going 47 miles an hour
12  approximately 1,100 feet from point of impact when there was a
13  sign, basically a warning sign, speed zone ahead.  And then when
14  he got to the speed limit side better than 600 feet from the
15  point of impact, when it was then 45, he went from 47 at the
16  warning sign, and when he got to the speed limit sign, he raised
17  his speed up to 50 and he stayed at 50 miles an hour
18  consistently until one second before impact, when his brakes
19  were engaged.
20      And for Mr. Dunn to opine, well, Mr. Woodall could have
21  confused looking at his speedometer, the speedometer could have
22  been off, or something like that, first of all, Woodall didn't
23  say anything like that, and it would be improper for Mr. Dunn.
24      THE COURT:  Thank you, Mr. McDaniel.
25      Who will respond on the defense side?  Mr. Cox?

1          MR. COX:  Yes, your Honor.  On the issue -- and I'll

2    take the last one first, as to the speedometer.  I think your

3    Honor addressed that in the last motion.  Mr. Dunn didn't

4    volunteer that.  He didn't say that in his direct examination.

5    That came up in response to a question that was specifically

6    asked of him.  The issue on that is, if you don't ask the

7    question, you don't get that answer.  That was a question about,

8    well, the witness was going 47 miles an hour, and basically

9    saying, well, he absolutely was going above the speed limit.

10   And Mr. Dunn said, well, that's not actually -- and I'm

11   paraphrasing here, but that that doesn't necessarily make it

12   true.  That's how that line of questioning came up, your Honor.

13       So our position is, if you don't open the door, that

14   doesn't come in.  But if you do open the door on it, Mr. Dunn

15   should be allowed to give whatever his opinion is on that, and

16   then that would go -- and then they could cross-examine him on

17   that opinion until the cows come home.  But if you ask the

18   question and then say, well, I want to ask the question, but I

19   don't want you to give an answer, don't ask the question.

20          THE COURT:  All right.  Thank you, Mr. Cox.

21       It seems to me that the rest of the motion on the material

22   that is undisclosed or these post-report depositions that he

23   didn't rely on, defendants have no problem with a grant on those

24   issues.

25          MR. COX:  Correct, your Honor, because, again, that's

1    the same line of questioning.  He didn't offer this until the

2    specific question was asked.  But I do want to make clear, if

3    you ask him, what depositions did you review and he answers, I

4    mean, I can't -- I don't want to tell Mr. Dunn to be less than

5    truthful when he is on the stand.  And that's our only issue

6    about that.

7           THE COURT:  So he reviewed some of the post-report

8    depositions but made no supplement to his report?

9           MR. COX:  And says he didn't even rely on them.

10          THE COURT:  Okay.

11          MR. BOBBY MCDANIEL:  Your Honor, there's another point

12   to that that I don't know that we've addressed, if I may address

13   it.

14          THE COURT:  Sure.

15          MR. BOBBY MCDANIEL:  In his report in detail, he set

16   out the perception-reaction time that he evaluated and used was

17   1.5 seconds for Mr. Woodall to see and perceive the hazard and

18   begin to react to it, which was the same perception-reaction

19   time used by the plaintiff's accident reconstruction expert,

20   Mr. Jackson.

21       So when we get to the deposition, for the first time we

22   hear from Mr. Dunn after asking him:  Did you use 1.5 seconds

23   perception-reaction time in your evaluation of this case?

24       Yes, but I'm not going to give an opinion of 1.5 seconds.

25   Now that I've read Dr. Arndt's deposition, I'm going to defer

1   Tom.

2       So he's changing his opinion from what was very firmly

3   1.5 seconds to 1.6 to 2.5 or something like that, that he's

4   adopting Dr. Dunn's report, meanwhile admitting that in all the

5   years he's testified many times 1.5 seconds is the perception-

6   reaction time.  And I'm almost certain he said I've never

7   deferred to a human factors expert before to establish the

8   perception-reaction time.

9       And it's just wrong for him to come in here and have his

10  written report which we relied upon and give the deposition, and

11  then he says, no, I'm not relying on 1.5 seconds.  I'm now

12  adopting Dr. Dunn's perception and reaction time.

13          THE COURT:  You mean -- no, this is Dr. Dunn.  You

14  mean Dr. Arndt's perception and reaction time.

15          MR. BOBBY MCDANIEL:  Yes, yes.  Dr. Dunn abandoned his

16  reported 1.5 seconds and at the deposition adopted Dr. Arndt's

17  1.6 to 2.5.

18          THE COURT:  Okay.  That's a new issue, something that

19  I didn't have in my notes.  I didn't get that out of the papers,

20  but I probably just missed it.

21      And, Mr. Cox, I need a response to that because that's

22  different from our post-report depositions that I didn't rely on

23  analysis that you and I went through.

24          MR. COX:  Correct.  This is the first time, your

25  Honor, that I've ever had a plaintiff say, I want to compel your

1    expert to testify to something.

2        What Mr. Dunn said was, I'm deferring to Dr. Arndt on that

3    now.  That is what I am doing.  I am not going to give an

4    opinion on that.

5        So it's not like now he's going to come to trial and say,

6    "I am now going to give an opinion."  He said in his deposition,

7    "I am not going to give an opinion on that."  We stand by that.

8    He is deferring to Dr. Arndt on that, your Honor.

9        So there is really no issue.  They're now trying to say,

10   well, no, we want to force him to give an opinion on that when

11   we're withdrawing that opinion.

12            THE COURT:  You're withdrawing his opinion of 1.5.

13            MR. COX:  And he is deferring to Dr. Arndt on that,

14   your Honor.  And there is actually also a mischaracterization.

15   What his testimony on that was was that's sort of the general

16   perception-reaction time.

17            THE COURT:  Is it fair -- do you agree that it's fair

18   to cross Dunn on the change, that he started at 1.5 and now he's

19   deferring to Arndt?

20            MR. COX:  They can absolutely ask him, "Well, you gave

21   this opinion.  What are you doing?"

22        And he can say just like he said in his deposition, "I'm

23   deferring to Dr. Arndt on that."

24            THE COURT:  Okay.  Mr. McDaniel, last word.

25            MR. BOBBY MCDANIEL:  Yes, your Honor.  And that is on

1    document 241, page 2, No. 3 where we raise that point.

2           THE COURT:  Hold on.  Let me get there.

3           MR. BOBBY MCDANIEL:  Okay.

4           THE COURT:  Document 241, page 3?

5           MR. BOBBY MCDANIEL:  241 -- page 3, your Honor.  And

6    it's No. 3 of the items listed there.

7           THE COURT:  I see it.  "I have not, however,

8    reviewed --"  so this plot keeps thickening.

9        Mr. Cox, at least according to the plaintiff's brief here,

10   Dr. Arndt did not disclose until his deposition that he had

11   relied on Dr. Arndt's deposition.  Is that true?

12          MR. BOBBY MCDANIEL:  Dr. Dunn did not disclose he had

13   relied on Dr. Arndt.

14          THE COURT:  Thank you, Mr. McDaniel.

15          MR. COX:  The issue with that, your Honor, is,

16   Dr. Arndt's deposition wasn't taken until after the report.  So

17   this is not that we had his deposition and then we didn't rely

18   on it.  We didn't have it yet, your Honor, and we made that

19   clear in our response.

20          THE COURT:  But I feel like we've finally wooled this

21   around to here is an instance where Dr. Dunn is relying on post-

22   report depositions to change his opinion.

23          MR. COX:  It's not that he's changing it; he's saying,

24   "I'm not giving an opinion on that," your Honor.  This is not

25   where he's now going to say, "This is my opinion on it."  He's

1    saying -- at trial he's going to say, "I do not have an opinion

2    on that."

3            THE COURT:  Mr. McDaniel?

4            MR. BOBBY MCDANIEL:  Well, in fact, in his report he

5    did have an opinion.  He said it was 1.5.  And by coming in on

6    the day of the deposition for the first time and saying, "I

7    defer to Dr. Arndt's calculations or opinions on perception-

8    reaction time," that's essentially him vouching for and

9    validating Dr. Arndt, when, in fact, we had no knowledge of

10   that, that he was going to do that.

11       The fact that the deposition was -- of Dr. Arndt was taken

12   after the report was prepared, we didn't receive and were not

13   advised of any modification to that report being needed or

14   supplemented.  We get to the deposition, that's the first we

15   hear about that I'm no longer going to opine and thereby agree

16   with the plaintiff's expert.  He is now saying, "No, no, I'm not

17   going to opine and I'm going to refer to Dr. Arndt."  In other

18   words, that's vouching for the credibility of Dr. Arndt also.

19           MR. COX:  Your Honor, I --

20           THE COURT:  I feel a ruling coming on, Mr. Cox, but

21   thank you.

22           MR. COX:  Yes, your Honor.

23           THE COURT:  So on 240, the matters about undisclosed

24   material, that's been handled.  Things not timely produced.  The

25   TV story is withdrawn.  The motion is granted on the speed

1    issue.  He can't speculate about that.

2         But, Mr. McDaniel, your brother Cox is exactly right that

3    if you open the door here, too bad, but I'm not going to let

4    Dunn testify about speed on direct and speculate what Woodall

5    saw or what he knew or what speed it was going.  But if you open

6    the door and question him on it, then you're stuck with what he

7    says.

8         On the change of opinion about reaction time, I think there

9    is some prejudice to the plaintiffs from the change, but not

10   much and not enough to exclude Dr. Dunn.  I think whatever

11   prejudice there is is easily cured by you scorching him,

12   Mr. McDaniel, on cross-examination about the change of opinion.

13   But I am not persuaded that there's a prejudicial vouching for

14   somebody else on the team or anything that would justify making

15   Dunn stick with his original calculation.

16        You can bring out the original calculation and how he

17   crawfished and that will be enough.

18              MR. BOBBY MCDANIEL:  Yes, sir.

19              THE COURT:  Okay.  Good.  Dr. Souheaver.  It's motion

20   No. 258.  Who will speak --

21              MR. BROOKS:  May I ask a clarifying point?

22              THE COURT:  Yes.

23              MR. BROOKS:  I think I understood what you said, but I

24   just want to make sure we all did.  Two witnesses and two

25   experts now, you've mentioned that the way they were examined in

1  their deposition, had it been at trial, would have opened the

2  door to the response that we were trying to keep out.

3           THE COURT:  Yes.

4           MR. BROOKS:  I just want to make sure that I'm not

5  hearing that asking in the deposition has opened the door for

6  trial, that if the question is asked at trial, the door will be

7  open for the same answer.

8           THE COURT:  You have said well what I said poorly,

9  Mr. Brooks, and I thank you.  The door is not open at this

10 point --

11          MR. BROOKS:  Thank you.

12          THE COURT:  -- by what was done in the deposition.

13          MR. BROOKS:  I thought that's what you meant.

14          THE COURT:  But it could be opened at trial if we go

15 down that same path.

16          MR. BROOKS:  Thank you.

17          THE COURT:  Sure.

18      Who will on the defense side, and maybe more than one, will

19 speak about Dr. Souheaver?

20          MS. JONES:  Your Honor, I will.

21          THE COURT:  Okay.  Ms. Jones, let's cut to the chase.

22 How does the Court navigate around *Nichols* and *Glover*?  What, if

23 any, part of Dr. Souheaver's testimony can come in, given what

24 he said and the law here?

25          MS. JONES:  Well, cutting to the chase, he will not be

1    offering an opinion on malingering or secondary gain, so that

2    will be the distinction between the *Nichols* case and what

3    happens here.  The *Nichols* case and that progeny really involves

4    cases in which they are trying to diagnose or look at the

5    credibility of what the person told them.  The distinction

6    between those cases and what Dr. Souheaver will do here is that

7    the issue, the operative question is, are Danielle's alleged

8    psychological symptoms proximately caused by her father's death?

9    That proximate cause question can't be answered by lay witness

10   testimony; it needs to be answered by expert testimony.

11        The way you answer that question is, psychologically

12   speaking, the gold standard to do that is through MMPI testing,

13   which is what was done here.  So what Dr. Souheaver should be

14   able to testify is that what the MMPI is, that it's normed, that

15   Danielle was given the MMPI, and that the results of the MMPI

16   were invalid.  He cannot diagnose her with anything.  That's it.

17        THE COURT:  Why isn't that last step beyond

18   invalidity -- he testifies, he says, "This is the test," he

19   explains it.  He says, "These are the results."

20        He's asked if the results are valid.  No, based on the

21   literature.  Anything above 100, danger, Will Robinson.  Right?

22   You'll do it much better.  Why isn't that the end?  That is, if

23   he's allowed to go the next step and say, "and I can't provide a

24   diagnosis," isn't that a wink wink, nudge nudge, into this

25   notion of secondary gain or malingering without using those

1   words?

2          MS. JONES:  Well, those are diagnoses and he's not

3   rendering a diagnosis here.  The reason it doesn't go into a

4   wink wink, nudge nudge, is because it's their burden to prove

5   the proximate cause.  The way you do that is through the MMPI

6   testing, and no one can do that.

7          THE COURT:  I'm sorry, but I'm not sure I understood

8   that answer.

9          MS. JONES:  Well, it was probably very poorly given,

10  so let me respond again.

11         THE COURT:  No.  I mean, let me think a moment and try

12  again.

13      We have a test.  We have results that, according to the

14  rules about that test, seem skewed, seem off, odd.  And maybe

15  it's in the explanation of why that's odd that the prejudice

16  begins to creep in.  And, therefore, Doctor can't diagnose.  And

17  the context here is the what's the cause, as you say, of

18  emotional struggles, supposed emotional struggles.  Is there any

19  other possibility than malingering or secondary gain in the sum

20  of all of that?  Has he essentially given an opinion that's

21  disallowed under *Nichols* and *Glover* by saying he can't give an

22  opinion because these test results are so bad, they're so over

23  the top?

24      Are you with me?  That's my question.  And so --

25         MS. JONES:  No, I understand the Court's concern on

1  that.  I think the issue forum is, this is just the scientific

2  way you go about resolving that question, and here we can't

3  scientifically resolve it.

4          THE COURT:  Well, what --

5          MS. JONES:  And there are other explanations.

6          THE COURT:  What are they?

7          MS. JONES:  Well, there could be personality

8  disorders, psychosis.  You know, other types of disorders can

9  explain that.  Somatoform disorders.  All of these can explain,

10  other than malingering and secondary gain.  So just because he

11  testifies that the test was invalid and he can't give a

12  diagnosis does not inevitably lead to the conclusion of

13  malingering or secondary gain.  And, in fact, he specifically

14  states that malingering isn't considered by this, that he's not

15  giving a malingering opinion, and he won't give secondary gain.

16          THE COURT:  This non opinion opinion is troubling.

17  I'm just not sure about it.

18          MS. JONES:  Your Honor, I think it goes to something

19  we've been talking about with some of the other experts, and

20  that is the ability to describe the science without necessarily

21  commenting on credibility or the ultimate question of it, but

22  defining and explaining the scientific process.

23          THE COURT:  Did Dr. Souheaver do a differential

24  diagnosis?

25          MS. JONES:  I'm sorry, your Honor.

1            THE COURT:  Take a moment and confer.

2        (Counsel conferring.)

3            MS. JONES:  Your Honor, what really starts this

4    analysis is that Danielle Brantley has testified that she has

5    depressive symptoms and is suicidal because of her father's

6    death.  That has to be proven by expert testimony.  It's

7    insufficient for her to be able to say that.  So now that starts

8    the analysis of proving or disproving this connection.  That's

9    done through the MMPI.

10           THE COURT:  And I remember we had a fuss about this

11   IME, and plaintiff objected and I ordered it.  So that -- is

12   your argument, Ms. Jones, in that context?  That is, her

13   testimony that I'm suicidal, that's what prompts the test, and

14   the jury at least is entitled to hear the -- about the test?

15           MS. JONES:  Correct.

16           THE COURT:  All right.  Anything else on the defense

17   side of this?

18           MS. JONES:  Let me confer.

19           THE COURT:  Okay.

20       (Counsel conferring.)

21           MR. GALAS:  Not on the UPS side, Judge.

22           MS. JONES:  Going back to this idea of proximate

23   causation, we have to have some way to prove that scientifically

24   there is no -- that she can't prove the connection.  It's her

25   burden of proof, and what we're doing is showing that she can't

1    scientifically prove that connection.  There's no expert

2    testimony on behalf of the plaintiff's side on this issue, so

3    the only testimony will be that scientifically you cannot prove

4    that.

5              THE COURT:  Thank you, Ms. Jones.

6              MS. JONES:  Yes.

7              THE COURT:  Mr. Baker, I'll let you tag if you want

8    to.

9              MR. BAKER:  Simple point.  We're not using

10   Dr. Souheaver to try to prove that she's malingering or lacks

11   credibility.  Our concern is, once she takes the stand and asks

12   this jury to compensate her for suicidal ideation caused by her

13   father's death caused by our client's negligence, we should have

14   a right to say and prove and use the science to explain to the

15   jury she cannot prove that there's any connection between her

16   claim of suicidal ideation and her father's death as she says it

17   was caused through our negligence.  And that's what we're trying

18   to use Souheaver and the MMPI to do.

19       So exactly where the sharp edges of those boundaries are

20   we're not going to know until trial, but, you know, we're hoping

21   to have at least enough latitude that he can explain to the jury

22   these are the steps the psychologist can take objectively and

23   scientifically to determine if that connection exists, and it

24   dead ended in this case because of the way this test was

25   answered.  That's what we're trying to establish with

1    Dr. Souheaver.

2            THE COURT:  I understand the concern and I understand

3    the effort to develop testimony on this.  I am just concerned

4    about, at least if Dr. Souheaver testified consistent with his

5    report, which seems to me to go beyond what you just described.

6            MR. BAKER:  Well, I believe what I'm representing to

7    the Court is, if we can use our expert witness in the way that I

8    just explained, that's all we want to use him for.  I mean, he

9    independently writes his report and we disclose it, but as part

10   of trial strategy, we're not interested in the wink wink, nod

11   nod; we're interested in defending the claim that's being

12   brought against us that Ms. Danielle should be compensated

13   because she's been -- she has this form of damage of being

14   suicidal because of our client's negligence.  That's our

15   interest.

16           THE COURT:  And you understand, I'm sure, the Court's

17   concern that as Dr. Souheaver continues to talk of, well, I

18   couldn't decide and I couldn't diagnose, and there are all these

19   other things that sometimes come in.  Okay.

20       I'd like to hear from the plaintiffs on this.  Who will

21   speak?

22           MS. WALAS:  I will, your Honor.

23           THE COURT:  Ms. Walas.

24           MS. WALAS:  Yes, sir.  I'll start with your question,

25   the Court's question of how do you navigate around *Nichols* and

1   *Glover.*  You can't.

2       Dr. Souheaver does not just say I cannot provide a

3   diagnosis, stop, and nod nod, wink wink.  He says:  I cannot

4   provide an accurate diagnosis for Danielle Brantley since we

5   were unable to purposely -- to rule out purposely

6   overendorsement of symptoms for secondary gain.  That's how far

7   he goes.  He then says it again in a lot of other ways.

8           THE COURT:  That's the non opinion opinion that

9   concerns me.

10          MS. WALAS:  Exactly.  And it's very concerning,

11  because they then would like to say, well, we don't want to say

12  that, and, even so, we can have Dr. Souheaver talk about the

13  science and whatnot.  He also performed an IME on Kimberley

14  Brantley.  She -- he came up with a diagnosis on her.  We

15  have -- he can talk about the MMPI with relation to her.

16      The problem with using the science with respect to Danielle

17  is that -- and we attached this as part of the reply, although

18  it was in the original motion as well.  There are actually nine

19  scales on the MMPI-2.  He reported seven of them.  The two

20  scales that he left out are the scales dealing with how you

21  determine whether somebody's overreporting is -- let me check

22  the language because I don't want to mess this up.  But the FP

23  scale that was left out is particularly helpful in assessing

24  overreporting and can be particularly helpful when a test taker

25  produces a substantially elevated score on FR and the

 1   interpreter needs to determine whether this indicates

 2   overreporting or genuine dysfunction.

 3          THE COURT:  If I can slow you down, Ms. Walas, this

 4   document attached to the reply is big.

 5          MS. WALAS:  Yes, sir.

 6          THE COURT:  75 pages.  Where are you?

 7          MS. WALAS:  Do you want a page number?

 8          THE COURT:  Please.

 9          MS. WALAS:  All right.

10          THE COURT:  I do, only if you want me to follow it.

11          MS. WALAS:  I do.  It's Document 347-1, and -- I was

12   talking about FP, right?  So it would be page 247 of the tiny

13   pages, and in the document itself, page 27, it looks like.

14          THE COURT:  I think I'm with you.

15          MS. WALAS:  Or maybe 24.  That's at 24, yeah.

16          THE COURT:  It's at 246-47 of the underlying document?

17   Those page numbers are clearer.

18          MS. WALAS:  Yes, and then on the next page, there's

19   this handy dandy little chart.

20          THE COURT:  Yes.

21          MS. WALAS:  And that's what I was reading off of.

22          THE COURT:  Okay.

23          MS. WALAS:  So there -- so we know that her F score,

24   according to Dr. Souheaver's report, was 111.  Based on that, it

25   would say -- he says it says there's potential overreporting.

1   You're supposed to go then to look at the FP scale or the FS

2   scale.  And that's how we know that interpretation from the

3   chart previously where it discusses how you interpret the F

4   scale.

5       He doesn't have that in his report.  He said he didn't

6   think it was important in his deposition.  Same with the FS

7   scale, which also is used by the test takers as part of the

8   methodology to determine -- to identify test takers who

9   overreport somatic symptoms.

10      Again, so the science that supposedly supports and weighs

11  into why it's overreporting may be able to be proven by this

12  test.  The methodology he used left out a lot of that, which is

13  a big deal when we're dealing with the secondary part of this,

14  where he goes beyond what the MMPI says with respect to

15  overreporting.  Nothing in here says for secondary gain.

16      When you go to the front of the book, which I'll give you

17  the page number in here, on page 136, it defines overreporting

18  as something which occurs when a test taker reports problems he

19  or she does not actually have or exaggerates the significance of

20  the difficulties he or she does have.

21      Again, Dr. Souheaver goes beyond that in his report.  He

22  goes beyond that in his deposition testimony, talking about

23  she's doing this for secondary gain and for other reasons.  He

24  says so we can't believe what she tells us because it's not

25  credible.

1       So his reliance on the science is just, as they've said in

2   many of the cases, it's just a judgment of credibility under the

3   guise of science.

4       And I get a little bit carried away with this, so if you

5   need me to slow down or want to ask any questions, let me know.

6           THE COURT:  Let me break in.

7           MS. WALAS:  Okay.

8           THE COURT:  All right.  Assume that I granted

9   Brantley's motion in part and limited Dr. Souheaver's testimony

10  along the lines that Mr. Baker and I just discussed; that is,

11  not what Dr. Souheaver wants to say, but what the Court would

12  allow him to say:  I did the test.  I tested both of them.

13  Here's what I found on Mrs. Brantley.  And on Danielle, I

14  couldn't.  Here's what I found.  Here's how the tests work, and

15  that's not adequate for me to come to a conclusion.

16      And then you get up and blister him and say, "But look,"

17  and you walk him through page 136 and page 247 and 246.  Why

18  isn't that the right answer, to limit Dr. Souheaver, get rid of

19  the opinions expressed or implied about secondary gain and

20  malingering, and allow full cross-examination on the omitted

21  other steps of the protocol?

22      It's a compound question.  I'm sorry.

23          MS. WALAS:  No, it's fine.  Because his testing is

24  unreliable in and of itself because he didn't follow the

25  methodology.  They claim he performed a differential diagnosis.

1    He did not.  If he had done so, he would have considered these

2    other test scales as the protocol requires.

3        So stopping him from going -- from saying -- allowing him

4    to say, "I did the tests, these are the test results," and

5    stopping him doesn't cure the problem that exists with his

6    methodology.

7        So we have a two-part problem here.  We have the whole

8    credibility, prejudicial, the problems of how he goes too far in

9    the secondary gain and those *Nichols* issues.  But even if you

10   limited him to that, his score results still are not reliable

11   because he fails to follow the protocol and the interpretation

12   requiring all nine scales to be utilized and he only gives the

13   ones that show overreporting --

14               THE COURT:  I'm sorry.

15               MS. WALAS:  -- without more.

16               THE COURT:  I was too eager.

17       What did Dr. Souheaver testify on deposition when you all

18   went at him on these last two scales and why he felt that they

19   were unnecessary to do?

20               MS. WALAS:  I have to pull up that page.

21       It's on page 100 of his deposition where I know he

22   discusses it, at least in part.

23       He says on 100 to 101:  Yes, I said that wasn't included on

24   my graph, nor was the FS.  Meaning the FP and the FS.  And then

25   he just kind of goes on to say that it's statistically abnormal.

1        THE COURT:  Ms. Walas, let it cook for a minute, and

2    I'm going to go back to your brother Baker and your sister

3    Jones.

4        MS. WALAS:  Okay.

5        THE COURT:  Response on this notion of sort of a

6    *Daubert* reliability point of Dr. Souheaver's failure to look at

7    those last two scales, that that renders even his discussion of

8    the tests and what the results were and the I can't make a

9    diagnosis, that that defect in methodology renders even those

10   things unreliable and unhelpful?

11       MS. JONES:  It goes to cross-examination, your Honor.

12   She can cross-examine on him, but it doesn't go to the tests.

13   In fact, it's not his -- you know, when he's testing, he's

14   applying the standards and experience that he has from the

15   peer-reviewed research from the publishers on the MMPI and is

16   applying those test standards to it.

17       What she's suggesting is, she wants to challenge him on

18   which standards he chose and what other standards he might have

19   used.  That's cross-examination.

20       THE COURT:  All right.  Mr. Baker, anything else?

21       MR. BAKER:  No, thank you.

22       THE COURT:  Ms. Walas?

23       MS. WALAS:  Your Honor, it's not a matter of cross-

24   examination when the test requires consideration of all nine

25   scales and he only considered seven of them.

1          THE COURT:  Where is that requirement?  Which page?

2          MS. WALAS:  It is actually throughout that whole

3    section, but I believe I attached a chart at the back to make it

4    easier.

5          THE COURT:  Yes.  On 247, the chart?

6          MS. WALAS:  There's a full chart.  Page 319 discusses

7    the interpreting.  But let me find it real quick.

8       Your Honor, the discussion of interpreting the MMPI-2 RF

9    scales is Chapter 6 of the book.  It's pages 241 to 292.  And

10   the introduction opening paragraph discusses on how -- basically

11   summarizes the chapter, and then it begins with guidelines for a

12   "cannot say" score and each of the nine validity scales.  And

13   then as you read the whole chapter, it discusses each of the

14   scales and how you interpret them and what their purposes are

15   and why you're supposed to go through them all.  And then if you

16   look at, say, on page 265, there's a sample chart of what this

17   final graph should look like showing all nine of the scales.

18          THE COURT:  Is 265 page 34 of our Doc 347-1?

19          MS. WALAS:  Did you say 54 or 34, your Honor?

20          THE COURT:  34.

21          MS. WALAS:  Yes, sir.  That's one of them.  They're

22   throughout, so we can look at that one.

23          THE COURT:  Got it.  All right.  Counsel, I appreciate

24   your help on this and your thinking of it.

25       As has been made plain by the Court's words, I'm troubled

1    by Dr. Souheaver's opinions.  Brantley's motion to exclude is

2    partly granted and partly denied.  I'm not excluding him

3    completely, but I am going to limit substantially what he can

4    say.  Mr. Baker, it is those things and only those things that

5    you and I discussed.

6              MR. BAKER:  Understood.

7              THE COURT:  And then, Ms. Walas, I expect you to come

8    at him hammer and tongs on the last two aspects of the test and

9    the scaling and why he didn't complete it.  I believe if we stop

10   Dr. Souheaver short of his explicit and implicit testimony about

11   secondary gain and malingering and instead we end at here's the

12   test, here's how it went, these were the scores, I could not

13   make a diagnosis because this appeared to me to be

14   nonresponsive, and then you cross-examine him on what else he

15   could have done and didn't do, that I think addresses the

16   plaintiff's concern on proximate cause as well as the -- I'm

17   sorry, the defendants' concern on proximate cause, as well as

18   the defense [sic] concern about him going too far.

19        I'm not persuaded that there is any sufficient defect in

20   his methodology to exclude what he is -- to exclude more of his

21   work than the Court has already done.  And the exclusion is

22   based on *Nichols* and *Glover* rather than *Daubert*.

23        Okay.  I don't know about y'all, but I think it's time for

24   an afternoon break.

25        Mr. Galas, goodbye?

1          MR. GALAS:  I'll stick around a little longer, Judge.

2          THE COURT:  Okay.  I mean that in the nicest possible

3     way.

4          MR. GALAS:  I know you do.

5          THE COURT:  We'll take 15 minutes.

6     (Recess from 2:33 p.m. until 2:45 p.m.)

7          THE COURT:  Counsel, I forgot something, and that is

8     motion No. 187, the motion to bifurcate.  It's denied as moot

9     because there's no punitive damages left in the case, given my

10    earlier ruling.

11         Okay.  So we all -- just to keep things interesting, I

12    think I'm going to adopt a different procedure on these last

13    motions.  We're getting pretty late in the afternoon, and I

14    think based on the parties' good and comprehensive briefing, on

15    many of them I have a strong inclination, and so I'm just going

16    to rule, and silence will be acceptance subject to all of your

17    previous arguments and preserved on what you've said so far.

18         There are a couple that I think I may want to talk about,

19    and if any of them make someone howl and you just -- you believe

20    I've just stumbled into error on it, then stop me and we'll talk

21    about it.

22         Okay.  So 183 is Optimum and Woodall's omnibus motion in

23    limine.  The first item is Woodall's positive drug test and him

24    being fired from Werner and all of that.  That's a grant.

25    Doesn't have anything to do with what happened here, and the

1    unfair prejudice would outweigh its probative value.

2         Related point, that Woodall is part of a class action

3    against Werner, that's granted as unopposed.

4         Third, Woodall's previous tickets and CDL suspension,

5    that's also granted as unopposed.

6         Fourth, the witness testimony that Woodall didn't seem

7    upset after the accident, that's granted as unopposed.

8         Fifth is the -- Woodall's release from UPS after the

9    accident.  I don't think control is disputed, which was the one

10   basis that the plaintiffs said, no, this needs to come in.  I

11   don't think anybody disputes that UPS or Optimum could have let

12   Woodall go before, and so that's a grant, but with an exception,

13   and that is impeachment.  Impeachment.  I believe that if the --

14   depending upon how Mr. Woodall gets soaked up on how great of a

15   driver he was, that it may be proper then to impeach and say,

16   "Well, but you actually were fired later, weren't you?"  Or you

17   were let go, whatever it is.  But impeachment exception.

18   Otherwise, it's a grant.

19        Next -- and I've lost count.  I think y'all may have

20   numbered these with letters instead of numbers, so I think it's

21   F instead of six or seven.  I apologize for the bad labeling.

22   Optimum's argument that -- or an argument that Optimum should

23   have fired Woodall after the accident.  That's granted as

24   unopposed.

25        G is disparaging comments about trucks or the trucking

1    industry or big trucks.  That's granted as modified.  Consistent

2    with the bounds of honorable argument, no one should be making

3    disparaging remarks about anyone else.  I expect vigorous

4    argument from both sides in the case, but I do not expect

5    disparaging.  So that's granted with this broadening.

6        H, testimony that Optimum should have advised Woodall about

7    the dust storm.  That's unopposed, and so it is granted.  I

8    think that's not inconsistent with what the Court has ruled

9    earlier, that UPS, not Optimum, has -- that there is a potential

10   direct -- it is conceptually possible in law for there to be a

11   direct negligence claim against Optimum -- I'm sorry, against

12   UPS about the monitoring of weather and what it tells its

13   drivers.  But that's not Optimum.  And so H is granted as

14   unopposed.

15       "I," on the police report, is denied without prejudice and

16   some instructions.  The Court's not bound by the Arkansas law on

17   generally excluding police reports.  I believe they're public

18   records kept in the regular and ordinary course of business, and

19   so subject to -- or captured by various exceptions to the

20   hearsay rule.  But they are riddled with hearsay within hearsay,

21   and so we're going to have to be very careful about what, if

22   any, parts of the report come in.

23       I'd ask counsel to give thought to that, what could be

24   redacted to solve those evidentiary problems, if any, and what

25   parts really need to come in.  The witness statements, of

1    course, are out because they are hearsay within no exception.

2    But the trooper's drawing, narrative, probably okay.  There are

3    some sections on there about -- in the standard report form

4    about insurance.  We need to redact those and not let that come

5    into the case, whether there was insurance or what the carrier

6    was.  And there's another section about aggravating factors

7    or -- I've got that wrong, but, Ms. Jones, do you remember the

8    phrase?

9              MS. JONES:  Aggravating -- I think contributing

10   factors.

11             MR. BAKER:  Contributing factors.

12             MS. JONES:  Contributing factors.

13             THE COURT:  Contributing factors.  Okay.  Sorry.

14   Contributing factors.  I think there there is an embedded issue

15   about the trooper's expertise in coming to that conclusion, and

16   that's not been briefed and I don't know enough about this

17   trooper and whether he has had any -- how much experience he has

18   in investigating accidents or any special training in

19   reconstruction.  I'm just going to need the lawyers' help on

20   that.

21             MR. BOBBY MCDANIEL:  May I mention something, your

22   Honor?

23             THE COURT:  Sure.

24             MR. BOBBY MCDANIEL:  It probably won't be coming in,

25   but in his deposition, Mr. Woodall claimed essentially that the

1   trooper didn't give him a citation or that he wasn't found at

2   fault in any way.  If he gets on the stand and seems to imply he

3   was given a clean slate, I think he's opened that door.

4            THE COURT:  Understood, and maybe so.  But that's the

5   kind of issue I'm going to have to let hang fire until we're in

6   the middle of trial and I've heard more than I have.

7        The point on the police report, on "I," is -- it's just

8   denied without prejudice, and we're going to have to go line by

9   line and be careful about it.  Some of it is probably coming in

10  and some of it is probably staying out.

11       J is evidence of financial condition of the companies, and

12  that's granted.  That's not relevant to any issue in the case,

13  especially with punitives out.

14       K is evidence of insurance.  Granted as unopposed.  Again,

15  double-check that police report, because there's a box on there

16  about every driver and whether they had insurance and what the

17  name of the company is.  And the jurors, as y'all know, they can

18  sniff out things like that.  We need to be careful.

19       L, testimony -- probable testimony of witnesses not called.

20  Granted as unopposed.

21       M is expert reports, and it's unopposed except for

22  impeachment, and I think that's exactly right.  It's granted,

23  but you can use -- any party could use an expert's report to

24  impeach what they say on the stand.  And I know, given the many

25  good lawyers that are in the room in front of me, that that

1 would be handled correctly.  Just be careful on what you put up

2 in front of the jury and what might get up there inadvertently.

3 Move on little cat feet as you're using extrinsic documents to

4 impeach, please.

5   N, cumulative testimony by fact witnesses on damages.

6 Denied without prejudice.  This case, counsel, y'all know is a

7 big case, and we're going to take the time that's necessary to

8 try it.  One of the things that the Court will be doing in the

9 next few months is asking counsel to think, given all of these

10 rulings that I'm making today, to think hard about your

11 witnesses and how much time you need with them and then to let

12 me know that so that I can see how much time we need, and then I

13 will decide.  And it is quite likely that I will set some time

14 limits and just give a total amount of time to each side to be

15 divided on the defense side or maybe to each party and say you

16 use your most important -- pick out your most important stuff,

17 but this is the time that you have.

18   I just got through trying a case that Mr. Cox was involved

19 in, and a long time ago when there were a bunch of parties, it

20 was a three-week trial.  And then most of the parties went away

21 either by settlement or summary judgment, and it was a two-week-

22 plus trial.  And I told the parties, I gave them time limits,

23 and we well tried it, the jury got all that they needed, and we

24 did it in seven six-hour trial days, and the jury deliberated

25 for most of an afternoon and then most of the next morning.

1   So we'll figure out what we really need to get the case

2   well tried to the jury.  That will take care of -- those time

3   limits and us managing the clock will take care of cumulative

4   testimony.

5   So on No. 183, Optimum and Woodall's omnibus motion in

6   limine, mostly granted and partly denied, as I just specified.

7   Next is No. 185 by Optimum and Woodall, various things

8   relating to damages testimony, I would say.  It's multi point

9   but not too long, according to my notes.

10  Motion granted on -- about mental anguish testimony by

11  nonbeneficiaries.

12  MR. BOBBY MCDANIEL:  May I be heard on that?

13  THE COURT:  You may.

14  MR. BOBBY MCDANIEL:  Your Honor, mental anguish

15  testimony by nonbeneficiaries is relevant under the loss of life

16  evaluation.  The *McMullin* case decided by Judge Eisele I guess

17  is the seminal case on the issue, and basically it says

18  testimony that shows the deceased enjoyed his life and thought

19  his life had value and was looking forward to life, one way to

20  measure that is people who can describe how his life was in the

21  past:  Did he live a good life?  Did he affect people positively

22  or negatively?  And one way to determine how he enjoyed his life

23  is the effect his life had on other people when he died.  And

24  the fact that, when he died, some of them suffered some mental

25  anguish is some evidence from which a jury could reasonably

1    conclude he must have been a pretty good guy, must have enjoyed

2    his life, he must have meant something as a giving person to

3    those people.

4         It's not going to be long testimony.  I think I've got a

5    whole bunch of people that's going to be less than four hours,

6    three and a half hours.  But the fact that his death affected

7    other people -- and that runs over to the, for example, the size

8    of the funeral.  The fact that his life meant so much to so many

9    other people is evidence that he valued his life because he

10   contributed positively to other people.

11        So I'm really focusing on the mental anguish, but I'm

12   drawing the corollary, because it's not just like the 17-month-

13   old baby in *McMullin* couldn't say anything, but the Court ruled

14   how his little life affected his mom and dad, smiling at them

15   and whatnot.

16        Here, his life affected not just his father and his wife

17   and children, but it affected other people as an indicator that

18   he had a good life and he enjoyed his life, and I think that's

19   relevant, your Honor.

20             THE COURT:  Thank you, Mr. McDaniel, and I'm glad you

21   mentioned the *McMullin* case.  It's -- you know, we're -- my

22   colleagues and I aren't bound by what each of us do, but most of

23   us can't do half as well as Judge Eisele in terms of his

24   thinking and careful consideration of these issues.  I'm glad,

25   too, you went to the size of the funeral.

1      This element of loss of life damages is a vexed one.  It

2  is -- it's just hard to get your hands around.  And Judge Eisele

3  acknowledges that.  That's one of the beautiful things about the

4  *McMullin* opinion is him wrestling with that, trying to figure

5  out exactly what it means.

6      The Brantley family can offer testimony about the value

7  that Mr. Brantley put on his own life, whether that's from

8  family members or friends.  The difficulty with the mental

9  anguish suffered by nonstatutory beneficiaries and, similarly,

10  the size of the funeral kind of evidence is that, in my

11  judgment, it's several steps removed from this core issue of how

12  much Mr. Brantley valued his own life.  And so what I just heard

13  articulated was, a witness wants to say this is how

14  Mr. Brantley's death affected me because this is the kind of

15  person he was.

16      The second part of that is fine:  This is the kind of

17  person he was.  He was active in his community.  He went to

18  Rotary every week and he helped disabled children and taught

19  Sunday school.  That part is fine.  All of those go to how it is

20  Mr. Brantley was valuing his own life.

21      It's the first part, the "this is how his death affected

22  me" that is problematic and that I'm excluding.  And so I hope

23  that line is clear, and I will do my best to steer by it at

24  trial.

25      I know you don't agree with me, Mr. McDaniel, but I need --

1    I want to be sure that you understand my ruling.

2            MR. BOBBY MCDANIEL:  I do understand your ruling on

3    mental anguish by nonbeneficiaries.  I understand.

4            THE COURT:  Very good.  Same thing on the funeral

5    size.  Our steps of inference that would be required are

6    several, and I think there's the risk of prejudice and

7    confusion.

8        On Mr. Flannery taking measurements, Mr. McDaniel, I'm

9    inclined to exclude that as well.  As I understand it, he's not

10   an expert, and he just -- he went out, and he's not a witness,

11   and he just went out and did some measuring because you asked

12   him to, so why -- and he wasn't disclosed until after the expert

13   deadline, so your -- please howl or try to convince me

14   otherwise, but I just -- it's just troubling to me.

15           MR. BOBBY MCDANIEL:  Okay.  I'll be very quick.

16   First, the defense says it's improper for a plaintiff lawyer to

17   ask a witness to do anything.  I've never seen that.  Maybe I

18   missed it.  But to ask him to, "Hey, would you measure the

19   shoulder," him taking a tape measure and measuring the shoulder

20   is not expert.  That's lay capability.  And he's not offering

21   expert testimony.  "I took a tape measure and I measured the

22   width of the shoulder and it was 8 feet."

23           THE COURT:  Did Flannery -- sorry to interrupt, but

24   did he see the accident or was he involved in the -- is he any

25   way in --

1       MR. BOBBY MCDANIEL:  No.  He was one of the two

2  witnesses that were down in the field where the dust was so

3  thick they couldn't see it, where normally they could easily.

4       THE COURT:  Got it.

5       MR. BOBBY MCDANIEL:  So basically what I'm saying,

6  your Honor, it's not an expert to take a tape measure and read a

7  tape measure.  Anybody can do that.  Likewise, for him to do it

8  at our request doesn't invalidate it.  It might make him subject

9  to being cross-examined subject to being biased, but it doesn't

10  change what he did.

11       Likewise, for him to testify that I've seen tractor-

12  trailer trucks on the shoulder and I've pulled a farm tractor

13  that's wider than that off the shoulder, that's not something

14  we've asked him to do, but based on his past experience.  But I

15  don't think it's a problem, but I'll defer to your Honor,

16  obviously.

17       THE COURT:  Thank you.  As I said, my mind is mixed on

18  this and I have concerns about it.  I'd like to hear perhaps

19  from one of the defense counsel.  Will this pass muster as sort

20  of lay opinion testimony of -- I don't know.

21       MR. COX:  Absolutely not, your Honor.

22       THE COURT:  Why not, Mr. Cox?

23       MR. COX:  Number one, this is not a witness.  This is

24  not someone who was actively involved in the accident.  This is,

25  frankly, couching expert testimony in a friend of counsel, and

1   that's just inappropriate.  We couldn't go out and tell somebody

2   to go out and start taking pictures out there, and then we're

3   going to have you testify after the expert deadline about what

4   all these pictures showed and how weather has affected you in

5   the past.  It's completely improper, your Honor.  Just

6   completely.

7              THE COURT:  Thank you, Mr. Cox.

8       Mr. McDaniel, your objection -- or your arguments are

9   preserved, but this is Mr. Flannery's work out there, his

10  measurements and the pulling off of the vehicle, the width of

11  the shoulder, it's just too expert-like for me to allow, given

12  the nondisclosure.  And so granted on the last piece of 185.  So

13  that's a grant across the board on all of the damages issues

14  addressed.

15      191 is a motion in limine about the TDI manual and the

16  relationship between TDI and Optimum.  It's partly granted and

17  partly denied.  As indicated by my previous rulings, the manual,

18  I believe, is admissible as part of this industry standards.

19  Further, it's saved from the hearsay rule by being a document

20  prepared in the normal course of business by TDI.

21      The relationship between TDI and Optimum I do not think

22  will confuse the jury, and we can have two minutes of evidence

23  on that, of how TDI is an umbrella entity and markets Optimum's

24  services.  So subject to my earlier ruling about the uses and

25  non uses of the TDI handbook, this -- it will be admitted.

1          I do want a caution.  That is, as the -- as has been

2     pointed out, these internal rules and policies don't create

3     legal duties, and we need to be careful about that with all of

4     the witnesses.

5          So 191 is denied with instructions.

6          Next is 200.  This is Optimum and Woodall's motion about

7     one-touch calls and texts.  The plaintiff has agreed that she is

8     not going to call Breck McDaniel, the cell phone expert, to

9     testify.  These calls were about 18 minutes, as I understand it,

10    before the accident.  And so this motion is granted.  We just

11    don't need to get into calls and texts.

12             MR. BRETT MCDANIEL:  Judge, may I briefly be heard on

13    that?

14             THE COURT:  Sure.

15             MR. BRETT MCDANIEL:  Judge, there is one additional

16    component of that, and that is as it relates to credibility of

17    the witness.  Mr. Woodall has testified, and I understand

18    there's some dispute about the context, but within his

19    deposition, he said, "I never called anyone while I was

20    driving."  And when you combine the timing of his cell phone

21    with his testimony about where and when he was driving, it shows

22    that that's blatantly incorrect.  And Mr. Woodall has made other

23    statements that we certainly assert are inconsistent, for

24    example, as it relates to his speed, as it relates to about what

25    he saw, what he was doing, things like that that we think have a

1    great deal of relevance as it relates to his testimony about his

2    operation of the tractor-trailer and his credibility.

3            THE COURT:  I understand, Mr. McDaniel, that you need

4    to and will, I'm sure, make a hard run at his credibility.  What

5    concerns me on that narrow sliver of it about the cell phone is

6    the unfair prejudice that might arise.  It seems to me that that

7    outweighs the probative value of the impeachment, on

8    impeachment.  I'm happy to revisit that once we get in the

9    middle of trial and we -- and I hear his testimony, but the

10   potential inflammation of the jury here, putting the man on his

11   cell phone or maybe he was on his cell phone as he has to decide

12   about the dust cloud and the weather when we know that for 18

13   minutes before the accident happened, he was not on that phone

14   apart from what he said, my instinct is that that call goes to

15   the defendants.  It's just too -- fraught with too much

16   difficulty.

17           MR. BRETT MCDANIEL:  Thank you, Judge.

18           THE COURT:  Sure.  But, as I said, when we get him on

19   the stand, if you want to make another run at me out of the

20   presence of the jury, then do so.

21       So 200 is a grant.

22       204 is corporate wealth, UPS's corporate wealth, and that's

23   granted as unopposed.

24       207, the "wall of dust" photograph.  We're finally here.  I

25   want to hear argument from each side, but my inclination is that

1    the picture is admissible.  I understand that it's not of the

2    accident scene at the moment of the accident, but it seems to me

3    that it's close enough to be admissible under the cases, with

4    the caution that everybody needs to be clear from the

5    plaintiff's side about not representing that this is a picture

6    of the scene and from the defense side with doing everything

7    that needs to be done to -- in terms of the timing of the

8    photograph and where it was taken, situating it in the context

9    of the whole, and I'm even open to an appropriate limiting

10   instruction to the jury.  But I believe that it is admissible as

11   long as handled carefully.

12       Which of the defendants would like to be heard on that?

13       MR. COX:  I'll be heard on that, your Honor, and I

14   understand your Honor's ruling, and I'll try to limit my

15   comments within that context.

16       Our position, frankly, is, your Honor, that there is no way

17   to give a limiting instruction that won't be totally harmful in

18   this case because the plaintiffs are going to jump up and down

19   with every witness and talk about, "This is the wall of dust."

20   And the implication clearly is, and this is what Mr. Woodall

21   saw.  And that, your Honor, is the problem with that, is that it

22   improperly misleads the jury that this photograph is what

23   Mr. Woodall saw as he was driving through the dust storm when,

24   in fact, the proof is to the contrary to that, that it's clear

25   that it was further back, that it was not at the time of the

1   accident, and all of those other issues that your Honor talked

2   about that would cause some consternation.  And it's just our

3   position, your Honor, that when you take that and put it with

4   the prejudicial value and the harm and the misleading of the

5   jury, that it should be excluded, your Honor.

6           THE COURT:  I certainly understand the arguments, and

7   they were well briefed in the papers.  Your record is safe, but

8   it's overruled.  And I'm not going to let the plaintiffs jump up

9   and say, "This is what he saw," and if that's the premise of a

10  question, I expect an objection that it assumes facts not in

11  evidence.  And if you don't object, I may object on my own, and

12  then I'll sustain my own objection.

13          MR. COX:  I know your Honor will win the objection.

14          THE COURT:  My direction and instruction to

15  plaintiff's counsel is, of course this photograph helps you and

16  you're entitled to use it, but do so carefully.  Don't overegg

17  the pudding, and beware of representing, either explicitly

18  saying or implying that the picture captures exactly the moment

19  right before the accident.  It needs to be given its proper

20  context.

21      So 207 is denied, with instructions to be careful and

22  clear.

23      How does the trooper say his last name?  Dail?  Dial?

24          MR. BOBBY MCDANIEL:  Dail, like D-a-l-e.

25          THE COURT:  And Mr. McDaniel, is he the one that came

1    up with the "wall of dust" phrase?

2            MR. BOBBY MCDANIEL:  Yes, sir.  During questioning,

3    when he showed it to us for the first time, he described it as a

4    wall of dust, and that's why he took the picture.  And then

5    that's the same picture that Mr. Mitchell, who was following

6    UPS, said that's what it looked like as he drove into it, so --

7            THE COURT:  Got it.  Well, I'm not going to exclude

8    the photograph and I'm not going to exclude this phrase of "wall

9    of dust."  It's from the trooper's mouth, and I think it's part

10   of what comes in and the jury needs to weigh.  They can agree or

11   disagree with that based on all of the evidence.

12       Okay.  That's 207.  As I said, denied with instructions.

13       Next is 209.  This has to do with defense counsel's

14   practice.  That's unopposed and it's granted.

15       Next is 213, which is an omnibus motion by UPS.  So we've

16   got several pieces, and they're numbered one, two, et cetera.

17   So I'll just go through them.

18       One is the experts' CVs, reports, resumes, all of that.

19   That's granted as unopposed, with our exception, caveat on

20   impeachment that I mentioned before.

21       Two, disparaging comments about tractor-trailers, trucking

22   industry, and so forth.  Granted as modified, as I ruled before.

23   Nobody is supposed to disparage anybody else's client beyond the

24   bounds of fair argument, of course, and I'll police that as we

25   go along.

1      Three is granted as unopposed.  That's about religious

2  references.

3      Four is granted as unopposed about defense counsel's

4  resources, and everybody agrees that on experts y'all can talk

5  about how much the people were paid.  That's fine.  That's fair

6  game for cross.  But nothing about the firms or the company's

7  resources.

8      Five is testimony about the weight and size of the tractor-

9  trailer.  That's denied.  That's a fact, and the jury will be

10  wondering about it, and whoever knows about it can testify on

11  how much the tractor weighed and the load of pipe that was

12  being -- that was on the flatbed and whatever -- all of those

13  facts about this vehicle.

14      Six is Woodall's prior tickets and accidents.  That's

15  granted as unopposed.

16          MR. GALAS:  Judge, can I stop you there?

17          THE COURT:  Yes.

18          MR. GALAS:  So there was an issue that we briefed in

19  our footnote on our reply brief on this.  So the numbering in

20  the body of the motion doesn't match up with the lettering that

21  we briefed, actually briefed --

22          THE COURT:  Oh, okay.

23          MR. GALAS:  -- in the brief.  So that's something that

24  we informed plaintiff's counsel about, and they filed a couple

25  of supplemental oppositions, so it was all addressed.  But I can

1   tell by your Honor's reference now to No. 5, which we omitted

2   from the brief and removed, that your Honor is using the

3   numbering system of the motion rather than the brief.  So

4   probably -- well, it's definitely more accurate to use the

5   brief, which is Document 214.

6           MR. COX:  What we did, your Honor, unfortunately, we

7   used numbering in the motion and lettering in the briefs.  So we

8   have A, B, C, D, and they don't correspond, unfortunately.

9           MR. GALAS:  Everything tracked up until No. 5, which

10  we withdrew.  We ultimately pulled any argument about the size

11  and weight of the truck.  So we removed that from the body of

12  our memorandum.

13          THE COURT:  Well, my list that I'm working from uses

14  the numerals, and I'd like to keep doing that, but I'll -- or

15  let's do this:  I'll abandon any effort to number or letter the

16  issues, and I'll just deal with them in substance, as I have it

17  here in my notes.  How about that?

18          MR. GALAS:  Sure.  And I guess I can call out, Judge,

19  if we've withdrawn that piece of the omnibus, too, so that your

20  Honor doesn't have to rule on something that we've ultimately

21  withdrawn.

22          THE COURT:  Okay.  And so I'm not sure where our

23  interlude began.  Was it on -- were you saying that you withdrew

24  on weight and size of vehicle?

25          MR. GALAS:  Yes.

1          MR. COX:  Correct, your Honor.

2          THE COURT:  Okay.

3          MR. GALAS:  But then we added -- so this is -- so your

4    Honor's numbering scheme -- and I really feel bad about the way

5    this went.  Like I said, it just --

6          MR. BROOKS:  It's the way they count in Philadelphia.

7          MR. COX:  It may just help if your Honor will continue

8    the way you're doing it and tell us what you're ruling on, and

9    we can go back through, and the parties are smart enough to

10   figure that out.

11         MR. GALAS:  There are probably only two that your

12   Honor may not cover that we can go back and say these two were

13   also added.

14         THE COURT:  And ask me at the end if I don't cover

15   them.

16         MR. COX:  Yes, your Honor.

17         MR. GALAS:  Very good.

18         THE COURT:  Okay.  Thank you.  So prior tickets and

19   accidents, that's granted as unopposed.

20      The next issue is Woodall's prior drug use, and that's

21   granted as well for the reasons that I stated earlier on another

22   motion.

23      The next item that I have on my list is this

24   characterization of Woodall as a high-risk driver.

25         MR. GALAS:  We removed that and made that a separate

1    motion I think your Honor dealt with already in the Meyerhoff

2    motion.

3            THE COURT:  And I was going to rule consistently with

4    my earlier position, that that was -- what did I rule?  I'm

5    sorry.  I'm getting tired, counsel.

6            MR. GALAS:  Yes, your Honor.  You struck

7    Mr. Meyerhoff's references to the high-risk driver.

8            THE COURT:  Yes.  So it is a grant on this.

9        The next issue was, at least as I have it written here, is

10   trying to eliminate arguments that UPS had a duty to monitor and

11   advise Woodall about the weather.  That is decided by my initial

12   ruling on summary judgment that as a matter of ordinary care,

13   the company, UPS, may well have had a duty.  I just need to see

14   what the facts are.  I'm certainly not going to prohibit

15   argument about that.

16       I do -- I am, consistent with my earlier rulings, though,

17   not going to allow the experts to testify what the law is on

18   that.

19       Next issue is presentation of defense expert testimony

20   during Brantley's case in chief.  It's unopposed, and that's

21   granted.

22       Next, golden rule or "send a message" arguments, unopposed.

23   Granted.

24       Next issue is this preventable point.  I've already ruled

25   on that.  It is out.  So that's a grant.  And I'm sure y'all

1  will ask me to put in the jury instructions the regulations that

2  define preventable, and we'll let the jury -- you can argue it.

3       Next is on weather conditions that were hazardous, or

4  defendants' violation of 49 C.F.R. 392.14.

5            MR. GALAS:  We pulled 13 and 14, Judge.  We moved them

6  to the Mr. Meyerhoff motion.

7            THE COURT:  Okay.  So I will -- those are denied as

8  moot then on those two points.

9       Next is material not timely disclosed.  Again, that's a

10  grant.  It may be premature, but I would ask each side to avoid

11  or at least minimize surprises, keep them to the surprises that

12  we have to have.

13       Next is cumulative and duplicative witness testimony.

14            MR. COX:  Your Honor, can we go back just briefly to

15  the untimely disclosed?  Because I don't -- I don't want anybody

16  to be sandbagged by that.  Part of our argument included these

17  revised, or new reports is I think what the plaintiffs even call

18  them of Grant, and we actually -- and just so your Honor can

19  rule on that, we contend that that was a new report and that

20  report was untimely, and we moved to exclude that report.

21            THE COURT:  I didn't remember that being covered here,

22  but my rulings on Grant stay the same as whatever they were when

23  we covered them earlier in the hearings, and I'm not intending

24  to modify them here.

25            MR. COX:  Thank you, your Honor.

1          THE COURT:  And, as I said, on cumulative or

2    duplicative matters, we'll handle that by way of scheduling.

3          There's no dispute that folks should not argue or there

4    shouldn't be any testimony about the length of time between the

5    accident and the trial.  That's unopposed and that's granted.

6          The next issue is expert opinion from lay witnesses.  This

7    is denied without prejudice because I just need context and

8    texture to be able to rule on this, and I'm -- I know that I

9    have done some of it, but I'm -- I'm concerned about ruling in

10   the abstract.

11         Next is testimony relating to Woodall's training by UPS or

12   others.

13         MR. GALAS:  We just pulled that one and actually made

14   it one of the ones that we'll have to go back to.

15         THE COURT:  Okay.  I don't understand that last thing

16   that you just said.  You've either pulled it or you haven't.

17         MR. GALAS:  We pulled that one as written there as

18   your Honor is looking at it, and then as Mr. Cox stated, there

19   are going to be two that are not listed in those numbers but

20   which were briefed, and that's going to be one of the two.

21         THE COURT:  Okay.

22         MR. GALAS:  I think it will make sense when your Honor

23   sees it, is what I'm trying to say.

24         THE COURT:  I'll put a sticky note on it and I'll try

25   to understand.

1     Next is the Jackson reconstruction animations.  I have not

2   seen them, of course, but I'm inclined to grant the motion and

3   exclude the animations, for several reasons:  One, my general

4   grumpiness about demonstratives; and, two, I don't know, I can't

5   get a good enough sense from the paper on whether it is

6   substantially similar to the accident as it happened.

7        So, Mr. McDaniel, do you want to be heard on this?

8           MR. BOBBY MCDANIEL:  If I may, your Honor.

9           THE COURT:  Sure.

10          MR. BOBBY MCDANIEL:  The animation is showing the --

11   to assist the jury in understanding the reconstruction expert's

12   testimony.  It shows the location of the vehicles, from which

13   there is no dispute, to my knowledge, and then it shows the

14   movement of the tractor-trailer truck at various locations that

15   are identified in the photographs and that you can see where the

16   tractor-trailer was.  This shows in the animation where the

17   tractor-trailer truck was in reference to certain landmarks and

18   where he -- it showed his perception-reaction time and then his

19   slowing to a stop if he had been going 37 miles an hour or less.

20   And it shows that, you know, his movement into the vehicle at 50

21   miles an hour, then reducing to 40.  There's a lot of distances

22   and times and seconds that are involved, and this would just

23   help the jury understand the dynamics of how this wreck occurred

24   and the movement of the vehicles.

25        We are not representing nor will we represent that it

1    represents the visibility of anybody.  It just is a showing of

2    the vehicles on an -- overlaid on an aerial photograph of the

3    scene, and I think it would clearly be helpful to the jury.

4         If nothing else, I would like for your Honor to look at it

5    before you rule, if you would consider doing that.

6              THE COURT:  Am I remembering right, Mr. McDaniel, that

7    the trooper's report of the accident has a series of drawings

8    that shows the sequence of collisions?  There's three, four,

9    five of them?

10             MR. BOBBY MCDANIEL:  Yes, your Honor.  The

11   illustration by the police officer shows immediately prior to

12   impact and then impact.  What it doesn't show is where the truck

13   was and the time sequencing of where the truck was in reference

14   to visible landmarks so the jury can get an understanding of,

15   well, when the truck was at this point and he was going so many

16   miles an hour and he was so many seconds from impact.  When he's

17   at this point, he's going so many miles an hour, so many seconds

18   from impact.  And that will help the jury understand the time,

19   distance, and speed relationships of the truck at various

20   points.

21             THE COURT:  I understand that it would help them.  I'm

22   just not sure it's evidence, and when we call it a

23   demonstrative, I don't know that the jury can make that

24   distinction.

25        I'd like a few words from Mr. Galas or Mr. Cox on this.

1          MR. COX:  Your Honor, clearly this is improper.  On

2     the one hand we're going to show them a "wall of dust"

3     photograph and say this is what everybody saw out there, and on

4     the other hand, we're going to show them a demonstrative piece

5     of evidence that Mr. McDaniel even said that the reason they're

6     showing it is to talk about visibility and landmarks and what

7     people saw when it doesn't show any of that.  That's clearly

8     misleading to the jury, your Honor, and that's the prejudicial

9     value of saying this is demonstrative.  It's evidence.  And

10    that's what a jury is going to say.  They're going to say, "Wow,

11    I can't believe the driver saw this."  Or then we get into,

12    well, all of these trying to reconcile what the proof is.  And

13    the whole -- this whole case is about visibility.  And then when

14    you show them something that does not take into account

15    visibility at all, it is misleading and it is improper, your

16    Honor.

17          THE COURT:  Mr. McDaniel?

18          MR. BOBBY MCDANIEL:  Your Honor, a jury is capable of

19    making that distinction.  Animations like this are done, are

20    used all the time.  And, again, I would just ask your Honor to

21    look at it.  It's less than 60 seconds.  And I can have Amanda

22    go get a copy, if you would like.  But I think in fairness to

23    the plaintiff, it would be so much helpful for the jury to be

24    able to understand the dynamics of the movements of the vehicles

25    in relationship of the vehicles with time, speed, and distance

1    by visible landmarks which they will be able to see.  We're not

2    going to represent it's the visibility of any driver.

3            THE COURT:  Understood.  I would like to see it,

4    Mr. McDaniel, but we don't have to do it right now.

5            MR. BOBBY MCDANIEL:  All right.

6            THE COURT:  What I'm going to do is grant this motion

7    but subject to the Court's reconsideration after I view this

8    animation and think about it some more.  So it's a soft grant,

9    not a hard grant.

10       The next item that I have is about arguments that UPS has

11   failed to take responsibility for the accident by defending

12   itself.  According to my notes, Mr. Galas, and this was the one

13   thing I saw, this was briefed but wasn't in the motion.

14           MR. GALAS:  That's one of the two, Judge.

15           THE COURT:  Okay.

16           MR. GALAS:  I think it's subsection N in the brief.

17           THE COURT:  All right.  And so that's -- I believe

18   this is a grant.  We don't need to get into -- this is a

19   variation on the time and how long it's taken.  And for her

20   part, my notes are that Brantley has said that she doesn't

21   intend to argue that UPS has failed to accept responsibility by

22   taking the case to trial.  I think I can safely say that

23   everybody in this room loves trials.  We want trials.  And we're

24   not -- we shouldn't be in the business of criticizing folks who

25   want to take their case to trial.

1    All right.  So I've hit one of the new points, Mr. Galas.

2  What was the other one?

3            MR. GALAS:  The other one, Judge, is subsection E in

4  the brief, ECF No. 214, page 4, and I think this one is pretty

5  well addressed by your Honor's prior rulings, but it's to bar

6  evidence critical of UPS Freight's engagement, retention, or

7  training of Mr. Woodall, effectively following up on the motion

8  for summary judgment that your Honor had granted earlier.

9            THE COURT:  I think that's clearly controlled by my

10 earlier ruling and that that's a grant.

11           MR. GALAS:  Thank you, Judge.

12           THE COURT:  Okay.  But what about the one with my --

13           MR. GALAS:  That was it.

14           THE COURT:  That was it.  That's old 19.

15           MR. COX:  That's it, your Honor.

16           MR. GALAS:  Yes.

17           THE COURT:  Okay.  Well, as E instead of 19, it's

18 granted.

19           MR. GALAS:  Thank you, Judge.

20           THE COURT:  Okay.  How are we doing?  Everybody

21 holding up?  Raise your hand if you need a break.

22    You need a break?  Okay.  We'll take 15 minutes, counsel.

23    Mr. Galas, you need to go.

24    (Recess from 3:39 p.m. until 3:49 p.m.)

25           THE COURT:  All right.  Counsel, let me look through

1    my stack of notes here.  I think we're almost done.

2         Mr. Weeks, cheer up.

3              MR. WEEKS:  Okay.

4              THE COURT:  Okay.  Next is UPS's motion on the

5    "reptile theory."  Motion is denied.  I expect all counsel to,

6    as I've said a couple of times earlier in the hearing, to stay

7    within the bounds of good, honorable advocacy that doesn't

8    inflame the jury or appeal to passion or prejudice.  I

9    understand that -- I understand UPS's concern about this, but I

10   do not share it at this point and I will police the issues as

11   they arise along the way.

12        This motion actually goes beyond the "reptile theory" to

13   this notion about professional driver, and I wanted to speak

14   about that.  I hinted at this earlier.  I don't think -- with

15   respect, I do not believe that a truck driver is a professional

16   within the meaning of that term.  He is certainly skilled, but

17   that's not what a professional is.  Truck driving is not a -- is

18   not a true profession.  Now, I know the language is changing and

19   we speak of profession interchangeably with job now, but I do

20   not consider it to be so.  I am concerned about the notion that

21   he -- he, Mr. Woodall -- had a higher standard of care than

22   other drivers on the road.  He did not.  It's the same standard

23   of care.

24        It is true that truck drivers have greater skills and they

25   have particular skills.  Ms. Walas, I think you and I talked

1    about this on another point.  But I think to the extent we can

2    minimize references to professional driver, the better, and if

3    we drift and there is the express statement or the implication

4    of -- that there's a higher standard of care on truck drivers,

5    then I will intervene.

6        So, long story short on four, it's denied as to the

7    "reptile theory," but granted in terms of arguments that there's

8    a higher standard of care here, given the CDL license.

9        Number 217, motion to preclude evidence of Woodall's post-

10   accident release.  Granted.  I just don't think that it's

11   relevant, for the reasons that I said earlier on ruling on a

12   similar issue.

13       MR. BROOKS:  Will your reservation regarding

14   impeachment if Mr. Woodall strays far enough apply here as well?

15       THE COURT:  Same reservation, and thank you,

16   Mr. Brooks, for reminding me.  So it's granted with a caveat,

17   and that is, if UPS and Optimum sing Woodall's praises too

18   loudly, then this may become permissible impeachment, that he

19   lost his job a few months later.  Thank you, Mr. Brooks, for

20   reminding me.

21       Number 6, hypothetical questions to lay jurors [sic], it's

22   a grant.  I agree with the defendants on this and the authority

23   cited that one of the essential differences between lay

24   witnesses and expert witnesses is responding to hypotheticals,

25   and it's just best not to begin going down that road.

1          MR. BROOKS:  My only concern, if I may, with that

2    motion was taking -- was context.  It is hard to know of -- it

3    is hard to know out of the context of full examination whether

4    one question is hypothetical or it's within the context of the

5    rest of the examination if it fits with the facts.  I probably

6    won't be examining any witnesses, that's almost guaranteed, but

7    my -- the concept that a hypothetical question to a lay witness

8    I think is out of bounds is understandable to everybody; the

9    question is whether it's a hypothetical question.  And that is

10   why I would ask the Court to consider reserving the ruling and

11   having a contemporaneous objection because the hypothetical may

12   be in the eye of the beholder at the time.  I went over some of

13   the questions during some of the depositions, and I wasn't so

14   sure they were hypothetical in the brief.

15          THE COURT:  Can you get that microphone any closer,

16   Mr. Brooks?  Or one of your colleagues?

17          MR. BROOKS:  Yes.  And I get hoarse as the day goes

18   on.

19          THE COURT:  Me too.  No, but; that is, my ruling

20   stands.  No hypothetical questions.  But I'll consider at

21   sidebar if there is a specific question that someone wants to

22   ask that you think might offend this ruling or that the lawyer

23   thinks might offend this ruling or has -- is hypothetical-ish.

24   But I'm having trouble, I'm having trouble thinking of one, of

25   questions that would not offend that rule.

1    Assume these facts.  What if this had been different?  What

2  if he had -- those --

3          MR. BROOKS:  Agreed.

4          THE COURT:  Okay.

5          MR. BROOKS:  That's clearly a hypothetical.

6          THE COURT:  Yes.

7          MR. BROOKS:  But those were not the types of questions

8  that were set forth in the brief.  They were things like, "Would

9  you agree with me that if you couldn't --" something like,

10  "Would you agree with me that if you can't stop within the

11  distance between you and the car in front of you, that you're

12  driving in a dangerous manner?"  That to me is not a

13  hypothetical question.  That's a question within the facts of

14  the case.

15          THE COURT:  I disagree.

16          MR. BROOKS:  I stand corrected.

17          THE COURT:  Well, at least for purposes of this case.

18  Right?

19          MR. BROOKS:  Yes.

20          THE COURT:  Yeah.  I disagree.

21    All right.  Counsel, I believe that's it.  I believe that

22  may be the last motion.

23          MR. GALAS:  I believe you're right, Judge.

24          THE COURT:  All right.

25          MR. COX:  We believe you're always right, your Honor.

1    THE COURT:  Thank you, Mr. Cox.  Nice try.  So noted,
2  for the record.
3    MR. COX:  It's getting late, your Honor.
4    THE COURT:  It is getting late.
5    All right.  Here's what let's do --
6    MR. BRETT MCDANIEL:  Judge?
7    THE COURT:  Yes.
8    MR. BRETT MCDANIEL:  I'm sorry.  I hate to interrupt,
9  but I believe 251 may not have been taken up, and there was a
10  housekeeping matter on John Does that you wanted to mention.
11    THE COURT:  Thank you on the John Does.  They're
12  dismissed without prejudice because the time for amending
13  pleadings has passed.
14    251.  Let me find it on my -- on one of my lists here.
15    MR. BRETT MCDANIEL:  Judge, that was the motion for
16  intervention that you already ruled on.  My apologies.  I'm
17  sorry.
18    THE COURT:  That's okay.  I appreciate the briefing on
19  that and the little dustup about it, and I hope -- well, counsel
20  understood, or I hope I made it understandable of why to let
21  them in tentatively.  I just think that's the practical way,
22  best way to handle that.
23    Counsel, thank you.  I know we're all tired and worn out.
24    MR. BOBBY MCDANIEL:  I've got the animation on a jump
25  drive.  May I approach the bench?

1          THE COURT:  Oh, good.  Of course.

2      Any objection from the defense?

3          MR. COX:  No, your Honor.

4          THE COURT:  Good.  Thank you.

5          MR. BOBBY MCDANIEL:  I'll take Amanda's word for it

6  that it works.

7          THE COURT:  Okay.  And if not, I'll file a text order

8  and say give me another copy.  But thank you for getting that to

9  me.

10          MR. BOBBY MCDANIEL:  Thank you.

11          THE COURT:  Sure.  As I was saying, counsel, I know

12  we're all tired, but I appreciate everybody's help.  I'll enter

13  this order here in the next couple of days, and I know that the

14  transcript will be available in due course if anyone wants to

15  order it.  My sense is that the parties need to let all of this

16  sink in and think about the shape of the case based on my

17  rulings, and then I believe it would be useful for us to have

18  another conference, another hearing, I'm thinking in late July

19  or early August at a mutually convenient date.  Maybe -- let's

20  call it the pretrial part one.  I'm not sure that everything

21  will be in shape to handle all the pretrial issues, but my sense

22  is that we -- that it would be time well spent if we got back

23  together.  Not everybody has to come.  All of you are welcome,

24  but at least one lawyer for each party.

25      I'll think about that, and if I'm confirmed in that view,

1    then Ms. Black will reach out about convenient dates.

2           MR. BOBBY MCDANIEL:  May I ask a question about your

3    contemplation of time?  I haven't tried a case with you where

4    that's involved.

5           THE COURT:  Yes.

6           MR. BOBBY MCDANIEL:  Do you allot a certain amount of

7    time per side whether you use it in direct or whether you use it

8    in cross, so that if you're allotted so much time, a long cross-

9    examination doesn't eat up my time, it eats up the defense time?

10   Is that right?

11          THE COURT:  Yes.

12          MR. BOBBY MCDANIEL:  Okay.

13          THE COURT:  My version of the chess clock, to the

14   extent I've used one, is to say, hypothetically, Mr. Brooks --

15          MR. BROOKS:  Purely hypothetical.

16          THE COURT:  Purely hypothetically, that Brantley has

17   20 hours to present her case, either by direct or cross-

18   examination of any witness, and if I thought that the party

19   really needed reining in, I would say including objections and

20   opening and closing, that it's 20 total.  The objections point

21   is sometimes needed to create the proper incentives, because we

22   don't need to be drifting over here to sidebar all the time.

23       I don't think I'm going to need to put those incentives in

24   place in this case, but -- but that's the way I have worked it,

25   Mr. McDaniel, of just here's your total time.  You use it

1    however you think best on direct, cross, whatever.  And I'm not

2    saying that for sure and for certain that I will.  If y'all come

3    back to me and say that we've got four weeks worth of trial or

4    three weeks worth of trial, then I probably will because I think

5    we could probably try the case well in less than that.

6         Those are the kind of things after we've all had time to

7    think and sleep and food and rest, voir dire, instructional

8    issues, those are the kind of things that I think it would be

9    useful for getting back together on.

10        Okay.  Mr. Cox, anything on behalf of UPS?

11            MR. COX:  I just have one issue that I want to bring

12   up with the Court now, and I hope the Court will indulge me.  I

13   was mentioning to Mr. McDaniel earlier that I'm taking a

14   vacation with my family the end of July through the first of

15   August.  It usually doesn't matter, but the last time, I was on

16   the phone the whole time, and my wife said, "If you're going to

17   do this, stay at home."  And I would rather not hear that again,

18   so I would just like if we could reschedule it sometime outside

19   of that time, your Honor.

20            THE COURT:  I'm for families and vacations, Mr. Cox.

21   If you will let Ms. Black know your dates of when you're going

22   to be gone, we will not have the conference during that time.

23            MR. COX:  Thank you, your Honor.

24            THE COURT:  Certainly.  And thank you for raising it.

25   I know that some lawyers are shy about that, but I'm glad that

1    you are not and have asked.  And you know that if you hadn't

2    said anything, I would have put that conference right in the

3    middle of it.

4            MR. COX:  I know, your Honor.

5            THE COURT:  And then we'd both be in trouble.

6            MR. COX:  Yes.

7            THE COURT:  All right.  Mr. Baker or Ms. Jones?

8            MR. BAKER:  Nothing further.  I mean, we've got a

9    scheduling issue in July also.  We start a three-week trial on

10   July 8, so our July is wiped.

11           THE COURT:  You're shot, aren't you?

12           MR. BAKER:  We're vacationing in Marion County this

13   summer.

14           THE COURT:  Wow.  Well, this is helpful.  So we're

15   looking at early August, at the earliest, after Mr. Cox gets

16   back, and that's fine.  Maybe we can't have two hearings.  Maybe

17   we just have another all-day marathon session, because we'll --

18   y'all's pretrial filings will be due in early August, and given

19   what has been said, it might -- we might just need to wait until

20   after those come in.

21       Mr. Brooks, what have you got to do in July or August?

22           MR. BROOKS:  I haven't been told yet.  I'm gone next

23   week.

24           THE COURT:  Okay.  All right.

25           MR. BROOKS:  Baseball season is over, and I suspect

1    I'll be taking a redhead fly fishing.

2          THE COURT:  Excellent.  I'm glad to hear it.

3      All right.  Counsel, thank you for your patience with me.

4    We're in recess.

5          (Proceedings adjourned at 4:05 p.m.)

6                    REPORTER'S CERTIFICATE

7      I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

8

9                                Date:  July 5, 2019
     /s/ Christa R. Jacimore, RDR, CRR, CCR
10       United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25